Name **Chris Epperson**
Street Address **1642 W Robinson**
City and County **Fresno**
State and Zip Code **CA 93705**
Telephone Number **559 225 6432**

**FILED**

**DEC 05 2023**

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

**Chris Jonathan Epperson**

_____

_____

*(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

-against-

**United States Congress**
**The republican Party**
**House of Representatives**

*(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

**Complaint for a Civil Case**

Case No. **1:23cv1687 NODJ**
**SKO**
*(to be filled in by the Clerk's Office)*

Jury Trial:    ☑ Yes    ☐ No
*(check one)*

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

Name                        Chris Jonathan Epperson
Street Address              1642 W Robinson
City and County             Fresno
State and Zip Code          California  93705
Telephone Number            559 225 6432

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known).  Attach additional pages if needed.

Defendant No. 1

Name                        Bill Clinton
Job or Title
(if known)
Street Address
City and County
State and Zip Code
Telephone Number

Defendant No. 2

Name                        Barrack Obama
Job or Title
(if known)
Street Address
City and County
State and Zip Code
Telephone Number

2

Defendant No. 3

    Name                               Donald Trumph

    Job or Title
    (if known)

    Street Address

    City and County

    State and Zip Code

    Telephone Number


Defendant No. 4

    Name                               George Bush

    Job or Title
    (if known)

    Street Address

    City and County

    State and Zip Code

    Telephone Number


## II.    Basis for Jurisdiction

Federal Courts are courts of limited jurisdiction (limited power).  Generally, only two
types of cases can be heard in Federal Court: cases involving a federal question and cases
involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising
under the United States Constitution or federal laws or treaties is a federal question case.
Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another
state or nation and the amount at stake is more than $75,000 is a diversity of citizenship
case.  In a diversity of citizenship case, no defendant may be a citizen of the same state as
any plaintiff.

What is the basis for Federal Court jurisdiction? *(check all that apply)*

    ☑ Federal question                    ☑ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

**A.    If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

18 U.S.C 793, 18 USC 794, 18 USC 797, 18 USC 798, 42 U.S.C 2274, 42 USC 2275 42 USC 2277, or 50 USC 783

**B.    If the Basis for Jurisdiction Is Diversity of Citizenship**

1.    The Plaintiff(s)

   a.    If the plaintiff is an individual

   The plaintiff, *(name)* Joseph Biden , is a citizen of the State of *(name)* Montana .

   b.    If the plaintiff is a corporation

   The plaintiff, *(name)* _____, is incorporated under the laws of the State of *(name)* _____, and has its principal place of business in the State of *(name)* _____.

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

   a.    If the defendant is an individual

   The defendant, *(name)* Chris Epperson is a citizen of the State of *(name)* California . *Or is a citizen of (foreign nation)* U.S .

b.   If the defendant is a corporation

The defendant, *(name)* _____, is
incorporated under the laws of the State of *(name)*
_____, and has its principal place of
business in the State of *(name)* _____. *Or is*
incorporated under the laws of *(foreign nation)*
_____, and has its principal place of
business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an
additional page providing the same information for each additional
defendant.)*

3.   The Amount in Controversy

The amount in controversy—the amount the plaintiff claims the defendant
owes or the amount at stake—is more than $75,000, not counting interest
and costs of court, because *(explain)*:

500,000,000 Fiscal year
The Production Act of 1950
Executive Order 10958

## III.   Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as
briefly as possible the facts showing that each plaintiff is entitled to the damages or other
relief sought.  State how each defendant was involved and what each defendant did that
caused the plaintiff harm or violated the plaintiff's rights, including the dates and places
of that involvement or conduct.  If more than one claim is asserted, number each claim
and write a short and plain statement of each claim in a separate paragraph.  Attach
additional pages if needed.

September 24 1980, gun powder-plot of the
Constitution laws had been violated by
the action of the State legislature in 1961,
November 30, 1963 Executive Order 11130

## IV.  Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

The 25th Section of the judiciary Act of 1789, brought under the Constitution of the United States where prohibition is against State laws impairing the obligation of contracts

## V.  Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 12/5 , 2023

Signature of Plaintiff _____

Printed Name of Plaintiff  Chris J. Epperson

6

Prose Chris Jonathan Epperson

Enactment of this Act clause III Article III Section 2

Rev.St. SS 177.1978.1979,5510


14 Stat. 27,ch.31

16 Stat. 140,ch 114


Title II

Title III


(1)Sec.102.(a)(1)


(2)Sec.103.(b)(2)


(3)Sec.104.(c)(1)


(4)Sec.105.(a)(2)

— Treason —

Whoever enters into any agreement, combination, or conspiracy to defraud the United States, or any department or agency thereof, by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim, shall be fined under this title or imprisoned not more than ten years, or both.

(June 25, 1948, ch. 645, 62 Stat. 698; Pub. L. 103–322, title XXXIII, § 330016(1)(L), Sept. 13, 1994, 108 Stat. 2147.)

Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

(June 25, 1948, ch. 645, 62 Stat. 698; Pub. L. 99–562, § 7, Oct. 27, 1986, 100 Stat. 3169.)

Whoever makes, alleges, or presents any claim or application for indemnity for the loss of any registered or insured letter, parcel, package, or other article or matter, or the contents thereof, knowing such claim or application to be false, fictitious, or fraudulent; or

Whoever for the purpose of obtaining or aiding to obtain the payment or approval of any such claim or application, makes or uses any false statement, certificate, affidavit, or deposition; or

Whoever knowingly and willfully misrepresents, or misstates, or, for the purpose aforesaid, knowingly and willfully conceals any material fact or circumstance in respect of any such claim or application for indemnity—

Shall be fined under this title or imprisoned not more than one year, or both.

Where the amount of such claim or application for indemnity is less than $1,000 only a fine shall be imposed.

(June 25, 1948, ch. 645, 62 Stat. 698; Pub. L. 103–322, title XXXIII, § 330016(1)(G), Sept. 13, 1994, 108 Stat. 2147; Pub. L. 104–294, title VI, § 606(a), Oct. 11, 1996, 110 Stat. 3511.)

Whoever knowingly and willfully makes, or presents any false, fictitious or fraudulent affidavit, declaration, certificate, voucher, endorsement, or paper or writing purporting to be such, concerning any claim for pension or

payment thereof, or pertaining to any other matter within the jurisdiction of the Secretary of Veterans Affairs, or knowingly or willfully makes or presents any paper required as a voucher in drawing a pension, which paper bears a date subsequent to that upon which it was actually signed or acknowledged by the pensioner; or

Whoever knowingly and falsely certifies that the declarant, affiant, or witness named in such declaration, affidavit, voucher, endorsement, or other paper or writing personally appeared before him and was sworn thereto, or acknowledged the execution thereof—

Shall be fined under this title or imprisoned not more than five years, or both.

(June 25, 1948, ch. 645, 62 Stat. 699; Pub. L. 102–54, §13(f)(1), June 13, 1991, 105 Stat. 275; Pub. L. 103–322, title XXXIII, §330016(1)(L), Sept. 13, 1994, 108 Stat. 2147.)

Whoever, being a claim agent, attorney, or other person engaged in the collection of claims for pay, pension, or other allowances for any soldier, sailor, or marine, or for any commissioned officer of the military or naval forces, or for any person who may have been a soldier, sailor, marine, or officer of the regular or volunteer forces of the United States, or for his dependents or beneficiaries, retains, without the consent of the owner or owners thereof, or refuses to deliver or account for the same upon demand duly made by the owner or owners thereof, or by their agent or attorney, the discharge papers of any such soldier, sailor, or marine, or commissioned officer, which may have been placed in his hands for the purpose of collecting said claims, shall be fined under this title or imprisoned not more than six months, or both; and shall be debarred from prosecuting any such claim in any department or agency of the United States.

(June 25, 1948, ch. 645, 62 Stat. 699; Pub. L. 103–322, title XXXIII, §330016(1)(G), Sept. 13, 1994, 108 Stat. 2147.)

Whoever, being a judge, clerk, or deputy clerk of any court of the United States or a Territory or Possession thereof, or a United States district attorney, assistant attorney, marshal, deputy marshal, magistrate judge, or other person holding any office or employment, or position of trust or profit under the United States, directly or indirectly purchases at less than the full face value thereof, any claim against the United States for the fee, mileage, or expenses of any witness, juror, deputy marshal, or any other officer of such court, shall be fined under this title.

# — Seditious Conspiracy —

(June 25, 1948, ch. 645, 62 Stat. 699; Pub. L. 90–578, title IV,
§ 402(b)(2), Oct. 17, 1968, 82 Stat. 1118; Pub. L. 101–650, title III,
§ 321, Dec. 1, 1990, 104 Stat. 5117; Pub. L. 103–322, title XXXIII,
§ 330016(1)(H), Sept. 13, 1994, 108 Stat. 2147.)

**50 U.S.C.**
United States Code, 2014 Edition
Title 50 - WAR AND NATIONAL DEFENSE
TITLE 50 - APPENDIX-WAR AND NATIONAL DEFENSE
DEFENSE PRODUCTION ACT OF 1950
From the U.S. Government Publishing Office, www.gpo.gov

# DEFENSE PRODUCTION ACT OF 1950

## ACT SEPT. 8, 1950, CH. 932, 64 STAT. 798

Sec.
2061.     Short title.
2062.     Declaration of policy.

### TITLE I—PRIORITIES AND ALLOCATIONS

2071.     Priority in contracts and orders.
2072.     Hoarding of designated scarce materials.
2073.     Penalties.
2074.     Limitation on actions without Congressional authorization.
2075.     Presidential power to ration gasoline among classes of end-users unaffected.
2076.     Designation of energy as a strategic and critical material.
2077.     Strengthening domestic capability.
2078.     Modernization of small business suppliers.

### TITLE II—AUTHORITY TO REQUISITION AND CONDEMN

2081.     Repealed.

### TITLE III—EXPANSION OF PRODUCTIVE CAPACITY AND SUPPLY

2091.     Presidential authorization for the national defense.
2092.     Loans to private business enterprises.
2093.     Other presidential action authorized.
2094.     Defense Production Act Fund.
2095 to 2099a. Omitted.

### TITLE IV—PRICE AND WAGE STABILIZATION

2101 to 2112. Repealed.

### TITLE V—SETTLEMENT OF LABOR DISPUTES

2121 to 2123. Repealed.

### TITLE VI—CONTROL OF REAL ESTATE CREDIT

2131 to 2137. Repealed.

TITLE VII—GENERAL PROVISIONS

2151.     Small business.
2152.     Definitions.
2153.     Civilian personnel.
2154.     Regulations and orders.
2155.     Investigations; records; reports; subpoenas; right to counsel.
2156.     Jurisdiction of courts; injunctions; venue; process; effect of termination of provisions.
2157.     Liability for compliance with invalid regulations; discrimination against orders or contracts affected by priorities or allocations.
2158.     Voluntary agreements and plans of action for preparedness programs and expansion of production capacity and supply.
2158a.    Repealed.
2159.     Public participation in rulemaking.
2160.     Employment of personnel; appointment policies; nucleus executive reserve; use of confidential information by employees; printing and distribution of reports.
2161.     Authorization of appropriations.
2162.     Repealed.
2163.     Territorial application of Act.
2163a.    Repealed.
2164.     Separability.
2165.     Repealed.
2166.     Termination of Act.
2167 to 2169. Repealed.
2170.     Authority to review certain mergers, acquisitions, and takeovers.
2170a.    Prohibition on purchase of United States defense contractors by entities controlled by foreign governments.
2170b.    Reports on foreign industrial espionage.
2171.     Defense Production Act Committee.
2172.     Annual report on impact of offsets.

**AMENDMENTS**

**1952**—Act June 30, 1952, ch. 530, title I, §116(a), 66 Stat. 305, struck out "CONSUMER AND" in title VI heading.

**1951**—Act July 31, 1951, ch. 275, title I, §107, 65 Stat. 138, amended heading of title II by inserting "AND CONDEMN".

**TERMINATION DATE**

For termination of certain provisions of act Sept. 8, 1950, see section 2166 of this Appendix.

## §2061. Short title

This Act [sections 2061 to 2170, 2171, and 2172 of this Appendix], divided into titles, may be cited as "the Defense Production Act of 1950".

(Sept. 8, 1950, ch. 932, §1, 64 Stat. 798.)

**SHORT TITLE OF 2009 AMENDMENT**

Pub. L. 111–67, §1(a), Sept. 30, 2009, 123 Stat. 2006, provided that: "This Act [enacting sections 2091 to 2094 and 2172 of this Appendix, amending sections 2062, 2071, 2076, 2077, 2152, 2158, 2160, 2161, 2166, and 2171 of this Appendix, omitting sections 2095, 2096, 2096a, 2097 to 2099, and 2099a of this Appendix, repealing sections 2081, 2101, 2102, 2104 to 2112, 2121 to 2123, and 2132 to 2137 of this Appendix, and amending provisions set out as notes under section 2172 of this Appendix and section 1113 of Title 31, Money and Finance] may be cited as the 'Defense Production Act Reauthorization of 2009'."

**SHORT TITLE OF 2008 AMENDMENT**

Pub. L. 110–36, §1, Oct. 8, 2008, 122 Stat. 4026, provided that: "This Act [amending sections 2160 and 2166 of this Appendix] may be cited as the 'Defense Production Act Extension and Reauthorization of 2008'."

### SHORT TITLE OF 2007 AMENDMENT

Pub. L. 110–49, §1(a), July 26, 2007, 121 Stat. 246, provided that: "This Act [amending section 2170 of this Appendix, section 5315 of Title 5, Government Organization and Employees, and section 301 of Title 31, Money and Finance, and enacting provisions set out as notes under section 2170 of this Appendix and section 5315 of Title 5] may be cited as the 'Foreign Investment and National Security Act of 2007'."

### SHORT TITLE OF 2003 AMENDMENT

Pub. L. 108–195, §1, Dec. 19, 2003, 117 Stat. 2892, provided that: "This Act [amending sections 2152, 2155, 2161, and 2166 of this Appendix and enacting provisions set out as notes under sections 2062, 2093, and 2099 of this Appendix] may be cited as the 'Defense Production Act Reauthorization of 2003'."

### SHORT TITLE OF 2001 AMENDMENT

Pub. L. 107–47, §1, Oct. 5, 2001, 115 Stat. 260, provided that: "This Act [amending sections 2091, 2093, 2094, 2099, 2161, and 2166 of this Appendix] may be cited as the 'Defense Production Act Amendments of 2001'."

### SHORT TITLE OF 1995 AMENDMENT

Pub. L. 104–64, §1, Dec. 18, 1995, 109 Stat. 689, provided that: "This Act [amending sections 2161 and 2166 of this Appendix and enacting provisions set out as a note under section 2062 of this Appendix] may be cited as the 'Defense Production Act Amendments of 1995'."

### SHORT TITLE OF 1992 AMENDMENT

Pub. L. 102–558, §1(a), Oct. 28, 1992, 106 Stat. 4198, provided that: "This Act [enacting sections 2074, 2077, 2078, 2099a, and 2171 of this Appendix, amending sections 2062, 2091 to 2094, 2097, 2099, 2151 to 2155, 2159 to 2161, 2166, and 2170 of this Appendix, sections 1815, 1817, 1818, 1820, 1834, 1834a, and 3104 of Title 12, Banks and Banking, and section 1143 of Title 30, Mineral Lands and Mining, repealing sections 2162, 2165, 2167, and 2169 of this Appendix, enacting provisions set out as notes under sections 2062, 2099, and 2159 of this Appendix and sections 1815, 1817, 1834, 1834a, and 3104 of Title 12, and repealing provisions set out as notes under sections 1817, 1834, and 1834a of Title 12] may be cited as the 'Defense Production Act Amendments of 1992'."

### SHORT TITLE OF 1991 AMENDMENT

Pub. L. 102–99, §1, Aug. 17, 1991, 105 Stat. 487, provided that: "This Act [amending sections 2071, 2158, 2161, and 2166 of this Appendix, repealing section 2158a of this Appendix, and enacting provisions set out as a note under section 2071 of this Appendix] may be cited as the 'Defense Production Act Extension and Amendments of 1991'."

### SHORT TITLE OF 1986 AMENDMENT

Pub. L. 99–441, §1, Oct. 3, 1986, 100 Stat. 1117, provided that: "This Act [amending sections 2099, 2161, and 2166 of this Appendix and provisions set out as a note under section 5314 of Title 5, Government Organization and Employees] may be cited as the 'Defense Production Act Amendments of 1986'."

### SHORT TITLE OF 1984 AMENDMENT

Pub. L. 98–265, §1, Apr. 17, 1984, 98 Stat. 149, provided that: "This Act [enacting section 2099 of this Appendix and amending sections 2091, 2092, 2093, 2161, and 2166 of this Appendix] may be cited as the 'Defense Production Act Amendments of 1984'."

### SHORT TITLE OF 1980 AMENDMENT

Pub. L. 96–294, title I, part A (§§101–107), §101, June 30, 1980, 94 Stat. 617, provided that: "This part [enacting sections 2075, 2076, and 2095 to 2098 of this Appendix, amending sections 2062, 2091 to 2093, 2151, 2161, and 2166 of this Appendix, and enacting a provision set out as a note under section 2062 of this Appendix] may be cited as the 'Defense Production Act Amendments of 1980'."

### SHORT TITLE OF 1977 AMENDMENT

Pub. L. 95–37, §1, June 1, 1977, 91 Stat. 178, provided: "That this Act [amending section 2166 of this Appendix] may be cited as the 'Defense Production Act Extension Amendments of 1977'."

SHORT TITLE OF 1975 AMENDMENT

Pub. L. 94–152, §1, Dec. 16, 1975, 89 Stat. 810, provided: "That this Act [enacting section 2158a of this Appendix, amending sections 2158, 2160, 2162, 2166, 2168, and 2169 of this Appendix, and enacting provisions set out as notes under section 2158 of this Appendix] may be cited as the 'Defense Production Act Amendments of 1975'."

### SHORT TITLE OF 1974 AMENDMENT

Pub. L. 93–426, §1, Sept. 30, 1974, 88 Stat. 1166, provided: "That this Act [enacting section 2169 of this Appendix and amending sections 2094, 2161, and 2166 of this Appendix] may be cited as the 'Defense Production Act Amendments of 1974'."

### SHORT TITLE OF 1955 AMENDMENT

Act Aug. 9, 1955, ch. 655, §1, 69 Stat. 580, provided: "That this Act [amending sections 2062, 2093, 2151, 2158, 2160, 2162, and 2166 of this Appendix and enacting provisions set out as notes under section 2062 of this Appendix] may be cited as the 'Defense Production Act Amendments of 1955'."

### SHORT TITLE OF 1953 AMENDMENT

Act June 30, 1953, ch. 171, §1, 67 Stat. 129, provided: "That this Act [amending sections 2062, 2071, 2091, 2093, 2151, 2152, 2155, 2163a, and 2166 of this Appendix] may be cited as the 'Defense Production Act Amendments of 1953'."

### SHORT TITLE OF 1952 AMENDMENT

Act June 30, 1952, ch. 530, §1, 66 Stat. 296, provided: "That this Act [enacting sections 1894a, 2111, 2112, and 2137 of this Appendix and section 43a of Title 41, Public Contracts, and amending sections 1884, 1894, 1894a, 2071, 2074, 2092, 2102, 2103, 2107, 2108, 2123, 2155, 2157, 2158, 2162, 2163a, and 2166 of this Appendix and sections 44 and 45 of Title 41] may be cited as the 'Defense Production Act Amendments of 1952'."

### SHORT TITLE OF 1951 AMENDMENT

Act July 31, 1951, ch. 275, §1, 65 Stat. 131, provided: "That this Act [amending sections 1884, 1892 to 1896, 1898, 1899, 2071, 2072, 2074, 2081, 2093, 2094, 2102, 2103, 2105, 2109, 2122, 2123, 2131, 2133, 2135, 2151, 2153 to 2156, 2160, and 2163a to 2166 of this Appendix, repealing section 694f of former Title 38, Pensions, Bonuses, and Veterans' Relief, and enacting provisions set out as a note under section 1907 of this Appendix] may be cited as the 'Defense Production Act Amendments of 1951'."

### DELEGATION OF FUNCTIONS

Functions of President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to production, conservation, use, control, distribution, and allocation of energy, delegated to Secretary of Energy, see section 4 of Ex. Ord. No. 11790, eff. June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15, Commerce and Trade.

For delegation of certain authority of President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix] relating to national defense resource preparedness and statement of related policy, see Ex. Ord. No. 13603, Mar. 16, 2012, 77 F.R. 16651, set out as a note under section 2153 of this Appendix.

## §2062. Declaration of policy

### (a) Findings

Congress finds that—

(1) the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services for the national defense and to prepare for and respond to military conflicts, natural or man-caused disasters, or acts of terrorism within the United States;

(2) to ensure the vitality of the domestic industrial base, actions are needed—

(A) to promote industrial resources preparedness in the event of domestic or foreign threats to the security of the United States;

(B) to support continuing improvements in industrial efficiency and responsiveness;

(C) to provide for the protection and restoration of domestic critical infrastructure operations under emergency conditions; and

(D) to respond to actions taken outside of the United States that could result in reduced supplies of strategic and critical materials, including energy, necessary for national defense and the general economic well-being of the United States;

(3) in order to provide for the national security, the national defense preparedness effort of the United States Government requires—

    (A) preparedness programs to respond to both domestic emergencies and international threats to national defense;

    (B) measures to improve the domestic industrial base for national defense;

    (C) the development of domestic productive capacity to meet—

        (i) essential national defense needs that can result from emergency conditions; and

        (ii) unique technological requirements; and

    (D) the diversion of certain materials and facilities from ordinary use to national defense purposes, when national defense needs cannot otherwise be satisfied in a timely fashion;

(4) to meet the requirements referred to in this subsection, this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] provides the President with an array of authorities to shape national defense preparedness programs and to take appropriate steps to maintain and enhance the domestic industrial base;

(5) in order to ensure national defense preparedness, it is necessary and appropriate to assure the availability of domestic energy supplies for national defense needs;

(6) to further assure the adequate maintenance of the domestic industrial base, to the maximum extent possible, domestic energy supplies should be augmented through reliance on renewable energy sources (including solar, geothermal, wind, and biomass sources), more efficient energy storage and distribution technologies, and energy conservation measures;

(7) much of the industrial capacity that is relied upon by the United States Government for military production and other national defense purposes is deeply and directly influenced by—

    (A) the overall competitiveness of the industrial economy of the United States; and

    (B) the ability of industries in the United States, in general, to produce internationally competitive products and operate profitably while maintaining adequate research and development to preserve competitiveness with respect to military and civilian production; and

(8) the inability of industries in the United States, especially smaller subcontractors and suppliers, to provide vital parts and components and other materials would impair the ability to sustain the Armed Forces of the United States in combat for longer than a short period.

## (b) Statement of policy

It is the policy of the United States that—

(1) to ensure the adequacy of productive capacity and supply, Federal departments and agencies that are responsible for national defense acquisition should continuously assess the capability of the domestic industrial base to satisfy production requirements under both peacetime and emergency conditions, specifically evaluating the availability of adequate production sources, including subcontractors and suppliers, materials, skilled labor, and professional and technical personnel;

(2) every effort should be made to foster cooperation between the defense and commercial sectors for research and development and for acquisition of materials, components, and equipment;

(3) plans and programs to carry out the purposes of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] should be undertaken with due consideration for promoting efficiency and competition;

(4) in providing United States Government financial assistance under this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] to correct a domestic industrial base shortfall, the

President should give consideration to the creation or maintenance of production sources that will remain economically viable after such assistance has ended;

(5) authorities under this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] should be used to reduce the vulnerability of the United States to terrorist attacks, and to minimize the damage and assist in the recovery from terrorist attacks that occur in the United States;

(6) in order to ensure productive capacity in the event of an attack on the United States, the United States Government should encourage the geographic dispersal of industrial facilities in the United States to discourage the concentration of such productive facilities within limited geographic areas that are vulnerable to attack by an enemy of the United States;

(7) to ensure that essential national defense requirements are met, consideration should be given to stockpiling strategic materials, to the extent that such stockpiling is economical and feasible; and

(8) in the construction of any industrial facility owned by the United States Government, in the rendition of any financial assistance by the United States Government for the construction, expansion, or improvement of any industrial facility, and in the production of goods and services, under this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] or any other provision of law, each department and agency of the United States Government should apply, under the coordination of the Federal Emergency Management Agency, when practicable and consistent with existing law and the desirability for maintaining a sound economy, the principle of geographic dispersal of such facilities in the interest of national defense.

(Sept. 8, 1950, ch. 932, §2, 64 Stat. 798; June 30, 1953, ch. 171, §2, 67 Stat. 129; Aug. 9, 1955, ch. 655, §2, 69 Stat. 580; June 29, 1956, ch. 474, §4, 70 Stat. 408; Pub. L. 96–294, title I, §102, June 30, 1980, 94 Stat. 617; Pub. L. 102–558, title I, §101, Oct. 28, 1992, 106 Stat. 4199; Pub. L. 111–67, §3(a), Sept. 30, 2009, 123 Stat. 2007.)

### AMENDMENTS

**2009**—Pub. L. 111–67 amended section generally, substituting provisions relating to findings and statement of policy with respect to the domestic industrial base for former findings and statement of policy concerning development of national security industrial and technology base.

**1992**—Pub. L. 102–558 amended section generally, substituting provisions relating to findings and statement of policy, for provisions stating that mobilization effort continued to require diversion of materials and facilities from civilian to military use, and to require development of preparedness programs and expansion of productive capacity and supply, in order to reduce time required for full mobilization in case of attack on the United States or to respond to actions occurring outside the United States resulting in termination or reduction of availability of strategic materials, including energy, and provisions stating policy of Congress was to encourage geographical dispersal of industrial facilities, and requiring executive branch departments and agencies to apply principle of geographical dispersal in construction of such facilities.

**1980**—Pub. L. 96–294 inserted provisions relating to preparedness respecting termination or reduction in availability of strategic and critical materials, including energy, and domestic energy supplies for national defense needs.

**1956**—Act June 29, 1956, inserted paragraph relating to encouragement of the geographical dispersal of the industrial facilities of the United States.

**1955**—Act Aug. 9, 1955, provided that mobilization effort requires development of preparedness programs and expansion of productive capacity and supply in order to reduce time required for full mobilization.

**1953**—Act June 30, 1953, amended section generally to make it conform to the more limited scope of sections 2061 et seq. of this Appendix.

### EFFECTIVE DATE OF 1992 AMENDMENT

Pub. L. 102–558, title III, §304, Oct. 28, 1992, 106 Stat. 4226, provided that: "This Act [enacting sections 2074, 2077, 2078, 2099a, and 2171 of this Appendix, amending sections 2062, 2091 to 2094, 2097, 2099, 2151 to 2155, 2159 to 2161, 2166, and 2170 of this Appendix, sections 1815, 1817, 1818, 1820, 1834, 1834a, and 3104 of Title 12, Banks and Banking, and section 1143 of Title 30, Mineral Lands and Mining, repealing sections 2162, 2165, 2167, and 2169 of this Appendix, enacting provisions set out as notes under sections 2062, 2099, and 2159 of this Appendix and sections 1815, 1817, 1834, 1834a, and 3104 of Title 12, and repealing provisions set out as notes under sections 1817, 1834, and 1834a of Title 12] and the amendments

made by this Act shall be deemed to have become effective on March 1, 1992, except as otherwise specifically provided in this Act."

**EFFECTIVE DATE OF 1980 AMENDMENT**

Pub. L. 96–294, title I, §107, June 30, 1980, 94 Stat. 633, provided that: "The amendments made by this part [enacting sections 2075, 2076, and 2095 to 2098 of this Appendix, amending sections 2062, 2091 to 2093, 2151, 2161, and 2166 of this Appendix, and enacting a provision set out as a note under section 2061 of this Appendix] shall take effect on the date of the enactment of this part [June 30, 1980]."

**EFFECTIVE DATE OF 1955 AMENDMENT**

Act Aug. 9, 1955, ch. 655, §11, 69 Stat. 583, provided that: "The provisions of this Act [amending sections 2062, 2093, 2151, 2158, 2160, 2162, and 2166 of this Appendix and enacting provisions set out as a note under this section] shall take effect as of the close of July 31, 1955."

**TERMINATION DATE**

For termination of certain provisions of act Sept. 8, 1950, see section 2166 of this Appendix.

**REPORT ON CONTRACTING WITH MINORITY- AND WOMEN-OWNED BUSINESSES**

Pub. L. 108–195, §6, Dec. 19, 2003, 117 Stat. 2893, directed the Secretary of Defense to prepare and submit to Congress a report on the extent to which contracts entered into during the fiscal year ending before the end of the 1-year period beginning Dec. 19, 2003, under the Defense Production Act of 1950, section 2061 et seq. of this Appendix, had been contracts with minority- and women-owned businesses.

**REPORTS TO CONGRESS**

Pub. L. 104–64, §4, Dec. 18, 1995, 109 Stat. 689, directed the President to prepare and transmit to Congress an interim report, not later than Jan. 31, 1997, and a final report, not later than Sept. 30, 1997, on proposed legislative modernization of the authorities contained in the Defense Production Act of 1950, section 2061 et seq. of this Appendix.

**EVALUATION OF DOMESTIC DEFENSE INDUSTRIAL BASE POLICY**

Pub. L. 102–558, title II, §203, Oct. 28, 1992, 106 Stat. 4220, established Congressional Commission on the Evaluation of the Defense Industrial Base Policy which was to submit, not later than Mar. 1, 1995, a final report to Congress outlining criteria for maintaining strength of domestic industrial base for purposes of supporting national security strategy of United States, taking into consideration, with respect to each Federal agency and department with any responsibility for maintaining strength of domestic defense industrial base, adequacy of statutory framework, budgets, policies, and programs of such agency or department in maintaining domestic defense industrial base, and whether such elements were being effectively implemented and coordinated within such agency or department, as well as degree to which similar activities in commercial sector were being integrated and implemented by such agency or department, and further provided for membership of Commission, as well as staff, powers, interim reports, appropriations, and termination of Commission 60 days after submission of final report.

# TITLE I—PRIORITIES AND ALLOCATIONS

## §2071. Priority in contracts and orders

### (a) Allocation of materials, services, and facilities

The President is hereby authorized (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance, and (2) to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense.

**(b) Critical and strategic materials**

The powers granted in this section shall not be used to control the general distribution of any material in the civilian market unless the President finds (1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship.

**(c) Domestic energy; materials, equipment, and services**

(1) Notwithstanding any other provision of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix], the President may, by rule or order, require the allocation of, or the priority performance under contracts or orders (other than contracts of employment) relating to, materials, equipment, and services in order to maximize domestic energy supplies if he makes the findings required by paragraph (3) of this subsection.

(2) The authority granted by this subsection may not be used to require priority performance of contracts or orders, or to control the distribution of any supplies of materials, services, and facilities in the marketplace, unless the President finds that—

(A) such materials, services, and facilities are scarce, critical, and essential—

(i) to maintain or expand exploration, production, refining, transportation;

(ii) to conserve energy supplies; or

(iii) to construct or maintain energy facilities; and

(B) maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the authority specified in paragraph (1) of this subsection.

(3) During any period when the authority conferred by this subsection is being exercised, the President shall take such action as may be appropriate to assure that such authority is being exercised in a manner which assures the coordinated administration of such authority with any priorities or allocations established under subsection (a) of this section and in effect during the same period.

**(d) Rules; consultation among agency heads**

The head of each Federal agency to which the President delegates authority under this section shall

(1) issue, and annually review and update whenever appropriate, final rules, in accordance with section 553 of title 5, United States Code, that establish standards and procedures by which the priorities and allocations authority under this section is used to promote the national defense, under both emergency and nonemergency conditions; and

(2) as appropriate and to the extent practicable, consult with the heads of other Federal agencies to develop a consistent and unified Federal priorities and allocations system.

(Sept. 8, 1950, ch. 932, title I, §101, 64 Stat. 799; July 31, 1951, ch. 275, title I, §101(a), 65 Stat. 131; June 30, 1952, ch. 530, title I, §§101, 102, 66 Stat. 296, 297; June 30, 1953, ch. 171, §3, 67 Stat. 129; Pub. L. 94–163, title I, §104(a), Dec. 22, 1975, 89 Stat. 878; Pub. L. 102–99, §6, Aug. 17, 1991, 105 Stat. 490; Pub. L. 111–67, §4, Sept. 30, 2009, 123 Stat. 2009; Pub. L. 113–172, §3, Sept. 26, 2014, 128 Stat. 1897.)

AMENDMENTS

**2014**—Subsec. (d)(1). Pub. L. 113–172 substituted "issue, and annually review and update whenever appropriate, final rules" for "not later than 270 days after the date of enactment of the Defense Production Act Reauthorization of 2009, issue final rules".

**2009**—Subsec. (d). Pub. L. 111–67 added subsec. (d).

**1991**—Subsec. (a)(2). Pub. L. 102–99, §6(1), substituted "materials, services, and facilities" for "materials and facilities".

Subsec. (c)(1). Pub. L. 102–99, §6(2), substituted "materials, equipment, and services" for "supplies of materials and equipment".

Subsec. (c)(2) to (4). Pub. L. 102–99, §6(3), (4), added par. (2), redesignated par. (4) as (3), and struck out former pars. (2) and (3) which read as follows:

"(2) The President shall report to the Congress within sixty days after the date of enactment of this subsection on the manner in which the authority contained in paragraph (1) will be administered. This report shall include the manner in which allocations will be made, the procedure for requests and appeals, the criteria for determining priorities as between competing requests, and the office or agency which will administer such authorities.

"(3) The authority granted in this subsection may not be used to require priority performance of contracts or orders, or to control the distribution of any supplies of materials and equipment in the marketplace, unless the President finds that—

"(A) such supplies are scarce, critical, and essential to maintain or further (i) exploration, production, refining, transportation, or (ii) the conservation of energy supplies, or (iii) for the construction and maintenance of energy facilities; and

"(B) maintenance or furtherance of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the authority specified in paragraph (1) of this subsection."

**1975**—Subsec. (c). Pub. L. 94–163 added subsec. (c).

**1953**—Subsec. (a). Act June 30, 1953, struck out provisions which related to slaughtering of livestock and allocation of meat and meat products.

Subsec. (b). Act June 30, 1953, retained priorities and allocation authority for defense production but generally to discontinue such authority with respect to the civilian market except in the special cases where, because of shortages and demands of the defense effort, there otherwise would be a significant dislocation in the civilian market resulting in appreciable hardship.

**1952**—Act June 30, 1952, redesignated existing provisions as subsec. (a), inserted provisions relating to meat and meat products, and added subsec. (b).

**1951**—Act July 31, 1951, inserted provision relating to slaughtering of livestock.

### EFFECTIVE DATE OF 1991 AMENDMENT

Pub. L. 102–99, §7, Aug. 17, 1991, 105 Stat. 490, provided that: "This Act [amending this section and sections 2158, 2161, and 2166 of this Appendix, repealing section 2158a of this Appendix, and enacting provisions set out as a note under section 2061 of this Appendix] shall take effect on October 20, 1990."

### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

### DELEGATION OF FUNCTIONS

Functions of President under act Sept. 8, 1950 [section 2061 et seq. this Appendix], relating to production, conservation, use, control, distribution, and allocation of energy, delegated to Secretary of Energy, see section 4 of Ex. Ord. No. 11790, June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15, Commerce and Trade.

For delegation of certain authority of President under this section, see sections 201 to 203 of Ex. Ord. No. 13603, Mar. 16, 2012, 77 F.R. 16652, 16653, set out as a note under section 2153 of this Appendix.

### REPORT ON INDUSTRY PREPAREDNESS

Pub. L. 110–53, title X, §1002(b), Aug. 3, 2007, 121 Stat. 375, provided that: "Not later than 6 months after the last day of fiscal year 2007 and each subsequent fiscal year, the Secretary of Homeland Security, in cooperation with the Secretary of Commerce, the Secretary of Transportation, the Secretary of Defense, and the Secretary of Energy, shall submit to the Committee on Banking, Housing, and Urban Affairs and the Committee on Homeland Security and Governmental Affairs of the Senate and the Committee on Financial Services and the Committee on Homeland Security of the House of Representatives a report that details the actions taken by the Federal Government to ensure, in accordance with subsections (a) and (c) of section 101 of the Defense Production Act of 1950 (50 U.S.C. App. 2071), the preparedness of industry to reduce interruption of critical infrastructure and key resource operations during an act of terrorism, natural catastrophe, or other similar national emergency."

### PRESIDENTIAL AUTHORITY TO ISSUE ORDERS RELATING TO DOMESTIC ENERGY SUPPLIES

Pub. L. 94–163, title I, §104(b), Dec. 22, 1975, 89 Stat. 879, as amended by Pub. L. 99–58, title I, §101(b), July 2, 1985, 99 Stat. 102; Pub. L. 101–46, §1(2), June 30, 1989, 103 Stat. 132; Pub. L. 101–262, §2(a), Mar.

31, 1990, 104 Stat. 924; Pub. L. 101–560, §2(a), Aug. 10, 1990, 104 Stat. 421; Pub. L. 101–383, §2(1), Sept. 15, 1990, 104 Stat. 727; Pub. L. 105–388, §6, Nov. 13, 1998, 112 Stat. 3479; Pub. L. 106–469, title I, §103(2), Nov. 9, 2000, 114 Stat. 2029, provided that: "The expiration of the Defense Production Act of 1950 [section 2061 et seq. of this Appendix] or any amendment of such Act after the date of enactment of this Act [Dec. 22, 1975] shall not affect the authority of the President under section 101(c) of such Act [subsec. (c) of this section], as amended by subsection (a) of this section and in effect on the date of enactment of this Act, unless Congress by law expressly provides to the contrary."

31, 1990, 104 Stat. 924; Pub. L. 101–560, §2(a), Aug. 10, 1990, 104 Stat. 421; Pub. L. 101–383, §2(1), Sept.

### EXECUTIVE ORDER NO. 10161

Ex. Ord. No. 10161, Sept. 9, 1950, 15 F.R. 6105, as amended by Ex. Ord. No. 10200, Jan. 3, 1951, 16 F.R. 61; Ex. Ord. No. 10233, Apr. 23, 1951, 16 F.R. 3503; Ex. Ord. No. 10281, Aug. 28, 1951, 16 F.R. 8789; Ex. Ord. No. 10301, Nov. 5, 1951, 16 F.R. 11257; Ex. Ord. No. 10324, Feb. 6, 1952, 17 F.R. 1171; Ex. Ord. No. 10359, June 9, 1952, 17 F.R. 5269; Ex. Ord. No. 10373, July 15, 1952, 17 F.R. 6425; Ex. Ord. No. 10377, July 28, 1952, 17 F.R. 6891; Ex. Ord. No. 10390, Sept. 2, 1952, 17 F.R. 7995; and Ex. Ord. No. 10433, Feb. 4, 1953, 18 F.R. 761, which related to delegation of President's functions, was revoked by Ex. Ord. No. 10480, Aug. 18, 1953, 18 F.R. 4939, formerly set out under section 2153 of this Appendix.

### ABOLITION OF WAGE STABILIZATION BOARD AND CREATION OF NEW BOARD

Wage Stabilization Board created by Ex. Ord. No. 10161, eff. Sept. 9, 1950, 15 F.R. 6105, as amended, abolished by section 2103(b)(6) of this Appendix. A new Wage Stabilization Board was created by section 2103(b)(1), which terminated according to section 2166 of this Appendix Apr. 30, 1953.

### POWERS OF SECRETARY OF COMMERCE UNDER EX. ORD. NO. 10161

The Secretary of Commerce by F.R. Doc. 50–8068, filed Sept. 13, 1950, 15 F.R. 6182, established the National Production Authority in the Department of Commerce to perform the functions and exercise the powers vested in the Secretary of Commerce by Ex. Ord. No. 10161, and established the Advisory Committee on Priorities Administration which was to serve in an advisory capacity with respect to policy matters. The National Production Authority was abolished and its functions merged into the Business and Defense Services Administration by Secretary of Commerce order, dated Oct. 1, 1953, which in turn was abolished by Department Organization Order 40–1A of Sept. 15, 1970 and its functions transferred to the Bureau of Domestic Commerce. All functions of the Bureau of Domestic Commerce were transferred by the Secretary of Commerce to the Domestic and International Business Administration, within the Department of Commerce, eff. Nov. 17, 1972.

## §2072. Hoarding of designated scarce materials

In order to prevent hoarding, no person shall accumulate (1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices, materials which have been designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation. The President shall order published in the Federal Register, and in such other manner as he may deem appropriate, every designation of materials the accumulation of which is unlawful and any withdrawal of such designation.

In making such designations the President may prescribe such conditions with respect to the accumulation of materials in excess of the reasonable demands of business, personal, or home consumption as he deems necessary to carry out the objectives of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix]. This section shall not be construed to limit the authority contained in sections 101 and 704 of this Act [sections 2071 and 2154 of this Appendix].

(Sept. 8, 1950, ch. 932, title I, §102, 64 Stat. 799; July 31, 1951, ch. 275, title I, §101(b), 65 Stat. 132.)

### AMENDMENTS

**1951**—Act July 31, 1951, authorized President to prescribe conditions and exceptions allowing maintenance of substantial inventories of critical materials in certain cases.

### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

Functions of President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to production, conservation, use, control, distribution, and allocation of energy, delegated to Secretary of Energy, see section 4 of Ex. Ord. No. 11790, June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15, Commerce and Trade.

## §2073. Penalties

Any person who willfully performs any act prohibited, or willfully fails to perform any act required, by the provisions of this title [sections 2071 to 2078 of this Appendix] or any rule, regulation, or order thereunder, shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both.

(Sept. 8, 1950, ch. 932, title I, §103, 64 Stat. 799.)

### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

## §2074. Limitation on actions without Congressional authorization

### (a) Wage or price controls

No provision of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] shall be interpreted as providing for the imposition of wage or price controls without the prior authorization of such action by a joint resolution of Congress.

### (b) Chemical or biological weapons

No provision of title I of this Act [sections 2071 to 2078 of this Appendix] shall be exercised or interpreted to require action or compliance by any private person to assist in any way in the production of or other involvement in chemical or biological warfare capabilities, unless authorized by the President (or the President's designee who is serving in a position at level I of the Executive Schedule in accordance with section 5312 of title 5, United States Code) without further redelegation.

(Sept. 8, 1950, ch. 932, title I, §104, as added Pub. L. 102–558, title I, §112, Oct. 28, 1992, 106 Stat. 4202.)

### PRIOR PROVISIONS

A prior section 2074, act Sept. 8, 1950, ch. 932, title I, §104, as added July 31, 1951, ch. 275, title I, §101(c), 65 Stat. 132; amended June 30, 1952, ch. 530, §103, 66 Stat. 297, which related to limitations on imports of fats and oils, terminated at close of June 30, 1953, by terms of section 2166(a) of this Appendix.

### EFFECTIVE DATE

Section deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as an Effective Date of 1992 Amendment note under section 2062 of this Appendix.

### DELEGATION OF AUTHORITY

Authority of President under subsec. (b) of this section delegated to Secretary of Defense, without authority to redelegate, by section 204 of Ex. Ord. No. 13603, Mar. 16, 2012, 77 F.R. 16653, set out as a note under section 2153 of this Appendix.

## §2075. Presidential power to ration gasoline among classes of end-users unaffected

Nothing in this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] shall be construed to authorize the President to institute, without the approval of the Congress, a program for the rationing of gasoline among classes of end-users.

(Sept. 8, 1950, ch. 932, title I, §105, as added Pub. L. 96–294, title I, §103, June 30, 1980, 94 Stat. 617.)

EFFECTIVE DATE

Section effective June 30, 1980, see section 107 of Pub. L. 96–294, set out as an Effective Date of 1980 Amendment note under section 2062 of this Appendix.

TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

## §2076. Designation of energy as a strategic and critical material

For purposes of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix], "energy" shall be designated as a "strategic and critical material" after the date of the enactment of this section [June 30, 1980]: *Provided*, That no provision of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] shall, by virtue of such designation [1] grant any new direct or indirect authority to the President for the mandatory allocation or pricing of any fuel or feedstock (including, but not limited to, crude oil, residual fuel oil, any refined petroleum product, natural gas, or coal) or electricity or any other form of energy.

(Sept. 8, 1950, ch. 932, title I, §106, as added Pub. L. 96–294, title I, §103, June 30, 1980, 94 Stat. 617; amended Pub. L. 111–67, §5, Sept. 30, 2009, 123 Stat. 2009.)

AMENDMENTS

2009—Pub. L. 111–67 substituted "such designation" for "such designation—" and "energy." for "energy; or", struck out par. (1) designation before "grant any new direct or indirect authority to the President for", and struck out par. (2), which read as follows: "grant any new direct or indirect authority to the President to engage in the production of energy in any manner whatsoever (such as oil and gas exploration and development, or any energy facility construction), except as expressly provided in sections 305 and 306 for synthetic fuel production."

EFFECTIVE DATE

Section effective June 30, 1980, see section 107 of Pub. L. 96–294, set out as an Effective Date of 1980 Amendment note under section 2062 of this Appendix.

TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

[1] *So in original. Probably should be followed by a comma.*

## §2077. Strengthening domestic capability

### (a) In general

Utilizing the authority of title III of this Act [sections 2091 to 2094 of this Appendix] or any other provision of law, the President may provide appropriate incentives to develop, maintain, modernize, restore, and expand the productive capacities of domestic sources for critical components, critical technology items, materials, and industrial resources essential for the execution of the national security strategy of the United States.

### (b) Critical components and critical technology items

#### (1) Maintenance of reliable sources of supply

The President shall take appropriate actions to assure that critical components, critical technology items, essential materials, and industrial resources are available from reliable sources when needed to meet defense requirements during peacetime, graduated mobilization, and national emergency.

**(2) Appropriate action**

For purposes of this subsection, appropriate action may include—

(A) restricting contract solicitations to reliable sources;

(B) restricting contract solicitations to domestic sources pursuant to—

(i) section 2304(b)(1)(B) or section 2304(c)(3) of title 10, United States Code;

(ii) section 303(b)(1)(B) or section 303(c)(3) of the Federal Property and Administrative Services Act of 1949 [now 41 U.S.C. 3303(a)(1)(B), 3304(a)(3)]; or

(iii) other statutory authority;

(C) stockpiling critical components; and

(D) developing substitutes for a critical component or a critical technology item.

(Sept. 8, 1950, ch. 932, title I, §107, as added Pub. L. 102–558, title I, §111, Oct. 28, 1992, 106 Stat. 4201; amended Pub. L. 111–67, §6, Sept. 30, 2009, 123 Stat. 2009.)

#### REFERENCES IN TEXT

Section 303(b)(1)(B) or section 303(c)(3) of the Federal Property and Administrative Services Act of 1949, referred to in subsec. (b)(2)(B)(ii), means subsecs. (b)(1)(B) or (c)(3) of section 303 of act June 30, 1949, ch. 288, which were classified to section 253(b)(1)(B), (c)(3) of former Title 41, Public Contracts, and were repealed and restated as sections 3303(a)(1)(B) and 3304(a)(3), respectively, of Title 41, Public Contracts, by Pub. L. 111–350, §§3, 7(b), Jan. 4, 2011, 124 Stat. 3677, 3855.

#### AMENDMENTS

**2009**—Subsec. (a). Pub. L. 111–67, §6(1), inserted "restore," after "modernize," and "materials," after "items,".

Subsec. (b). Pub. L. 111–67, §6(2)(A), (B), redesignated pars. (2) and (3) as (1) and (2), respectively, and struck out former par. (1). Prior to amendment, text of par. (1) read as follows:

"(A) IN GENERAL.—The President, acting through the Secretary of Defense, shall identify critical components and critical technology items for each item on the Critical Items List of the Commanders-in-Chief of the Unified and Specified Commands and other items within the inventory of weapon systems and defense equipment.

"(B) DEFINITION.—Any component identified as critical by a National Security Assessment conducted pursuant to section 113(i) of title 10, United States Code, or by a Presidential determination as a result of a petition filed under section 232 of the Trade Expansion Act of 1962 shall be designated as a critical component for purposes of this Act, unless the President determines that the designation is unwarranted."

Subsec. (b)(1). Pub. L. 111–67, §6(2)(C), substituted ", critical technology items, essential materials, and industrial resources" for "or critical technology items".

#### EFFECTIVE DATE

Section deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as an Effective Date of 1992 Amendment note under section 2062 of this Appendix.

#### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

#### DELEGATION OF FUNCTIONS

Functions of the President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to the production, conservation, use, control, distribution, and allocation of energy, delegated to the Secretary of Energy, see section 4 of Ex. Ord. No. 11790, eff. June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15, Commerce and Trade.

For delegation of authority of President under subsecs. (a) and (b)(1) of this section, see sections 310 and 311 of Ex. Ord. No. 13603, Mar. 16, 2012, 77 F.R. 16655, set out as a note under section 2153 of this Appendix.

# §2078. Modernization of small business suppliers

## (a) In general

In providing any assistance under this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix], the President shall accord a strong preference for small business concerns which are subcontractors or suppliers, and, to the maximum extent practicable, to such small business concerns located in areas of high unemployment or areas that have demonstrated a continuing pattern of economic decline, as identified by the Secretary of Labor.

**(b) Modernization of equipment**

**(1) In general**

Funds authorized under title III [sections 2091 to 2094 of this Appendix] may be used to guarantee the purchase or lease of advance manufacturing equipment, and any related services with respect to any such equipment for purposes of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix].

**(2) Small business suppliers**

In considering proposals for title III [sections 2091 to 2094 of this Appendix] projects under paragraph (1), the President shall provide a strong preference for proposals submitted by a small business supplier or subcontractor whose proposal—

(A) has the support of the department or agency which will provide the guarantee;

(B) reflects that the small business concern has made arrangements to obtain qualified outside assistance to support the effective utilization of the advanced manufacturing equipment being proposed for installation; and

(C) meets the requirements of section 301, 302, or 303 [section 2091, 2092, or 2093 of this Appendix].

(Sept. 8, 1950, ch. 932, title I, §108, as added Pub. L. 102–558, title I, §111, Oct. 28, 1992, 106 Stat. 4202.)

EFFECTIVE DATE

Section deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as an Effective Date of 1992 Amendment note under section 2062 of this Appendix.

TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

DELEGATION OF FUNCTIONS

Functions of the President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to the production, conservation, use, control, distribution, and allocation of energy, delegated to the Secretary of Energy, see section 4 of Ex. Ord. No. 11790, eff. June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15, Commerce and Trade.

# TITLE II—AUTHORITY TO REQUISITION AND CONDEMN

# §2081. Repealed. Pub. L. 111–67, §2(a)(2), Sept. 30, 2009, 123 Stat. 2007

Section, acts Sept. 8, 1950, ch. 932, title II, §201, 64 Stat. 799; July 31, 1951, ch. 275, title I, §102(b), 65 Stat. 132, related to requisition of property needed for national defense. Prior to repeal, section was omitted as terminated at close of June 30, 1953, by former section 2166(a) of this Appendix.

# TITLE III—EXPANSION OF PRODUCTIVE CAPACITY AND SUPPLY

CODIFICATION

Title III of the Defense Production Act of 1950 was originally enacted by act Sept. 8, 1950, ch. 932, title III, 64 Stat. 800, and amended by acts June 2, 1951, ch. 121, 65 Stat. 52; July 31, 1951, ch. 275, 65 Stat. 131; June

30, 1952, ch. 530, 66 Stat. 296; June 30, 1953, ch. 171, 67 Stat. 129; Aug. 9, 1953, ch. 633, 69 Stat. 580; June 29, 1956, ch. 474, 70 Stat. 408; Pub. L. 86–560, June 30, 1960, 74 Stat. 282; Pub. L. 88–343, June 30, 1964, 78 Stat. 235; Pub. L. 91–379, Aug. 15, 1970, 84 Stat. 796; Pub. L. 92–325, June 30, 1972, 86 Stat. 390; Pub. L. 93–155, Nov. 16, 1973, 87 Stat. 605; Pub. L. 93–426, Sept. 30, 1974, 88 Stat. 1166; Pub. L. 94–273, Apr. 21, 1976, 90 Stat. 375; Pub. L. 96–41, July 30, 1979, 93 Stat. 319; Pub. L. 96–294, June 30, 1980, 94 Stat. 611; Pub. L. 98–265, Apr. 17, 1984, 98 Stat. 149; Pub. L. 99–441, Oct. 3, 1986, 100 Stat. 1117; Pub. L. 102–558, Oct. 28, 1992, 106 Stat. 4198; Pub. L. 107–47, Oct. 5, 2001, 115 Stat. 260; Pub. L. 107–314, Dec. 2, 2002, 116 Stat. 2458. Title III is shown here, however, as having been added by Pub. L. 111–67, §7, Sept. 30, 2009, 123 Stat. 2010, without reference to the intervening amendments because of the extensive revision of title III by Pub. L. 111–67.

## §2091. Presidential authorization for the national defense

### (a) Expediting production and deliveries or services

#### (1) Authorized activities

To reduce current or projected shortfalls of industrial resources, critical technology items, or essential materials needed for national defense purposes, subject to such regulations as the President may prescribe, the President may authorize a guaranteeing agency to provide guarantees of loans by private institutions for the purpose of financing any contractor, subcontractor, provider of critical infrastructure, or other person in support of production capabilities or supplies that are deemed by the guaranteeing agency to be necessary to create, maintain, expedite, expand, protect, or restore production and deliveries or services essential to the national defense.

#### (2) Presidential determinations required

Except during a period of national emergency declared by Congress or the President, a loan guarantee may be entered into under this section only if the President determines that—

(A) the loan guarantee is for an activity that supports the production or supply of an industrial resource, critical technology item, or material that is essential for national defense purposes;

(B) without a loan guarantee, credit is not available to the loan applicant under reasonable terms or conditions sufficient to finance the activity;

(C) the loan guarantee is the most cost effective, expedient, and practical alternative for meeting the needs of the Federal Government;

(D) the prospective earning power of the loan applicant and the character and value of the security pledged provide a reasonable assurance of repayment of the loan to be guaranteed;

(E) the loan to be guaranteed bears interest at a rate determined by the Secretary of the Treasury to be reasonable, taking into account the then-current average yield on outstanding obligations of the United States with remaining periods of maturity comparable to the maturity of the loan;

(F) the loan agreement for the loan to be guaranteed provides that no provision of the loan agreement may be amended or waived without the consent of the fiscal agent of the United States for the guarantee; and

(G) the loan applicant has provided or will provide—

(i) an assurance of repayment, as determined by the President; and

(ii) security—

(I) in the form of a performance bond, insurance, collateral, or other means acceptable to the fiscal agent of the United States; and

(II) in an amount equal to not less than 20 percent of the amount of the loan.

#### (3) Limitations on loans

Loans under this section may be—

(A) made or guaranteed under the authority of this section only to the extent that an appropriations Act—

(i) provides, in advance, budget authority for the cost of such guarantees, as defined in section 502 of the Federal Credit Reform Act of 1990 (2 U.S.C. 661a); and

(ii) establishes a limitation on the total loan principal that may be guaranteed, and

(B) made without regard to the limitations of existing law, other than section 1341 of title 31, United States Code.

## (b) Fiscal agents of the United States

### (1) In general

Any Federal agency or any Federal reserve bank, when designated by the President, is hereby authorized to act, on behalf of any guaranteeing agency, as fiscal agent of the United States in the making of such contracts of guarantee and in otherwise carrying out the purposes of this section.

### (2) Funds

All such funds as may be necessary to enable any fiscal agent described in paragraph (1) to carry out any guarantee made by it on behalf of any guaranteeing agency shall be supplied and disbursed by or under authority from such guaranteeing agency.

### (3) Limit on liability

No fiscal agent described in paragraph (1) shall have any responsibility or accountability, except as agent in taking any action pursuant to or under authority of this section.

### (4) Reimbursements

Each fiscal agent described in paragraph (1) shall be reimbursed by each guaranteeing agency for all expenses and losses incurred by such fiscal agent in acting as agent on behalf of such guaranteeing agency, including, notwithstanding any other provision of law, attorneys' fees and expenses of litigation.

## (c) Oversight

### (1) In general

All actions and operations of fiscal agents under authority of or pursuant to this section shall be subject to the supervision of the President, and to such regulations as the President may prescribe.

### (2) Other authority

The President is authorized to prescribe—

(A) either specifically or by maximum limits or otherwise, rates of interest, guarantee and commitment fees, and other charges which may be made in connection with loans, discounts, advances, or commitments guaranteed by the guaranteeing agencies through fiscal agents under this section; and

(B) regulations governing the forms and procedures (which shall be uniform to the extent practicable) to be utilized in connection with such guarantees.

## (d) Aggregate guarantee amounts

### (1) Industrial resource and critical technology shortfalls

#### (A) In general

If the making of any guarantee or obligation of the Federal Government under this title [sections 2091 to 2094 of this Appendix] relating to a domestic industrial base shortfall would cause the aggregate outstanding amount of all guarantees for such shortfall to exceed $50,000,000, any such guarantee may be made only—

(i) if the President has notified the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives in writing of the proposed guarantee; and

(ii) after the 30-day period following the date on which notice under clause (i) is provided.

#### (B) Waivers authorized

The requirements of subparagraph (A) may be waived—

(i) during a period of national emergency declared by Congress or the President; or

(ii) upon a determination by the President, on a nondelegable basis, that a specific guarantee is necessary to avert an industrial resource or critical technology item shortfall that would severely impair national defense capability.

### (2) Other limitations

The authority conferred by this section shall not be used primarily to prevent the financial insolvency or bankruptcy of any person, unless—

(A) the President certifies that the insolvency or bankruptcy would have a direct and substantially adverse effect upon national defense production; and

(B) a copy of the certification under subparagraph (A), together with a detailed justification thereof, is transmitted to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives not later than 10 days prior to the exercise of that authority for such use.

(Sept. 8, 1950, ch. 932, title III, §301, as added Pub. L. 111–67, §7, Sept. 30, 2009, 123 Stat. 2010.)

#### PRIOR PROVISIONS

A prior section 2091, act Sept. 8, 1950, ch. 932, title III, §301, 64 Stat. 800; June 30, 1953, ch. 171, §4, 67 Stat. 129; Pub. L. 91–379, title I, §104, Aug. 15, 1970, 84 Stat. 799; Pub. L. 96–294, title I, §104(a), (b), June 30, 1980, 94 Stat. 618; Pub. L. 98–265, §§3(a), 4(a), Apr. 17, 1984, 98 Stat. 149, 150; Pub. L. 102–558, title I, §§121(a), 141, Oct. 28, 1992, 106 Stat. 4203, 4217; Pub. L. 107–47, §4(1)–(3), (5), Oct. 5, 2001, 115 Stat. 260, related to loan guarantees, prior to the general amendment of title III of this Act by Pub. L. 111–67.

#### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

#### DELEGATION OF FUNCTIONS

Functions of President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to production, conservation, use, control, distribution, and allocation of energy, delegated to Secretary of Energy, see section 4 of Ex. Ord. No. 11790, eff. June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15, Commerce and Trade.

For delegation of authority of President under subsec. (a)(2) of this section, see section 305(a) of Ex. Ord. No. 13603, Mar. 16, 2012, 77 F.R. 16654, set out as a note under section 2153 of this Appendix.

#### EXECUTIVE ORDER NO. 10223

Ex. Ord. No. 10223, Mar. 12, 1951, 16 F.R. 2247, providing for the performance of certain functions under act Sept. 8, 1950, was revoked by section 404 of Ex. Ord. No. 10281, Aug. 28, 1951, 16 F.R. 8789.

## §2092. Loans to private business enterprises

### (a) Loan authority

To reduce current or projected shortfalls of industrial resources, critical technology items, or materials essential for the national defense, the President may make provision for loans to private business enterprises (including nonprofit research corporations and providers of critical infrastructure) for the creation, maintenance, expansion, protection, or restoration of capacity, the development of technological processes, or the production of essential materials, including the exploration, development, and mining of strategic and critical metals and minerals.

### (b) Conditions of loans

Loans may be made under this section on such terms and conditions as the President deems necessary, except that—

(1) financial assistance may be extended only to the extent that it is not otherwise available from private sources on reasonable terms; and

(2) during periods of national emergency declared by the Congress or the President, no such loan may be made unless the President determines that—

(A) the loan is for an activity that supports the production or supply of an industrial resource, critical technology item, or material that is essential to the national defense;

(B) without the loan, United States industry cannot reasonably be expected to provide the needed capacity, technological processes, or materials in a timely manner;

(C) the loan is the most cost-effective, expedient, and practical alternative method for meeting the need;

(D) the prospective earning power of the loan applicant and the character and value of the security pledged provide a reasonable assurance of repayment of the loan in accordance with the terms of the loan, as determined by the President; and

(E) the loan bears interest at a rate determined by the Secretary of the Treasury to be reasonable, taking into account the then-current average yield on outstanding obligations of the United States with remaining periods of maturity comparable to the maturity of the loan.

## (c) Limitations on loans

Loans under this section may be—

(1) made or guaranteed under the authority of this section only to the extent that an appropriations Act—

(A) provides, in advance, budget authority for the cost of such guarantees, as defined in section 502 of the Federal Credit Reform Act of 1990 (2 U.S.C. 661a); and

(B) establishes a limitation on the total loan principal that may be guaranteed; and

(2) made without regard to the limitations of existing law, other than section 1341 of title 31, United States Code.

## (d) Aggregate loan amounts

### (1) In general

If the making of any loan under this section to correct a shortfall would cause the aggregate outstanding amount of all obligations of the Federal Government under this title [sections 2091 to 2094 of this Appendix] relating to such shortfall to exceed $50,000,000, such loan may be made only—

(A) if the President has notified the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives, in writing, of the proposed loan; and

(B) after the 30-day period following the date on which notice under subparagraph (A) is provided.

### (2) Waivers authorized

The requirements of paragraph (1) may be waived—

(A) during a period of national emergency declared by the Congress or the President; and

(B) upon a determination by the President, on a nondelegable basis, that a specific loan is necessary to avert an industrial resource or critical technology shortfall that would severely impair national defense capability.

(Sept. 8, 1950, ch. 932, title III, §302, as added Pub. L. 111–67, §7, Sept. 30, 2009, 123 Stat. 2012.)

### PRIOR PROVISIONS

A prior section 2092, act Sept. 8, 1950, ch. 932, title III, §302, 64 Stat. 801; June 30, 1952, ch. 530, title I, §104, 66 Stat. 298; Pub. L. 93–155, title VIII, §807(b), Nov. 16, 1973, 87 Stat. 615; Pub. L. 96–294, title I, §104(c), June 30, 1980, 94 Stat. 618; Pub. L. 98–265, §§3(b), 4(b), Apr. 17, 1984, 98 Stat. 149, 151; Pub. L. 102–558, title I, §121(b), Oct. 28, 1992, 106 Stat. 4204, related to loans to private business enterprises, prior to the general amendment of title III of this Act by Pub. L. 111–67.

### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

### DELEGATION OF FUNCTIONS

Functions of President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to production, conservation, use, control, distribution, and allocation of energy, delegated to Secretary of Energy,

see section 4 of Ex. Ord. No. 11790, June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15, Commerce and Trade.

For delegation of certain authority of President under this section, see sections 302 and 305(a) of Ex. Ord. No. 13603, Mar. 16, 2012, 77 F.R. 16654, set out as a note under section 2153 of this Appendix.

EXECUTIVE ORDER NO. 10634

Ex. Ord. No. 10634, Aug. 31, 1955, 20 F.R. 6433, as amended by Ex. Ord. No. 10773, July 1, 1958, 23 F.R. 5061; Ex. Ord. No. 10782, Sept. 6, 1958, 23 F.R. 6971, which related to loans for facilities destroyed or damaged by major disaster, was revoked by section 5–106 of Ex. Ord. No. 12148, July 20, 1979, 44 F.R. 43243, set out as a note under section 5195 of Title 42, The Public Health and Welfare.

## §2093. Other presidential action authorized

### (a) In general

#### (1) In general

To create, maintain, protect, expand, or restore domestic industrial base capabilities essential for the national defense, the President may make provision—

(A) for purchases of or commitments to purchase an industrial resource or a critical technology item, for Government use or resale;

(B) for the encouragement of exploration, development, and mining of critical and strategic materials, and other materials;

(C) for the development of production capabilities; and

(D) for the increased use of emerging technologies in security program applications and the rapid transition of emerging technologies—

(i) from Government-sponsored research and development to commercial applications; and

(ii) from commercial research and development to national defense applications.

#### (2) Treatment of certain agricultural commodities

A purchase for resale under this subsection shall not include that part of the supply of an agricultural commodity which is domestically produced, except to the extent that such domestically produced supply may be purchased for resale for industrial use or stockpiling.

#### (3) Terms of sales

No commodity purchased under this subsection shall be sold at less than—

(A) the established ceiling price for such commodity, except that minerals, metals, and materials shall not be sold at less than the established ceiling price, or the current domestic market price, whichever is lower; or

(B) if no ceiling price has been established, the higher of—

(i) the current domestic market price for such commodity; or

(ii) the minimum sale price established for agricultural commodities owned or controlled by the Commodity Credit Corporation, as provided in section 407 of the Agricultural Act of 1949 (7 U.S.C. 1427).

#### (4) Delivery dates

No purchase or commitment to purchase any imported agricultural commodity shall specify a delivery date which is more than 1 year after the date of termination of this section.

#### (5) Presidential determinations

Except as provided in paragraph (7), the President may not execute a contract under this subsection unless the President, on a non-delegable basis, determines, with appropriate explanatory material and in writing, that—

(A) the industrial resource, material, or critical technology item is essential to the national defense;

(B) without Presidential action under this section, United States industry cannot reasonably be expected to provide the capability for the needed industrial resource, material, or critical

technology item in a timely manner; and

(C) purchases, purchase commitments, or other action pursuant to this section are the most cost effective, expedient, and practical alternative method for meeting the need.

**(6) Notification to Congress of shortfall**

**(A) In general**

Except as provided in paragraph (7), the President shall provide written notice to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives of a domestic industrial base shortfall prior to taking action under this subsection to remedy the shortfall. The notice shall include the determinations made by the President under paragraph (5).

**(B) Aggregate amounts**

If the taking of any action under this subsection to correct a domestic industrial base shortfall would cause the aggregate outstanding amount of all such actions for such shortfall to exceed $50,000,000, the action or actions may be taken only after the 30-day period following the date on which the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives have been notified in writing of the proposed action.

**(C) Limitation**

If the taking of any action or actions under this section to correct an industrial resource shortfall would cause the aggregate outstanding amount of all such actions for such industrial resource shortfall to exceed $50,000,000, no such action or actions may be taken, unless such action or actions are authorized to exceed such amount by an Act of Congress.

**(7) Waivers authorized**

The requirements of paragraphs (1) through (6) may be waived—

(A) during a period of national emergency declared by the Congress or the President; or

(B) upon a determination by the President, on a nondelegable basis, that action is necessary to avert an industrial resource or critical technology item shortfall that would severely impair national defense capability.

**(b) Exemption for certain limitations**

Subject to the limitations in subsection (a), purchases and commitments to purchase and sales under subsection (a) may be made without regard to the limitations of existing law (other than section 1341 of title 31, United States Code), for such quantities, and on such terms and conditions, including advance payments, and for such periods, but not extending beyond a date that is not more than 10 years from the date on which such purchase, purchase commitment, or sale was initially made, as the President deems necessary, except that purchases or commitments to purchase involving higher than established ceiling prices (or if no such established ceiling prices exist, currently prevailing market prices) or anticipated loss on resale shall not be made, unless it is determined that supply of the materials could not be effectively increased at lower prices or on terms more favorable to the Government, or that such purchases are necessary to assure the availability to the United States of overseas supplies.

**(c) Presidential findings**

**(1) In general**

The President may take the actions described in paragraph (2), if the President finds that—

(A) under generally fair and equitable ceiling prices, for any raw or nonprocessed material, there will result a decrease in supplies from high-cost sources of such material, and that the continuation of such supplies is necessary to carry out the objectives of this title [sections 2091 to 2094 of this Appendix]; or

(B) an increase in cost of transportation is temporary in character and threatens to impair maximum production or supply in any area at stable prices of any materials.

**(2) Subsidy payments authorized**

Upon a finding under paragraph (1), the President may make provision for subsidy payments on any such domestically produced material, other than an agricultural commodity, in such amounts and in such manner (including purchases of such material and its resale at a loss), and on such terms and conditions, as the President determines to be necessary to ensure that supplies from such high-cost sources are continued, or that maximum production or supply in such area at stable prices of such materials is maintained, as the case may be.

**(d) Incidental authority**

The procurement power granted to the President by this section shall include the power to transport and store and have processed and refined any materials procured under this section.

**(e) Installation of equipment in industrial facilities**

**(1) Installation authorized**

If the President determines that such action will aid the national defense, the President is authorized—

(A) to procure and install additional equipment, facilities, processes or improvements to plants, factories, and other industrial facilities owned by the Federal Government;

(B) to procure and install equipment owned by the Federal Government in plants, factories, and other industrial facilities owned by private persons;

(C) to provide for the modification or expansion of privately owned facilities, including the modification or improvement of production processes, when taking actions under section 301 [section 2091 of this Appendix], 302 [section 2092 of this Appendix], or this section; and

(D) to sell or otherwise transfer equipment owned by the Federal Government and installed under this subsection to the owners of such plants, factories, or other industrial facilities.

**(2) Indemnification**

The owner of any plant, factory, or other industrial facility that receives equipment owned by the Federal Government under this section shall agree—

(A) to waive any claim against the United States under section 107 or 113 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. 9607 and 9613); and

(B) to indemnify the United States against any claim described in paragraph (1) made by a third party that arises out of the presence or use of equipment owned by the Federal Government.

**(f) Excess metals, minerals, and materials**

**(1) In general**

Notwithstanding any other provision of law to the contrary, metals, minerals, and materials acquired pursuant to this section which, in the judgment of the President, are excess to the needs of programs under this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix], shall be transferred to the National Defense Stockpile established by the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98 et seq.), when the President deems such action to be in the public interest.

**(2) Transfers at no charge**

Transfers made pursuant to this subsection shall be made without charge against or reimbursement from funds appropriated for the purposes of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98 et seq.), except that costs incident to such transfer, other than acquisition costs, shall be paid or reimbursed from such funds.

**(g) Substitutes**

When, in the judgement of the President, it will aid the national defense, the President may make provision for the development of substitutes for strategic and critical materials, critical components, critical technology items, and other industrial resources.

(Sept. 8, 1950, ch. 932, title III, §303, as added Pub. L. 111–67, §7, Sept. 30, 2009, 123 Stat. 2013; amended Pub. L. 113–172, §4(a), Sept. 26, 2014, 128 Stat. 1897.)

For the date of termination of this section, referred to in subsec. (a)(4), see section 2166(a) of this Appendix.

The Strategic and Critical Materials Stock Piling Act, referred to in subsec. (f), is act June 7, 1939, ch. 190, as revised generally by Pub. L. 96–41, §2, July 30, 1979, 93 Stat. 319, which is classified generally to subchapter III (§98 et seq.) of chapter 5 of Title 50, War and National Defense. For complete classification of this Act to the Code, see section 98 of Title 50 and Tables.

## PRIOR PROVISIONS

A prior section 2093, act Sept. 8, 1950, ch. 932, title III, §303, 64 Stat. 801; July 31, 1951, ch. 275, title I, §103(a), 65 Stat. 133; June 30, 1953, ch. 171, §§5, 6, 67 Stat. 130; Aug. 9, 1955, ch. 655, §3, 69 Stat. 580; June 29, 1956, ch. 474, §2, 70 Stat. 408; Pub. L. 88–343, §2, June 30, 1964, 78 Stat. 235; Pub. L. 92–325, §1, June 30, 1972, 86 Stat. 390; Pub. L. 94–273, §2(29), Apr. 21, 1976, 90 Stat. 376; Pub. L. 96–41, §3(c), July 30, 1979, 93 Stat. 325; Pub. L. 96–294, title I, §104(d), June 30, 1980, 94 Stat. 618; Pub. L. 98–265, §§3(c), 4(c), Apr. 17, 1984, 98 Stat. 150, 151; Pub. L. 102–558, title I, §121(c), (d), Oct. 28, 1992, 106 Stat. 4204, 4206; Pub. L. 107–47, §4(3), Oct. 5, 2001, 115 Stat. 260, related to purchase of raw materials and installation of equipment, prior to the general amendment of title III of this Act by Pub. L. 111–67.

## AMENDMENTS

**2014**—Subsec. (a)(5). Pub. L. 113–172, §4(a)(1)(A), substituted ", on a non-delegable basis, determines, with appropriate explanatory material and in writing," for "determines" in introductory provisions.

Subsec. (a)(5)(C). Pub. L. 113–172, §4(a)(1)(B)–(D), added subpar. (C).

Subsec. (a)(6)(C). Pub. L. 113–172, §4(a)(2), added subpar. (C).

## EFFECTIVE DATE OF 2014 AMENDMENT

Pub. L. 113–172, §4(b), Sept. 26, 2014, 128 Stat. 1897, provided that: "Section 303(a)(6)(C) of the Defense Production Act of 1950 [50 U.S.C. App. 2093(a)(6)(C)], as added by subsection (a)(2), shall not apply to a project undertaken pursuant to a determination made before the date of the enactment of this Act [Sept. 26, 2014]."

## TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

## DELEGATION OF FUNCTIONS

Functions of President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to production, conservation, use, control, distribution, and allocation of energy, delegated to Secretary of Energy, see section 4 of Ex. Ord. No. 11790, June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15, Commerce and Trade.

For delegation of certain authority of President under this section, see sections 303(a), 304, 305(b), and 306–308 of Ex. Ord. No. 13603, Mar. 16, 2012, 77 F.R. 16654, 16655, set out as a note under section 2153 of this Appendix.

## AUTHORIZATION TO TAKE ACTIONS TO CORRECT THE INDUSTRIAL RESOURCE SHORTFALL FOR HIGH-PURITY BERYLLIUM METAL

Pub. L. 111–84, div. A, title VIII, §842, Oct. 28, 2009, 123 Stat. 2418, provided that: "Notwithstanding any limitation in section 303 of the Defense Production Act of 1950 (50 U.S.C. App. 2093), an action may be taken under such section to correct an industrial resource shortfall or domestic industrial base shortfall for high-purity beryllium metal if such action does not cause the aggregate outstanding amount of all such actions for such shortfall to exceed '$85,000,000'."

## RESOURCE SHORTFALL FOR RADIATION-HARDENED ELECTRONICS

Pub. L. 108–195, §3, Dec. 19, 2003, 117 Stat. 2892, provided that:

"(a) IN GENERAL.—Notwithstanding the limitation contained in section 303(a)(6)(C) of the Defense Production Act of 1950 ([former] 50 U.S.C. App. 2093(a)(6)(C)), the President may take actions under section 303 of the Defense Production Act of 1950 to correct the industrial resource shortfall for radiation-hardened electronics, to the extent that such Presidential actions do not cause the aggregate outstanding amount of all such actions to exceed $200,000,000.

"(b) REPORT BY THE SECRETARY.—Before the end of the 6-month period beginning on the date of the enactment of this Act [Dec. 19, 2003], the Secretary of Defense shall submit a report to the Committee on

Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives describing—

"(1) the current state of the domestic industrial base for radiation-hardened electronics;

"(2) the projected requirements of the Department of Defense for radiation-hardened electronics;

"(3) the intentions of the Department of Defense for the industrial base for radiation-hardened electronics; and

"(4) the plans of the Department of Defense for use of providers of radiation-hardened electronics beyond the providers with which the Department had entered into contractual arrangements under the authority of the Defense Production Act of 1950 [sections 2061 to 2072 of this Appendix], as of the date of the enactment of this Act."

Pub. L. 107–314, div. A, title VIII, §829, Dec. 2, 2002, 116 Stat. 2618, provided that: "Notwithstanding the limitation in section 303(a)(6)(C) of the Defense Production Act of 1950 ([former] 50 U.S.C. App. 2093(a)(6) (C)), action or actions may be taken under section 303 of that Act to correct the industrial resource shortfall for radiation-hardened electronics, if such actions do not cause the aggregate outstanding amount of all such actions to exceed $106,000,000."

### CLARIFICATION OF STOCKPILE STATUS OF CERTAIN MATERIALS

For provisions that all materials purchased under former section 2093 of this Appendix and held in the Defense Production Act inventory as of June 30, 1992, are transferred to the National Defense Stockpile, see section 3315 of Pub. L. 102–484, as amended, set out as a note under section 98c of Title 50, War and National Defense.

### EXECUTIVE ORDER NO. 10219

Ex. Ord. No. 10219, Feb. 28, 1951, 16 F.R. 1983, as amended by Ex. Ord. No. 10461, June 17, 1953, 18 F.R. 3513; Ex. Ord. No. 10537, June 22, 1954, 19 F.R. 3807; Ex. Ord. No. 10773, July 1, 1958, 23 F.R. 5061; Ex. Ord. No. 10782, Sept. 6, 1958, 23 F.R. 6971, which related to the responsibilities of Federal agencies with respect to transportation and storage, was superseded by Ex. Ord. No. 11051, Sept. 27, 1962, 27 F.R. 9683, formerly set out as a note under section 2271 of this Appendix.

## §2094. Defense Production Act Fund

### (a) Establishment of Fund

There is established in the Treasury of the United States a separate fund to be known as the "Defense Production Act Fund" (in this section referred to as the "Fund").

### (b) Moneys in Fund

There shall be credited to the Fund—

(1) all moneys appropriated for the Fund, as authorized by section 711 [section 2161 of this Appendix]; and

(2) all moneys received by the Fund on transactions entered into pursuant to section 303 [section 2093 of this Appendix].

### (c) Use of Fund

The Fund shall be available to carry out the provisions and purposes of this title [sections 2091 to 2094 of this Appendix], subject to the limitations set forth in this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] and in appropriations Acts.

### (d) Duration of Fund

Moneys in the Fund shall remain available until expended.

### (e) Fund balance

The Fund balance at the close of each fiscal year shall not exceed $750,000,000, excluding any moneys appropriated to the Fund during that fiscal year or obligated funds. If, at the close of any fiscal year, the Fund balance exceeds $750,000,000, the amount in excess of $750,000,000 shall be paid into the general fund of the Treasury.

### (f) Fund manager

The President shall designate a Fund manager. The duties of the Fund manager shall include—

(1) determining the liability of the Fund in accordance with subsection (g);

(2) ensuring the visibility and accountability of transactions engaged in through the Fund; and

(3) reporting to the Congress each year regarding activities of the Fund during the previous fiscal year.

## (g) Liabilities against Fund

When any agreement entered into pursuant to this title [sections 2091 to 2094 of this Appendix] after December 31, 1991, imposes any contingent liability upon the United States, such liability shall be considered an obligation against the Fund.

(Sept. 8, 1950, ch. 932, title III, §304, as added Pub. L. 111–67, §7, Sept. 30, 2009, 123 Stat. 2017.)

### PRIOR PROVISIONS

Prior sections 2094 to 2096 were omitted in the general amendment of title III of this Act by Pub. L. 111–67.

Section 2094, Sept. 8, 1950, ch. 932, title III, §304, 64 Stat. 802; June 2, 1951, ch. 121, Ch. XI, 65 Stat. 61; July 31, 1951, ch. 275, title I, §103(b), (c), 65 Stat. 134; Pub. L. 86–560, §2, June 30, 1960, 74 Stat. 282; Pub. L. 88–343, §3, June 30, 1964, 78 Stat. 235; Pub. L. 93–426, §2, Sept. 30, 1974, 88 Stat. 1166; Pub. L. 102–558, title I, §122, Oct. 28, 1992, 106 Stat. 4206; Pub. L. 107–47, §4(4), Oct. 5, 2001, 115 Stat. 260, related to Defense Production Act Fund.

Section 2095, Sept. 8, 1950, ch. 932, title III, §305, as added Pub. L. 96–294, title I, §104(e), June 30, 1980, 94 Stat. 619; amended Pub. L. 107–314, div. A, title X, §1062(o)(3), Dec. 2, 2002, 116 Stat. 2653, related to synthetic fuel production.

Section 2096, Sept. 8, 1950, ch. 932, title III, §306, as added Pub. L. 96–294, title I, §104(e), June 30, 1980, 94 Stat. 623; amended Pub. L. 107–314, div. A, title X, §1062(o)(3), Dec. 2, 2002, 116 Stat. 2653, related to synthetic fuel production subsequent to determinations respecting a national energy supply shortage of defense fuels.

Prior section 2096a, Pub. L. 96–294, title I, §106, June 30, 1980, 94 Stat. 633, which required annual reports on synthetic fuel production under former sections 2095 and 2096 of this Appendix was omitted as obsolete in view of the omission of those sections in the general amendment of title III of this Act by Pub. L. 111–67.

Prior sections 2097 to 2099a were omitted in the general amendment of title III of this Act by Pub. L. 111–67.

Section 2097, Sept. 8, 1950, ch. 932, title III, §307, as added Pub. L. 96–294, title I, §104(e), June 30, 1980, 94 Stat. 628; amended Pub. L. 102–558, title I, §151, Oct. 28, 1992, 106 Stat. 4218, related to synthetic fuel action.

Section 2098, Sept. 8, 1950, ch. 932, title III, §308, as added Pub. L. 96–294, title I, §104(e), June 30, 1980, 94 Stat. 631, related to definitions of "Government synthetic fuel project", "synthetic fuel", "synthetic fuel project", and "United States".

Section 2099, Sept. 8, 1950, ch. 932, title III, §309, as added Pub. L. 98–265, §6, Apr. 17, 1984, 98 Stat. 152; amended Pub. L. 99–441, §4, Oct. 3, 1986, 100 Stat. 1117; Pub. L. 102–558, title I, §124, Oct. 28, 1992, 106 Stat. 4207; Pub. L. 107–47, §4(5), Oct. 5, 2001, 115 Stat. 260, related to annual report on impact of offsets. See section 2172 of this Appendix.

Section 2099a, Sept. 8, 1950, ch. 932, title III, §310, as added Pub. L. 102–558, title I, §125, Oct. 28, 1992, 106 Stat. 4208, related to civil-military integration.

### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

### DEFENSE PRODUCTION ACT FUND MANAGER

Secretary of Defense designated Defense Production Act Fund Manager in accordance with subsec. (f) of this section, see section 309 of Ex. Ord. No. 13603, Mar. 16, 2012, 77 F.R. 16655, set out as a note under section 2153 of this Appendix.

### EXECUTIVE ORDER NO. 12346

Ex. Ord. No. 12346, Feb. 8, 1982, 47 F.R. 5993, related to the transition of synthetic fuel responsibilities from the Department of Energy to the United States Synthetic Fuels Corporation, revoked Ex. Ord. No. 12242,

and provided that the provisions of Ex. Ord. No. 12242 would continue in full force and effect with respect to any loan guarantee issued under its provisions.

# TITLE IV—PRICE AND WAGE STABILIZATION

## §§2101, 2102. Repealed. Pub. L. 111–67, §2(a)(2), Sept. 30, 2009, 123 Stat. 2007

Section 2101, act Sept. 8, 1950, ch. 932, title IV, §401, 64 Stat. 803, related to purposes of price and wage stabilization and cooperation by government agencies.

Section 2102, acts Sept. 8, 1950, ch. 932, title IV, §402, 64 Stat. 803; July 31, 1951, ch. 275, title I, §104(a) to (h), 65 Stat. 134; June 30, 1952, ch. 530, title I, §§105–111, 66 Stat. 298, related to price and wage controls.

### TERMINATION OF SECTIONS

Prior to repeal, sections 2101 and 2102 were omitted as terminated at close of June 30, 1953, by former section 2166(a) of this Appendix.

### EXECUTIVE ORDER NO. 10160

Ex. Ord. No. 10160, Sept. 9, 1950, 15 F.R. 6103, which related to preservation of records for certain purposes, was revoked by Ex. Ord. No. 10662, Mar. 13, 1956, 21 F.R. 1673.

### EXECUTIVE ORDER NO. 10434

Ex. Ord. No. 10434, Feb. 6, 1953, 18 F.R. 809, suspended all regulations and orders issued pursuant to the Defense Production Act of 1950 that stabilized wages, salaries, and other compensation.

### EXECUTIVE ORDER NO. 10494

Ex. Ord. No. 10494, Oct. 14, 1953, 18 F.R. 6585, as amended by Ex. Ord. No. 10773, July 1, 1958, 23 F.R. 5061; Ex. Ord. No. 10782, Sept. 6, 1958, 23 F.R. 6971, which related to the disposition of remaining functions, was revoked by section 5–103 of Ex. Ord. No. 12148, July 20, 1979, 44 F.R. 43243, set out as a note under section 5195 of Title 42, The Public Health and Welfare.

## §2103. Repealed. Pub. L. 89–554, §8(a), Sept. 6, 1966, 80 Stat. 656

Section, acts Sept. 8, 1950, ch. 932, title IV, §403, 64 Stat. 807; July 31, 1951, ch. 275, title I, §105(a), 65 Stat. 137; June 30, 1952, ch. 530, title I, §112, 66 Stat. 300, authorized an independent agency to administer price and wage controls and rationing, created a Wage Stabilization Board in the Economic Stabilization Agency and prescribed its duties and functions, and prescribed the jurisdiction of the Salary Stabilization Board and the Office of Salary Stabilization within the Economic Stabilization Agency.

### TERMINATION OF SECTION

Prior to repeal, section 2103 was omitted as terminated at close of June 30, 1953, by former section 2166(a) of this Appendix.

## §§2104 to 2112. Repealed. Pub. L. 111–67, §2(a)(2), Sept. 30, 2009, 123 Stat. 2007

Section 2104, act Sept. 8, 1950, ch. 932, title IV, §404, 64 Stat. 807, authorized consultation by the President with representatives of persons affected by regulations or orders relating to price and wage controls.

Section 2105, acts Sept. 8, 1950, ch. 932, title IV, §405, 64 Stat. 807; July 31, 1951, ch. 275, title I, §104(i), 65 Stat. 136, related to unlawfulness for violating sections 2101 to 2112 of this Appendix or any regulations, orders or requirements issued thereunder.

Section 2106, act Sept. 8, 1950, ch. 932, title IV, §406, 64 Stat. 807, prohibited any construction of sections 2101 to 2112 of this Appendix as requiring any person to sell any material or service, or to perform personal services.

Section 2107, acts Sept. 8, 1950, ch. 932, title IV, §407, 64 Stat. 807; June 30, 1952, ch. 530, title I, §113(a), 66 Stat. 301, related to objections to price and rent control regulations, filing, hearing and determination of

protests, procedure, and review.

Section 2108, acts Sept. 8, 1950, ch. 932, title IV, §408, 64 Stat. 808; June 30, 1952, ch. 530, title I, §113(b), 66 Stat. 302, related to determination, by the Emergency Court of Appeals, of validity of price, wage and rent control regulations, procedure, review by the Supreme Court, and stay of civil and criminal proceedings in other courts for determination of such validity.

Section 2109, acts Sept. 8, 1950, ch. 932, title IV, §409, 64 Stat. 811; July 31, 1951, ch. 275, title I, §104(j)–(l), 65 Stat. 136, in connection with actions for violations of section 2105 of this Appendix, and regulations or orders, related to injunctions, criminal penalties, recovery of overcharges, and disallowance of fines, penalties, and compromise sums for tax or other purposes.

Section 2110, act Sept. 8, 1950, ch. 932, title IV, §410, 64 Stat. 812, required certain price representations and agreements to be contained in contracts providing for the purchase of processed chickens and turkeys by government agencies.

Section 2111, act Sept. 8, 1950, ch. 932, title IV, §411, as added June 30, 1952, ch. 530, title I, §114, 66 Stat. 304, made it unnecessary to furnish reports on sales or services below ceiling prices if such sales at such prices had been certified to the President.

Section 2112, act Sept. 8, 1950, ch. 932, title IV, §412, as added June 30, 1952, ch. 530, title I, §114, 66 Stat. 304, permitted suspension or termination of price and wage controls over any materials or services, from time to time as economic factors might warrant, and their restoration if deemed necessary.

#### TERMINATION OF SECTIONS

Prior to repeal, sections 2104 to 2112 were omitted as terminated at close of June 30, 1953, by former section 2166(a) of this Appendix.

# TITLE V—SETTLEMENT OF LABOR DISPUTES

## §§2121 to 2123. Repealed. Pub. L. 111–67, §2(a)(2), Sept. 30, 2009, 123 Stat. 2007

Section 2121, act Sept. 8, 1950, ch. 932, title V, §501, 64 Stat. 812, stated intent of Congress in providing for settlement of labor disputes affecting national defense.

Section 2122, acts Sept. 8, 1950, ch. 932, title V, §502, 64 Stat. 812; July 31, 1951, ch. 275, title I, §105(b), 65 Stat. 137, stated national policy in connection with such settlement, and provided for voluntary conferences.

Section 2123, acts Sept. 8, 1950, ch. 932, title V, §503, 64 Stat. 812; July 31, 1951, ch. 275, title I, §105(c), 65 Stat. 137; June 30, 1952, ch. 530, title I, §115, 66 Stat. 305, provided that, in such settlements, due regard should be given to collective bargaining and other laws, and, as amended by the act of June 30, 1952, requested the President to invoke the Labor-Management Relations Act, 1947, (29 U.S.C. 141 et seq.), with regard to the steel strike then existing.

#### TERMINATION OF SECTIONS

Prior to repeal, sections 2121 to 2123 were omitted as terminated at close of June 30, 1953, by former section 2166(a) of this Appendix.

# TITLE VI—CONTROL OF REAL ESTATE CREDIT

## §2131. Repealed. June 30, 1952, ch. 530, title I, §116(a), 66 Stat. 305

Section, acts Sept. 8, 1950, ch. 932, title VI, §601, 64 Stat. 812; July 31, 1951, ch. 275, title I, §106(a), 65 Stat. 138, related to power to exercise consumer credit controls.

## §§2132 to 2137. Repealed. Pub. L. 111–67, §2(a)(2), Sept. 30, 2009, 123 Stat. 2007

Section 2132, act Sept. 8, 1950, ch. 932, title VI, §602, 64 Stat. 814, related to real estate construction credit.

Section 2133, acts Sept. 8, 1950, ch. 932, title VI, §603, 64 Stat. 814; July 31, 1951, ch. 275, title I, §106(b), 65 Stat. 138, prescribed penalties for violating sections 2131, 2132 and 2135 of this Appendix or any regulation or order issued thereunder.

Section 2134, act Sept. 8, 1950, ch. 932, title VI, §604, 64 Stat. 814, related to consumer credit controls.

Section 2135, acts Sept. 8, 1950, ch. 932, title VI, §605, 64 Stat. 814; July 31, 1951, ch. 275, title I, §106(c), 65 Stat. 138; Sept. 1, 1951, ch. 378, title VI, §602(a), 65 Stat. 313, related to real estate loans by government agencies.

Section 2136, act Sept. 8, 1950, ch. 932, title VI, §606, as added Sept. 1, 1951, ch. 378, title VI, §602(b), 65 Stat. 313, related to down-payment requirements on veterans' homes.

Section 2137, act Sept. 8, 1950, ch. 932, title VI, §607, as added June 30, 1952, ch. 530, title I, §116(b), 66 Stat. 305, related to credit controls on residential property.

### TERMINATION OF SECTIONS

Prior to repeal, sections 2132 to 2137 were omitted as terminated at close of June 30, 1953, by former section 2166(a) of this Appendix.

# TITLE VII—GENERAL PROVISIONS

## §2151. Small business

### (a) Participation

Small business concerns shall be given the maximum practicable opportunity to participate as contractors, and subcontractors at various tiers, in all programs to maintain and strengthen the Nation's industrial base and technology base undertaken pursuant to this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix].

### (b) Administration of Act

In administering the programs, implementing regulations, policies, and procedures under this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix], requests, applications, or appeals from small business concerns shall, to the maximum extent practicable, be expeditiously handled.

### (c) Advisory committee participation

Representatives of small business concerns shall be afforded the maximum opportunity to participate in such advisory committees as may be established pursuant to this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix].

### (d) Information

Information about this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] and activities undertaken in accordance with this Act shall be made available to small business concerns.

### (e) Allocations under section 101

Whenever the President makes a determination to exercise any authority to allocate any material pursuant to section 101 [section 2071 of this Appendix], small business concerns shall be accorded, to the extent practicable, a fair share of such material, in proportion to the share received by such business concerns under normal conditions, giving such special consideration as may be possible to emerging small business concerns.

(Sept. 8, 1950, ch. 932, title VII, §701, 64 Stat. 815; July 31, 1951, ch. 275, title I, §108, 65 Stat. 138; June 30, 1953, ch. 171, §7, 67 Stat. 130; Aug. 9, 1955, ch. 655, §§4, 5, 69 Stat. 580; Pub. L. 96–294, title I, §105(c), June 30, 1980, 94 Stat. 633; Pub. L. 102–558, title I, §131, Oct. 28, 1992, 106 Stat. 4209.)

### AMENDMENTS

**1992**—Pub. L. 102–558 amended section generally, substituting present provisions for provisions stating policy to encourage small business enterprises and providing for measures to carry out this policy, for allocation of materials in the civilian market, and for distribution of defense contracts.

**1980**—Subsec. (d). Pub. L. 96–294 substituted "enactment of the Defense Production Act Amendments of 1980" for "enactment of the Defense Production Act Amendments of 1955".

**1955**—Subsec. (c). Act Aug. 9, 1955, §4, struck out specific dates which were the basis for determination of materials in civilian market and inserted provisions requiring that a business receive its fair share based on a representative period before imposition of the allocation.

Subsec. (d). Act Aug. 9, 1955, §5, added subsec. (d).

**1953**—Subsec. (c). Act June 30, 1953, amended subsec. (c) generally, the principal change being to provide, in the allocation to business of a fair share of available civilian supply, a new base period for allocating materials not under control on July 1, 1953.

**1951**—Subsec. (c). Act July 31, 1951, provided that limitations and restrictions on production of specific items shall not exclude new concerns.

#### EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–558 deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as a note under section 2062 of this Appendix.

#### EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–294 effective June 30, 1980, see section 107 of Pub. L. 96–294, set out as a note under section 2062 of this Appendix.

#### EFFECTIVE DATE OF 1955 AMENDMENT

Amendment by act Aug. 9, 1955, effective as of close of July 31, 1955, see section 11 of act Aug. 9, 1955, set out as a note under section 2062 of this Appendix.

#### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

#### DELEGATION OF FUNCTIONS

Functions of President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to production, conservation, use, control, distribution, and allocation of energy, delegated to Secretary of Energy, see section 4 of Ex. Ord. No. 11790, June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15, Commerce and Trade.

For delegation of certain authority of President under title VII of act Sept. 8, 1950 [section 2151 et seq. of this Appendix], see section 802 of Ex. Ord. No. 13603, Mar. 16, 2012, 77 F.R. 16659, set out as a note under section 2153 of this Appendix.

## §2152. Definitions

For purposes of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix], the following definitions shall apply:

### (1) Critical component

The term "critical component" includes such components, subsystems, systems, and related special tooling and test equipment essential to the production, repair, maintenance, or operation of weapon systems or other items of equipment identified by the President as being essential to the execution of the national security strategy of the United States. Components identified as critical by a National Security Assessment conducted pursuant to section 113(i) of title 10, United States Code, or by a Presidential determination as a result of a petition filed under section 232 of the Trade Expansion Act of 1962 [19 U.S.C. 1862] shall be designated as critical components for purposes of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix], unless the President determines that the designation is unwarranted.

### (2) Critical infrastructure

The term "critical infrastructure" means any systems and assets, whether physical or cyber-based, so vital to the United States that the degradation or destruction of such systems and assets

would have a debilitating impact on national security, including, but not limited to, national economic security and national public health or safety.

**(3) Critical technology**

The term "critical technology" includes any technology designated by the President to be essential to the national defense.

**(4) Critical technology item**

The term "critical technology item" means materials directly employing, derived from, or utilizing a critical technology.

**(5) Defense contractor**

The term "defense contractor" means any person who enters into a contract with the United States—

    (A) to furnish materials, industrial resources, or a critical technology for the national defense; or

    (B) to perform services for the national defense.

**(6) Domestic industrial base**

The term "domestic industrial base" means domestic sources which are providing, or which would be reasonably expected to provide, materials or services to meet national defense requirements during peacetime, national emergency, or war.

**(7) Domestic source**

The term "domestic source" means a business concern—

    (A) that performs in the United States or Canada substantially all of the research and development, engineering, manufacturing, and production activities required of such business concern under a contract with the United States relating to a critical component or a critical technology item; and

    (B) that procures from business concerns described in subparagraph (A) substantially all of any components and assemblies required under a contract with the United States relating to a critical component or critical technology item.

**(8) Facilities**

The term "facilities" includes all types of buildings, structures, or other improvements to real property (but excluding farms, churches or other places of worship, and private dwelling houses), and services relating to the use of any such building, structure, or other improvement.

**(9) Foreign source**

The term "foreign source" means a business entity other than a "domestic source".

**(10) Guaranteeing agency**

The term "guaranteeing agency" means a department or agency of the United States engaged in procurement for the national defense.

**(11) Homeland security**

The term "homeland security" includes efforts—

    (A) to prevent terrorist attacks within the United States;

    (B) to reduce the vulnerability of the United States to terrorism;

    (C) to minimize damage from a terrorist attack in the United States; and

    (D) to recover from a terrorist attack in the United States.

**(12) Industrial resources**

The term "industrial resources" means materials, services, processes, or manufacturing equipment (including the processes, technologies, and ancillary services for the use of such equipment) needed to establish or maintain an efficient and modern national defense industrial base.

**(13) Materials**

The term "materials" includes—

(A) any raw materials (including minerals, metals, and advanced processed materials), commodities, articles, components (including critical components), products, and items of supply; and

(B) any technical information or services ancillary to the use of any such materials, commodities, articles, components, products, or items.

**(14) National defense**

The term "national defense" means programs for military and energy production or construction, military or critical infrastructure assistance to any foreign nation, homeland security, stockpiling, space, and any directly related activity. Such term includes emergency preparedness activities conducted pursuant to title VI of The Robert T. Stafford Disaster Relief and Emergency Assistance Act [42 U.S.C. 5195 et seq.] and critical infrastructure protection and restoration.

**(15) Person**

The term "person" includes an individual, corporation, partnership, association, or any other organized group of persons, or legal successor or representative thereof, or any State or local government or agency thereof.

**(16) Services**

The term "services" includes any effort that is needed for or incidental to—

(A) the development, production, processing, distribution, delivery, or use of an industrial resource or a critical technology item;

(B) the construction of facilities;

(C) the movement of individuals and property by all modes of civil transportation; or

(D) other national defense programs and activities.

**(17) Small business concern**

The term "small business concern" means a business concern that meets the requirements of section 3(a) of the Small Business Act [15 U.S.C. 632(a)] and the regulations promulgated pursuant to that section, and includes such business concerns owned and controlled by socially and economically disadvantaged individuals or by women.

(Sept. 8, 1950, ch. 932, title VII, §702, 64 Stat. 815; June 30, 1953, ch. 171, §8, 67 Stat. 130; Pub. L. 91–379, title I, §102, Aug. 15, 1970, 84 Stat. 796; Pub. L. 102–558, title I, §132, Oct. 28, 1992, 106 Stat. 4210; Pub. L. 103–337, div. C, title XXXIV, §3411(b), Oct. 5, 1994, 108 Stat. 3110; Pub. L. 108–195, §5, Dec. 19, 2003, 117 Stat. 2893; Pub. L. 111–67, §8, Sept. 30, 2009, 123 Stat. 2017.)

**REFERENCES IN TEXT**

The Robert T. Stafford Disaster Relief and Emergency Assistance Act, referred to in par. (14), is Pub. L. 93–288, May 22, 1974, 88 Stat. 143. Title VI of the Act is classified generally to subchapter IV–B (§5195 et seq.) of chapter 68 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 5121 of Title 42 and Tables.

**AMENDMENTS**

**2009**—Par. (1). Pub. L. 111–67, §8(1), substituted "equipment identified by the President" for "military equipment identified by the Secretary of Defense".

Pars. (2), (3). Pub. L. 111–67, §8(2)–(4), added par. (3), redesignated former par. (3) as (2), and struck out former par. (2). Prior to amendment, text of par. (2) read as follows: "The term 'critical industry for national security' means any industry (or industry sector) identified pursuant to section 2503(6) of title 10, United States Code, and such other industries or industry sectors as may be designated by the President as essential to provide industrial resources required for the execution of the national security strategy of the United States."

Pars. (4), (5). Pub. L. 111–67, §8(2), (5), redesignated pars. (5) and (6) as (4) and (5), respectively, and struck out former par. (4). Prior to amendment, text of par. (4) read as follows: "The term 'critical technology' includes any technology that is included in 1 or more of the plans submitted pursuant to section 6681 of title 42, United States Code, or section 2508 of title 10, United States Code (unless subsequently deleted), or such other emerging or dual use technology as may be designated by the President."

Par. (6). Pub. L. 111–67, §8(5), (6), redesignated par. (7) as (6), in heading, struck out "defense of all" "Domestic", and, in text, substituted " 'domestic industrial base' " for " 'domestic defense industrial base' " and struck out "graduated mobilization," after "peacetime,". Former par. (6) redesignated (5).

Pars. (7) to (9). Pub. L. 111–67, §8(2), (5), redesignated pars. (8), (10), and (11) as (7) to (9), respectively, and struck out former par. (9). Prior to amendment, text of par. (9) read as follows: "The term 'essential weapon system' means a major weapon system and other items of military equipment identified by the Secretary of Defense as being essential to the execution of the national security strategy of the United States." Former par. (7) redesignated (6).

Pars. (10), (11). Pub. L. 111–67, §8(8), added pars. (10) and (11). Former pars. (10) and (11) redesignated (8) and (9), respectively.

Par. (12). Pub. L. 111–67, §8(9), substituted "base" for "capacity".

Par. (14). Pub. L. 111–67, §8(10), substituted "military or critical infrastructure assistance to any foreign nation, homeland security" for "military assistance to any foreign nation".

Par. (16). Pub. L. 111–67, §8(11), added subpars. (C) and (D).

Par. (18). Pub. L. 111–67, §8(2), struck out par. (18). Text read as follows: "The term 'small business concern owned and controlled by socially and economically disadvantaged individuals' has the same meaning as in section 8(d)(3)(C) of the Small Business Act."

**2003**—Pars. (3) to (13). Pub. L. 108–195, §5(1), (2), added par. (3) and redesignated former pars. (3) to (12) as (4) to (13), respectively. Former par. (13) redesignated (14).

Par. (14). Pub. L. 108–195, §5(1), (3), redesignated par. (13) as (14) and inserted "and critical infrastructure protection and restoration" before period at end of last sentence. Former par. (14) redesignated (15).

Pars. (15) to (18). Pub. L. 108–195, §5(1), redesignated pars. (14) to (17) as (15) to (18), respectively.

**1994**—Par. (13). Pub. L. 103–337 inserted at end "Such term includes emergency preparedness activities conducted pursuant to title VI of The Robert T. Stafford Disaster Relief and Emergency Assistance Act."

**1992**—Pub. L. 102–558 amended section generally, substituting present provisions for provisions defining terms "person", "materials", "facilities", "national defense", "wages, salaries, and other compensation", and "defense contractor".

**1970**—Subsec. (d). Pub. L. 91–379, §102(1), inserted reference to space in definition of national defense.

Subsec. (f). Pub. L. 91–379, §102(2), added subsec. (f).

**1953**—Subsec. (d). Act June 30, 1953, amended subsec. (d) generally which, among other changes, inserted references to construction, military assistance to foreign nations and stockpiling, and struck out specific reference to "operations or activities in connection with the Mutual Defense Assistance Act of 1949, as amended".

#### EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–558 deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as a note under section 2062 of this Appendix.

#### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.


## §2153. Civilian personnel

Any officer or agency head may—

(1) appoint civilian personnel without regard to section 5331(b) of title 5, United States Code, and without regard to the provisions of title 5, United States Code, governing appointments in the competitive service; and

(2) fix the rate of basic pay for such personnel without regard to the provisions of chapter 51 and subchapter III of chapter 53 of title 5, United States Code, relating to classification and General Schedule pay rates,

except that no individual so appointed may receive pay in excess of the annual rate of basic pay payable for GS–18 of the General Schedule, as the President deems appropriate to carry out this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix].

(Sept. 8, 1950, ch. 932, title VII, §703, 64 Stat. 816; July 31, 1951, ch. 275, title I, §109(a), (b), 65 Stat. 138; Pub. L. 102–558, title I, §133, Oct. 28, 1992, 106 Stat. 4212.)

AMENDMENTS

**1992**—Pub. L. 102–558 amended section generally, substituting present provisions for provisions relating to delegation of Presidential authority, creation of new agencies, appointment and compensation of officers and personnel, and State representation in regional offices.

**1951**—Subsec. (a). Act July 31, 1951, §109(a), provided that executive head of one agency under this act shall be paid at a rate comparable to that paid heads of executive departments.

Subsec. (b). Act July 31, 1951, §109(b), to provide for State representation in regional offices.

#### EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–558 deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as a note under section 2062 of this Appendix.

#### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

#### REFERENCES IN OTHER LAWS TO GS–16, 17, OR 18 PAY RATES

References in laws to the rates of pay for GS–16, 17, or 18, or to maximum rates of pay under the General Schedule, to be considered references to rates payable under specified sections of Title 5, Government Organization and Employees, see section 529 [title I, §101(c)(1)] of Pub. L. 101–509, set out in a note under section 5376 of Title 5.

#### COMPENSATION OF CERTAIN OFFICIALS IN DOMESTIC AND INTERNATIONAL BUSINESS ADMINISTRATION

Compensation for certain officials in Domestic and International Business Administration fixed at certain prescribed rates by Ex. Ord. No. 11759, Jan. 15, 1974, 39 F.R. 2077, formerly set out as a note under section 1511 of Title 15, Commerce and Trade.

#### COMPENSATION OF DIRECTOR AND DEPUTY DIRECTOR, BUREAU OF DOMESTIC COMMERCE

Compensation for Director and Deputy Director, Bureau of Domestic Commerce, Department of Commerce, was fixed at certain prescribed rates by Ex. Ord. No. 11567, Nov. 16, 1970, 35 F.R. 17701, which was superseded by Ex. Ord. No. 11759, Jan. 15, 1974, 39 F.R. 2077, formerly set out as a note under section 1511 of Title 15, Commerce and Trade.

#### EXECUTIVE ORDER NO. 10193

Ex. Ord. No. 10193, Dec. 16, 1950, 15 F.R. 9031, which provided for conduct of mobilization effort of the Government, was revoked by Ex. Ord. No. 10480, Aug. 14, 1953, 18 F.R. 4939, formerly set out below.

#### EXECUTIVE ORDER NO. 10200

Ex. Ord. No. 10200, Jan. 3, 1951, 16 F.R. 61, as amended by Ex. Ord. No. 10281, Aug. 28, 1951, 16 F.R. 8789; Ex. Ord. No. 10433, Feb. 4, 1953, 18 F.R. 761, which related to establishment of Defense Production Administration, was revoked by Ex. Ord. No. 10480, Aug. 18, 1953, 18 F.R. 4939, formerly set out below.

#### EXECUTIVE ORDER NO. 10224

Ex. Ord. No. 10224, Mar. 15, 1951, 16 F.R. 2543, as amended by Ex. Ord. No. 10461, June 17, 1953, 18 F.R. 3513, which provided for establishment of the National Advisory Board on Mobilization Policy was revoked by section 7(1) of Ex. Ord. No. 10773, July 1, 1958, 23 F.R. 5061, which was subsequently superseded by Ex. Ord. No. 11051, Sept. 27, 1962, 27 F.R. 9683, formerly set out as a note under section 2271 of this Appendix.

#### EXECUTIVE ORDER NO. 10281

Ex. Ord. No. 10281, Aug. 28, 1951, 16 F.R. 8789, which related to defense materials procurement and supply, was revoked by Ex. Ord. No. 10480, Aug. 14, 1953, 18 F.R. 4939, formerly set out below.

#### EXECUTIVE ORDER NO. 10308

Ex. Ord. No. 10308, Dec. 3, 1951, 16 F.R. 12303, creating the Committee on Government Contract Compliance, was revoked and the Committee abolished by Ex. Ord. No. 10479, Aug. 17, 1953, 18 F.R. 4899, which was subsequently revoked by Ex. Ord. No. 10925, Mar. 7, 1961, 26 F.R. 1977.

#### EXECUTIVE ORDER NO. 10433

Ex. Ord. No. 10433, Feb. 4, 1953, 18 F.R. 761, which provided for merger of Defense Production Administration with the Office of Defense Mobilization, was revoked by Ex. Ord. No. 10480, Aug. 14, 1953,

### EXECUTIVE ORDER No. 10461

Ex. Ord. No. 10461, June 17, 1953, 18 F.R. 3513 which related to transfer of functions effected by Reorganization Plan No. 3 of 1953, was superseded by Ex. Ord. No. 11051, Sept. 27, 1962, 27 F.R. 9683, formerly set out as a note under section 2271 of this Appendix.

### EXECUTIVE ORDER No. 10480

Ex. Ord. No. 10480, Aug. 14, 1953, 18 F.R. 4939, as amended by Ex. Ord. No. 10489, Sept. 26, 1953, 18 F.R. 6201; Ex. Ord. No. 10537, June 22, 1954, 19 F.R. 3807; Ex. Ord. No. 10574, Nov. 8, 1954, 19 F.R. 7249; Ex. Ord. No. 10662, Mar. 14, 1956, 21 F.R. 1673; Ex. Ord. No. 10773, July 1, 1958, 23 F.R. 5061; Ex. Ord. No. 10782, Sept. 6, 1958, 23 F.R. 6971; Ex. Ord. No. 10819, May 11, 1959, 24 F.R. 3779; Ex. Ord. No. 11051, Sept. 27, 1962, 27 F.R. 9683; Ex. Ord. No. 11062, Nov. 19, 1962, 27 F.R. 11447; Ex. Ord. No. 11956, Jan. 13, 1977, 42 F.R. 2947; Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957; Ex. Ord. No. 12148, July 20, 1979, 44 F.R. 43239; Ex. Ord. No. 12381, §4, Sept. 8, 1982, 47 F.R. 39795; Ex. Ord. No. 12521, June 24, 1985, 50 F.R. 26335; Ex. Ord. No. 12649, Aug. 11, 1988, 53 F.R. 30639; Ex. Ord. No. 12773, Sept. 26, 1991, 56 F.R. 49387, which provided for administration of defense mobilization program, was revoked by section 904(a)(3) of Ex. Ord. No. 12919, June 3, 1994, 59 F.R. 29533, formerly set out below.

### EXECUTIVE ORDER No. 10660

Ex. Ord. No. 10660, Feb. 15, 1956, 21 F.R. 1117, as amended by Ex. Ord. No. 10773, July 1, 1958, 23 F.R. 5061; Ex. Ord. No. 10782, Sept. 6, 1958, 23 F.R. 6971; Ex. Ord. No. 11051, Sept. 27, 1962, 27 F.R. 9683, which established a National Defense Executive Reserve, was superseded by Ex. Ord. No. 11179, Sept. 22, 1964, 29 F.R. 13239, formerly set out below.

### EXECUTIVE ORDER No. 11179

Ex. Ord. No. 11179, Sept. 22, 1964, 29 F.R. 13239, as amended by Ex. Ord. No. 12148, July 20, 1979, 44 F.R. 43239, which established National Defense Executive Reserve, was revoked by section 904(a)(5) of Ex. Ord. No. 12919, June 3, 1994, 59 F.R. 29533, formerly set out below.

### EXECUTIVE ORDER No. 12919

Ex. Ord. No. 12919, June 3, 1994, 59 F.R. 29525, as amended by Ex. Ord. No. 11858, §11, as added by Ex. Ord. No. 13456, §1, Jan. 23, 2008, 73 F.R. 4680; Ex. Ord. No. 13286, §24, Feb. 28, 2003, 68 F.R. 10624, which delegated authorities and addressed national defense industrial resource policies and programs under the Defense Production Act of 1950, was revoked by Ex. Ord. No. 13603, §803(a), Mar. 16, 2012, 77 F.R. 16660, set out below.

### EX. ORD. No. 13603. NATIONAL DEFENSE RESOURCES PREPAREDNESS

Ex. Ord. No. 13603, Mar. 16, 2012, 77 F.R. 16651, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Defense Production Act of 1950, as amended (50 U.S.C. App. 2061 et seq.), and section 301 of title 3, United States Code, and as Commander in Chief of the Armed Forces of the United States, it is hereby ordered as follows:

## PART I—PURPOSE, POLICY, AND IMPLEMENTATION

SECTION 101. *Purpose.* This order delegates authorities and addresses national defense resource policies and programs under the Defense Production Act of 1950, as amended (the "Act").

SEC. 102. *Policy.* The United States must have an industrial and technological base capable of meeting national defense requirements and capable of contributing to the technological superiority of its national defense equipment in peacetime and in times of national emergency. The domestic industrial and technological base is the foundation for national defense preparedness. The authorities provided in the Act shall be used to strengthen this base and to ensure it is capable of responding to the national defense needs of the United States.

SEC. 103. *General Functions.* Executive departments and agencies (agencies) responsible for plans and programs relating to national defense (as defined in section 801(j) of this order), or for resources and services needed to support such plans and programs, shall:

(a) identify requirements for the full spectrum of emergencies, including essential military and civilian demand;

(b) assess on an ongoing basis the capability of the domestic industrial and technological base to satisfy requirements in peacetime and times of national emergency, specifically evaluating the availability of the most critical resource and production sources, including subcontractors and suppliers, materials, skilled labor, and professional and technical personnel;

(c) be prepared, in the event of a potential threat to the security of the United States, to take actions necessary to ensure the availability of adequate resources and production capability, including services and critical technology, for national defense requirements;

(d) improve the efficiency and responsiveness of the domestic industrial base to support national defense requirements; and

(e) foster cooperation between the defense and commercial sectors for research and development and for acquisition of materials, services, components, and equipment to enhance industrial base efficiency and responsiveness.

SEC. 104. *Implementation.* (a) The National Security Council and Homeland Security Council, in conjunction with the National Economic Council, shall serve as the integrated policymaking forum for consideration and formulation of national defense resource preparedness policy and shall make recommendations to the President on the use of authorities under the Act.

(b) The Secretary of Homeland Security shall:

(1) advise the President on issues of national defense resource preparedness and on the use of the authorities and functions delegated by this order;

(2) provide for the central coordination of the plans and programs incident to authorities and functions delegated under this order, and provide guidance to agencies assigned functions under this order, developed in consultation with such agencies; and

(3) report to the President periodically concerning all program activities conducted pursuant to this order.

(c) The Defense Production Act Committee, described in section 701 of this order, shall:

(1) in a manner consistent with section 2(b) of the Act, 50 U.S.C. App. 2062(b), advise the President through the Assistant to the President and National Security Advisor, the Assistant to the President for Homeland Security and Counterterrorism, and the Assistant to the President for Economic Policy on the effective use of the authorities under the Act; and

(2) prepare and coordinate an annual report to the Congress pursuant to section 722(d) of the Act, 50 U.S.C. App. 2171(d).

(d) The Secretary of Commerce, in cooperation with the Secretary of Defense, the Secretary of Homeland Security, and other agencies, shall:

(1) analyze potential effects of national emergencies on actual production capability, taking into account the entire production system, including shortages of resources, and develop recommended preparedness measures to strengthen capabilities for production increases in national emergencies; and

(2) perform industry analyses to assess capabilities of the industrial base to support the national defense, and develop policy recommendations to improve the international competitiveness of specific domestic industries and their abilities to meet national defense program needs.

## PART II—PRIORITIES AND ALLOCATIONS

SEC. 201. *Priorities and Allocations Authorities.* (a) The authority of the President conferred by section 101 of the Act, 50 U.S.C. App. 2071, to require acceptance and priority performance of contracts or orders (other than contracts of employment) to promote the national defense over performance of any other contracts or orders, and to allocate materials, services, and facilities as deemed necessary or appropriate to promote the national defense, is delegated to the following agency heads:

(1) the Secretary of Agriculture with respect to food resources, food resource facilities, livestock resources, veterinary resources, plant health resources, and the domestic distribution of farm equipment and commercial fertilizer;

(2) the Secretary of Energy with respect to all forms of energy;

(3) the Secretary of Health and Human Services with respect to health resources;

(4) the Secretary of Transportation with respect to all forms of civil transportation;

(5) the Secretary of Defense with respect to water resources; and

(6) the Secretary of Commerce with respect to all other materials, services, and facilities, including construction materials.

(b) The Secretary of each agency delegated authority under subsection (a) of this section (resource departments) shall plan for and issue regulations to prioritize and allocate resources and establish standards and procedures by which the authority shall be used to promote the national defense, under both emergency

and non-emergency conditions. Each Secretary shall authorize the heads of other agencies, as appropriate, to place priority ratings on contracts and orders for materials, services, and facilities needed in support of programs approved under section 202 of this order.

(c) Each resource department shall act, as necessary and appropriate, upon requests for special priorities assistance, as defined by section 801(l) of this order, in a time frame consistent with the urgency of the need at hand. In situations where there are competing program requirements for limited resources, the resource department shall consult with the Secretary who made the required determination under section 202 of this order. Such Secretary shall coordinate with and identify for the resource department which program requirements to prioritize on the basis of operational urgency. In situations involving more than one Secretary making such a required determination under section 202 of this order, the Secretaries shall coordinate with and identify for the resource department which program requirements should receive priority on the basis of operational urgency.

(d) If agreement cannot be reached between two such Secretaries, then the issue shall be referred to the President through the Assistant to the President and National Security Advisor and the Assistant to the President for Homeland Security and Counterterrorism.

(e) The Secretary of each resource department, when necessary, shall make the finding required under section 101(b) of the Act, 50 U.S.C. App. 2071(b). This finding shall be submitted for the President's approval through the Assistant to the President and National Security Advisor and the Assistant to the President for Homeland Security and Counterterrorism. Upon such approval, the Secretary of the resource department that made the finding may use the authority of section 101(a) of the Act, 50 U.S.C. App. 2071(a), to control the general distribution of any material (including applicable services) in the civilian market.

SEC. 202. *Determinations*. Except as provided in section 201(e) of this order, the authority delegated by section 201 of this order may be used only to support programs that have been determined in writing as necessary or appropriate to promote the national defense:

(a) by the Secretary of Defense with respect to military production and construction, military assistance to foreign nations, military use of civil transportation, stockpiles managed by the Department of Defense, space, and directly related activities;

(b) by the Secretary of Energy with respect to energy production and construction, distribution and use, and directly related activities; and

(c) by the Secretary of Homeland Security with respect to all other national defense programs, including civil defense and continuity of Government.

SEC. 203. *Maximizing Domestic Energy Supplies*. The authorities of the President under section 101(c)(1)–(2) of the Act, 50 U.S.C. App. 2071(c)(1)–(2), are delegated to the Secretary of Commerce, with the exception that the authority to make findings that materials (including equipment), services, and facilities are critical and essential, as described in section 101(c)(2)(A) of the Act, 50 U.S.C. App. 2071(c)(2)(A), is delegated to the Secretary of Energy.

SEC. 204. *Chemical and Biological Warfare*. The authority of the President conferred by section 104(b) of the Act, 50 U.S.C. App. 2074(b), is delegated to the Secretary of Defense. This authority may not be further delegated by the Secretary.

## PART III—EXPANSION OF PRODUCTIVE CAPACITY AND SUPPLY

SEC. 301. *Loan Guarantees*. (a) To reduce current or projected shortfalls of resources, critical technology items, or materials essential for the national defense, the head of each agency engaged in procurement for the national defense, as defined in section 801(h) of this order, is authorized pursuant to section 301 of the Act, 50 U.S.C. App. 2091, to guarantee loans by private institutions.

(b) Each guaranteeing agency is designated and authorized to: (1) act as fiscal agent in the making of its own guarantee contracts and in otherwise carrying out the purposes of section 301 of the Act; and (2) contract with any Federal Reserve Bank to assist the agency in serving as fiscal agent.

(c) Terms and conditions of guarantees under this authority shall be determined in consultation with the Secretary of the Treasury and the Director of the Office of Management and Budget (OMB). The guaranteeing agency is authorized, following such consultation, to prescribe: (1) either specifically or by maximum limits or otherwise, rates of interest, guarantee and commitment fees, and other charges which may be made in connection with such guarantee contracts; and (2) regulations governing the forms and procedures (which shall be uniform to the extent practicable) to be utilized in connection therewith.

SEC. 302. *Loans*. To reduce current or projected shortfalls of resources, critical technology items, or materials essential for the national defense, the head of each agency engaged in procurement for the national defense is delegated the authority of the President under section 302 of the Act, 50 U.S.C. App. 2092, to make

the Secretary of the Treasury and the Director of OMB.

SEC. 303. *Additional Authorities.* (a) To create, maintain, protect, expand, or restore domestic industrial base capabilities essential for the national defense, the head of each agency engaged in procurement for the national defense is delegated the authority of the President under section 303 of the Act, 50 U.S.C. App. 2093, to make provision for purchases of, or commitments to purchase, an industrial resource or a critical technology item for Government use or resale, and to make provision for the development of production capabilities, and for the increased use of emerging technologies in security program applications, and to enable rapid transition of emerging technologies.

(b) Materials acquired under section 303 of the Act, 50 U.S.C. App. 2093, that exceed the needs of the programs under the Act may be transferred to the National Defense Stockpile, if, in the judgment of the Secretary of Defense as the National Defense Stockpile Manager, such transfers are in the public interest.

SEC. 304. *Subsidy Payments.* To ensure the supply of raw or nonprocessed materials from high-cost sources, or to ensure maximum production or supply in any area at stable prices of any materials in light of a temporary increase in transportation cost, the head of each agency engaged in procurement for the national defense is delegated the authority of the President under section 303(c) of the Act, 50 U.S.C. App. 2093(c), to make subsidy payments, after consultation with the Secretary of the Treasury and the Director of OMB.

SEC. 305. *Determinations and Findings.* (a) Pursuant to budget authority provided by an appropriations act in advance for credit assistance under section 301 or 302 of the Act, 50 U.S.C. App. 2091, 2092, and consistent with the Federal Credit Reform Act of 1990, as amended (FCRA), 2 U.S.C. 661 et seq., the head of each agency engaged in procurement for the national defense is delegated the authority to make the determinations set forth in sections 301(a)(2) and 302(b)(2) of the Act, in consultation with the Secretary making the required determination under section 202 of this order; provided, that such determinations shall be made after due consideration of the provisions of OMB Circular A–129 and the credit subsidy score for the relevant loan or loan guarantee as approved by OMB pursuant to FCRA.

(b) Other than any determination by the President under section 303(a)(7)(b) of the Act, the head of each agency engaged in procurement for the national defense is delegated the authority to make the required determinations, judgments, certifications, findings, and notifications defined under section 303 of the Act, 50 U.S.C. App. 2093, in consultation with the Secretary making the required determination under section 202 of this order.

SEC. 306. *Strategic and Critical Materials.* The Secretary of Defense, and the Secretary of the Interior in consultation with the Secretary of Defense as the National Defense Stockpile Manager, are each delegated the authority of the President under section 303(a)(1)(B) of the Act, 50 U.S.C. App. 2093(a)(1)(B), to encourage the exploration, development, and mining of strategic and critical materials and other materials.

SEC. 307. *Substitutes.* The head of each agency engaged in procurement for the national defense is delegated the authority of the President under section 303(g) of the Act, 50 U.S.C. App. 2093(g), to make provision for the development of substitutes for strategic and critical materials, critical components, critical technology items, and other resources to aid the national defense.

SEC. 308. *Government-Owned Equipment.* The head of each agency engaged in procurement for the national defense is delegated the authority of the President under section 303(e) of the Act, 50 U.S.C. App. 2093(e), to:

(a) procure and install additional equipment, facilities, processes, or improvements to plants, factories, and other industrial facilities owned by the Federal Government and to procure and install Government-owned equipment in plants, factories, or other industrial facilities owned by private persons;

(b) provide for the modification or expansion of privately owned facilities, including the modification or improvement of production processes, when taking actions under sections 301, 302, or 303 of the Act, 50 U.S.C. App. 2091, 2092, 2093; and

(c) sell or otherwise transfer equipment owned by the Federal Government and installed under section 303(e) of the Act, 50 U.S.C. App. 2093(e), to the owners of such plants, factories, or other industrial facilities.

SEC. 309. *Defense Production Act Fund.* The Secretary of Defense is designated the Defense Production Act Fund Manager, in accordance with section 304(f) of the Act, 50 U.S.C. App. 2094(f), and shall carry out the duties specified in section 304 of the Act, in consultation with the agency heads having approved, and appropriated funds for, projects under title III of the Act.

SEC. 310. *Critical Items.* The head of each agency engaged in procurement for the national defense is delegated the authority of the President under section 107(b)(1) of the Act, 50 U.S.C. App. 2077(b)(1), to take appropriate action to ensure that critical components, critical technology items, essential materials, and industrial resources are available from reliable sources when needed to meet defense requirements during

peacetime, graduated mobilization, and national emergency. Appropriate action may include restricting contract solicitations to reliable sources, restricting contract solicitations to domestic sources (pursuant to statutory authority), stockpiling critical components, and developing substitutes for critical components or critical technology items.

SEC. 311. *Strengthening Domestic Capability*. The head of each agency engaged in procurement for the national defense is delegated the authority of the President under section 107(a) of the Act, 50 U.S.C. App. 2077(a), to utilize the authority of title III of the Act or any other provision of law to provide appropriate incentives to develop, maintain, modernize, restore, and expand the productive capacities of domestic sources for critical components, critical technology items, materials, and industrial resources essential for the execution of the national security strategy of the United States.

SEC. 312. *Modernization of Equipment*. The head of each agency engaged in procurement for the national defense, in accordance with section 108(b) of the Act, 50 U.S.C. App. 2078(b), may utilize the authority of title III of the Act to guarantee the purchase or lease of advance manufacturing equipment, and any related services with respect to any such equipment for purposes of the Act. In considering title III projects, the head of each agency engaged in procurement for the national defense shall provide a strong preference for proposals submitted by a small business supplier or subcontractor in accordance with section 108(b)(2) of the Act, 50 U.S.C. App. 2078(b)(2).

## PART IV—VOLUNTARY AGREEMENTS AND ADVISORY COMMITTEES

SEC. 401. *Delegations*. The authority of the President under sections 708(c) and (d) of the Act, 50 U.S.C. App. 2158(c), (d), is delegated to the heads of agencies otherwise delegated authority under this order. The status of the use of such delegations shall be furnished to the Secretary of Homeland Security.

SEC. 402. *Advisory Committees*. The authority of the President under section 708(d) of the Act, 50 U.S.C. App. 2158(d), and delegated in section 401 of this order (relating to establishment of advisory committees) shall be exercised only after consultation with, and in accordance with, guidelines and procedures established by the Administrator of General Services.

SEC. 403. *Regulations*. The Secretary of Homeland Security, after approval of the Attorney General, and after consultation by the Attorney General with the Chairman of the Federal Trade Commission, shall promulgate rules pursuant to section 708(e) of the Act, 50 U.S.C. App. 2158(e), incorporating standards and procedures by which voluntary agreements and plans of action may be developed and carried out. Such rules may be adopted by other agencies to fulfill the rulemaking requirement of section 708(e) of the Act, 50 U.S.C. App. 2158(e).

## PART V—EMPLOYMENT OF PERSONNEL

SEC. 501. *National Defense Executive Reserve*. (a) In accordance with section 710(e) of the Act, 50 U.S.C. App. 2160(e), there is established in the executive branch a National Defense Executive Reserve (NDER) composed of persons of recognized expertise from various segments of the private sector and from Government (except full-time Federal employees) for training for employment in executive positions in the Federal Government in the event of a national defense emergency.

(b) The Secretary of Homeland Security shall issue necessary guidance for the NDER program, including appropriate guidance for establishment, recruitment, training, monitoring, and activation of NDER units and shall be responsible for the overall coordination of the NDER program. The authority of the President under section 710(e) of the Act, 50 U.S.C. App. 2160(e), to determine periods of national defense emergency is delegated to the Secretary of Homeland Security.

(c) The head of any agency may implement section 501(a) of this order with respect to NDER operations in such agency.

(d) The head of each agency with an NDER unit may exercise the authority under section 703 of the Act, 50 U.S.C. App. 2153, to employ civilian personnel when activating all or a part of its NDER unit. The exercise of this authority shall be subject to the provisions of sections 501(e) and (f) of this order and shall not be redelegated.

(e) The head of an agency may activate an NDER unit, in whole or in part, upon the written determination of the Secretary of Homeland Security that an emergency affecting the national defense exists and that the activation of the unit is necessary to carry out the emergency program functions of the agency.

(f) Prior to activating the NDER unit, the head of the agency shall notify, in writing, the Assistant to the President for Homeland Security and Counterterrorism of the impending activation.

SEC. 502. *Consultants*. The head of each agency otherwise delegated functions under this order is delegated the authority of the President under sections 710(b) and (c) of the Act, 50 U.S.C. App. 2160(b), (c), to employ

persons of outstanding experience and ability without compensation and to employ experts, consultants, or organizations. The authority delegated by this section may not be redelegated.

## PART VI—LABOR REQUIREMENTS

SEC. 601. *Secretary of Labor.* (a) The Secretary of Labor, in coordination with the Secretary of Defense and the heads of other agencies, as deemed appropriate by the Secretary of Labor, shall:

(1) collect and maintain data necessary to make a continuing appraisal of the Nation's workforce needs for purposes of national defense;

(2) upon request by the Director of Selective Service, and in coordination with the Secretary of Defense, assist the Director of Selective Service in development of policies regulating the induction and deferment of persons for duty in the armed services;

(3) upon request from the head of an agency with authority under this order, consult with that agency with respect to: (i) the effect of contemplated actions on labor demand and utilization; (ii) the relation of labor demand to materials and facilities requirements; and (iii) such other matters as will assist in making the exercise of priority and allocations functions consistent with effective utilization and distribution of labor;

(4) upon request from the head of an agency with authority under this order: (i) formulate plans, programs, and policies for meeting the labor requirements of actions to be taken for national defense purposes; and (ii) estimate training needs to help address national defense requirements and promote necessary and appropriate training programs; and

(5) develop and implement an effective labor-management relations policy to support the activities and programs under this order, with the cooperation of other agencies as deemed appropriate by the Secretary of Labor, including the National Labor Relations Board, the Federal Labor Relations Authority, the National Mediation Board, and the Federal Mediation and Conciliation Service.

(b) All agencies shall cooperate with the Secretary of Labor, upon request, for the purposes of this section, to the extent permitted by law.

## PART VII—DEFENSE PRODUCTION ACT COMMITTEE

SEC. 701. *The Defense Production Act Committee.* (a) The Defense Production Act Committee (Committee) shall be composed of the following members, in accordance with section 722(b) of the Act, 50 U.S.C. App. 2171(b):

(1) The Secretary of State;
(2) The Secretary of the Treasury;
(3) The Secretary of Defense;
(4) The Attorney General;
(5) The Secretary of the Interior;
(6) The Secretary of Agriculture;
(7) The Secretary of Commerce;
(8) The Secretary of Labor;
(9) The Secretary of Health and Human Services;
(10) The Secretary of Transportation;
(11) The Secretary of Energy;
(12) The Secretary of Homeland Security;
(13) The Director of National Intelligence;
(14) The Director of the Central Intelligence Agency;
(15) The Chair of the Council of Economic Advisers;
(16) The Administrator of the National Aeronautics and Space Administration; and
(17) The Administrator of General Services.

(b) The Director of OMB and the Director of the Office of Science and Technology Policy shall be invited to participate in all Committee meetings and activities in an advisory role. The Chairperson, as designated by the President pursuant to section 722 of the Act, 50 U.S.C. App. 2171, may invite the heads of other agencies or offices to participate in Committee meetings and activities in an advisory role, as appropriate.

SEC. 702. *Offsets.* The Secretary of Commerce shall prepare and submit to the Congress the annual report required by section 723 of the Act, 50 U.S.C. App. 2172, in consultation with the Secretaries of State, the Treasury, Defense, and Labor, the United States Trade Representative, the Director of National Intelligence, and the heads of other agencies as appropriate. The heads of agencies shall provide the Secretary of Commerce with such information as may be necessary for the effective performance of this function.

## PART VIII—GENERAL PROVISIONS

SEC. 801. *Definitions.* In addition to the definitions in section 702 of the Act, 50 U.S.C. App. 2152, the following definitions apply throughout this order:

(a) "Civil transportation" includes movement of persons and property by all modes of transportation in interstate, intrastate, or foreign commerce within the United States, its territories and possessions, and the District of Columbia, and related public storage and warehousing, ports, services, equipment and facilities, such as transportation carrier shop and repair facilities. "Civil transportation" also shall include direction, control, and coordination of civil transportation capacity regardless of ownership. "Civil transportation" shall not include transportation owned or controlled by the Department of Defense, use of petroleum and gas pipelines, and coal slurry pipelines used only to supply energy production facilities directly.

(b) "Energy" means all forms of energy including petroleum, gas (both natural and manufactured), electricity, solid fuels (including all forms of coal, coke, coal chemicals, coal liquification, and coal gasification), solar, wind, other types of renewable energy, atomic energy, and the production, conservation, use, control, and distribution (including pipelines) of all of these forms of energy.

(c) "Farm equipment" means equipment, machinery, and repair parts manufactured for use on farms in connection with the production or preparation for market use of food resources.

(d) "Fertilizer" means any product or combination of products that contain one or more of the elements nitrogen, phosphorus, and potassium for use as a plant nutrient.

(e) "Food resources" means all commodities and products, (simple, mixed, or compound), or complements to such commodities or products, that are capable of being ingested by either human beings or animals, irrespective of other uses to which such commodities or products may be put, at all stages of processing from the raw commodity to the products thereof in vendible form for human or animal consumption. "Food resources" also means potable water packaged in commercially marketable containers, all starches, sugars, vegetable and animal or marine fats and oils, seed, cotton, hemp, and flax fiber, but does not mean any such material after it loses its identity as an agricultural commodity or agricultural product.

(f) "Food resource facilities" means plants, machinery, vehicles (including on farm), and other facilities required for the production, processing, distribution, and storage (including cold storage) of food resources, and for the domestic distribution of farm equipment and fertilizer (excluding transportation thereof).

(g) "Functions" include powers, duties, authority, responsibilities, and discretion.

(h) "Head of each agency engaged in procurement for the national defense" means the heads of the Departments of State, Justice, the Interior, and Homeland Security, the Office of the Director of National Intelligence, the Central Intelligence Agency, the National Aeronautics and Space Administration, the General Services Administration, and all other agencies with authority delegated under section 201 of this order.

(i) "Health resources" means drugs, biological products, medical devices, materials, facilities, health supplies, services and equipment required to diagnose, mitigate or prevent the impairment of, improve, treat, cure, or restore the physical or mental health conditions of the population.

(j) "National defense" means programs for military and energy production or construction, military or critical infrastructure assistance to any foreign nation, homeland security, stockpiling, space, and any directly related activity. Such term includes emergency preparedness activities conducted pursuant to title VI of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5195 et seq., and critical infrastructure protection and restoration.

(k) "Offsets" means compensation practices required as a condition of purchase in either government-to-government or commercial sales of defense articles and/or defense services as defined by the Arms Export Control Act, 22 U.S.C. 2751 *et seq.*, and the International Traffic in Arms Regulations, 22 C.F.R. 120.1–130.17.

(l) "Special priorities assistance" means action by resource departments to assist with expediting deliveries, placing rated orders, locating suppliers, resolving production or delivery conflicts between various rated orders, addressing problems that arise in the fulfillment of a rated order or other action authorized by a delegated agency, and determining the validity of rated orders.

(m) "Strategic and critical materials" means materials (including energy) that (1) would be needed to supply the military, industrial, and essential civilian needs of the United States during a national emergency, and (2) are not found or produced in the United States in sufficient quantities to meet such need and are vulnerable to the termination or reduction of the availability of the material.

(n) "Water resources" means all usable water, from all sources, within the jurisdiction of the United States, that can be managed, controlled, and allocated to meet emergency requirements, except "water resources" does not include usable water that qualifies as "food resources."

SEC. 802. *General.* (a) Except as otherwise provided in section 802(c) of this order, the authorities vested in the President by title VII of the Act, 50 U.S.C. App. 2151 et seq., are delegated to the head of each agency in

carrying out the delegated authorities under the Act and this order, by the Secretary of Labor in carrying out part VI of this order, and by the Secretary of the Treasury in exercising the functions assigned in Executive Order 11858, as amended.

(b) The authorities that may be exercised and performed pursuant to section 802(a) of this order shall include:

(1) the power to redelegate authorities, and to authorize the successive redelegation of authorities to agencies, officers, and employees of the Government; and

(2) the power of subpoena under section 705 of the Act, 50 U.S.C. App. 2155, with respect to (i) authorities delegated in parts II, III, and section 702 of this order, and (ii) the functions assigned to the Secretary of the Treasury in Executive Order 11858, as amended, provided that the subpoena power referenced in subsections (i) and (ii) shall be utilized only after the scope and purpose of the investigation, inspection, or inquiry to which the subpoena relates have been defined either by the appropriate officer identified in section 802(a) of this order or by such other person or persons as the officer shall designate.

(c) Excluded from the authorities delegated by section 802(a) of this order are authorities delegated by parts IV and V of this order, authorities in section[s] 721 and 722 of the Act, 50 U.S.C. App. 2170–2171, and the authority with respect to fixing compensation under section 703 of the Act, 50 U.S.C. App. 2153.

SEC. 803. *Authority.* (a) Executive Order 12919 of June 3, 1994, [formerly set out above] and sections 401(3)–(4) of Executive Order 12656 of November 18, 1988, [42 U.S.C. 5195 note] are revoked. All other previously issued orders, regulations, rulings, certificates, directives, and other actions relating to any function affected by this order shall remain in effect except as they are inconsistent with this order or are subsequently amended or revoked under proper authority. Nothing in this order shall affect the validity or force of anything done under previous delegations or other assignment of authority under the Act.

(b) Nothing in this order shall affect the authorities assigned under Executive Order 11858 of May 7, 1975, as amended, except as provided in section 802 of this order.

(c) Nothing in this order shall affect the authorities assigned under Executive Order 12472 of April 3, 1984, as amended.

SEC. 804. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect functions of the Director of OMB relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA.

# §2154. Regulations and orders

## (a) In general

Subject to section 709 [section 2159 of this Appendix] and subsection (b), the President may prescribe such regulations and issue such orders as the President may determine to be appropriate to carry out this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix].

## (b) Procurement regulations

Any procurement regulation, procedure, or form issued pursuant to subsection (a) shall be issued pursuant to section 25 of the Office of Federal Procurement Policy Act [now 41 U.S.C. 1302, 1303], and shall conform to any governmentwide procurement policy or regulation issued pursuant to section 6 or 25 of that Act [see 41 U.S.C. 1121 et seq., 1302, 1303].

(Sept. 8, 1950, ch. 932, title VII, §704, 64 Stat. 816; July 31, 1951, ch. 275, title I, §109(c), 65 Stat. 139; Pub. L. 102–558, title I, §134, Oct. 28, 1992, 106 Stat. 4212.)

REFERENCES IN TEXT

Sections 6 and 25 of the Office of Federal Procurement Policy Act, referred to in subsec. (b), were sections 6 and 25 of Pub. L. 93–400, which were classified to sections 405 and 421, respectively, of former Title 41, Public Contracts, and were repealed and largely restated in subchapter II (§1121 et seq.) of chapter 11 and as

## AMENDMENTS

1992—Pub. L. 102–558 amended section generally, substituting present provisions for provisions authorizing promulgation of rules, regulations, and orders by the President in order to carry out sections 2061 to 2170 of this Appendix.

1951—Act July 31, 1951, limited authority to regulate natural gas where a State agency is handling the matter.

## EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–558 deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as a note under section 2062 of this Appendix.

## TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

## DELEGATION OF FUNCTIONS

Functions of President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to production, conservation, use, control, distribution, and allocation of energy, delegated to Secretary of Energy, see section 4 of Ex. Ord. No. 11790, eff. June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15, Commerce and Trade.

## §2155. Investigations; records; reports; subpoenas; right to counsel

(a) The President shall be entitled, while this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] is in effect and for a period of two years thereafter, by regulation, subpoena, or otherwise, to obtain such information from, require such reports and the keeping of such records by, make such inspection of the books, records, and other writings, premises or property of, and take the sworn testimony of, and administer oaths and affirmations to, any person as may be necessary or appropriate, in his discretion, to the enforcement or the administration of this Act and the regulations or orders issued thereunder. The authority of the President under this section includes the authority to obtain information in order to perform industry studies assessing the capabilities of the United States industrial base to support the national defense. The President shall issue regulations insuring that the authority of this subsection will be utilized only after the scope and purpose of the investigation, inspection, or inquiry to be made have been defined by competent authority, and it is assured that no adequate and authoritative data are available from any Federal or other responsible agency. In case of contumacy by, or refusal to obey a subpoena served upon, any person referred to in this subsection, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the President, shall have jurisdiction to issue an order requiring such person to appear and give testimony or to appear and produce documents, or both; and any failure to obey such order of the court may be punished by such court as a contempt thereof.

(b) The production of a person's books, records, or other documentary evidence shall not be required at any place other than the place where such person usually keeps them, if, prior to the return date specified in the regulations, subpoena, or other document issued with respect thereto, such person furnishes the President with a true copy of such books, records, or other documentary evidence (certified by such person under oath to be a true and correct copy) or enters into a stipulation with the President as to the information contained in such books, records, or other documentary evidence. Witnesses shall be paid the same fees and mileage that are paid witnesses in the courts of the United States.

(c) Any person who willfully performs any act prohibited or willfully fails to perform any act required by the above provisions of this section, or any rule, regulation, or order thereunder, shall upon conviction be fined not more than $10,000 or imprisoned for not more than one year or both.

(d) Information obtained under this section which the President deems confidential or with reference to which a request for confidential treatment is made by the person furnishing such information shall not be published or disclosed unless the President determines that the withholding

thereof is contrary to the interest of the national defense, and any person willfully violating this provision shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both.

(e) Any person subpoenaed under this section shall have the right to make a record of his testimony and to be represented by counsel.

(Sept. 8, 1950, ch. 932, title VII, §705, 64 Stat. 816; July 31, 1951, ch. 275, title I, §109(d), 65 Stat. 139; June 30, 1952, ch. 530, title I, §117, 66 Stat. 306; June 30, 1953, ch. 171, §9, 67 Stat. 131; Pub. L. 91–452, title II, §251, Oct. 15, 1970, 84 Stat. 931; Pub. L. 102–558, title I, §142, Oct. 28, 1992, 106 Stat. 4217; Pub. L. 108–195, §4, Dec. 19, 2003, 117 Stat. 2893.)

### AMENDMENTS

**2003**—Subsec. (a). Pub. L. 108–195 inserted after first sentence "The authority of the President under this section includes the authority to obtain information in order to perform industry studies assessing the capabilities of the United States industrial base to support the national defense."

**1992**—Subsec. (a). Pub. L. 102–558, §142(1), substituted "subpoena" for "subpena" in two places.

Subsec. (b). Pub. L. 102–558, §142(1), (2), redesignated subsec. (c) as (b) and substituted "subpoena" for "subpena".

Subsec. (c). Pub. L. 102–558, §142(2), (3), redesignated subsec. (d) as (c) and substituted "$10,000" for "$1,000". Former subsec. (c) redesignated (b).

Subsec. (d). Pub. L. 102–558, §142(2), (4), redesignated subsec. (e) as (d) and struck out second undesignated par. which read as follows: "All information obtained by the Office of Price Stabilization under this section 705, as amended, and not made public prior to April 30, 1953, shall be deemed confidential and shall not be published or disclosed, either to the public or to another Federal agency except the Congress or any duly authorized committee thereof, and except the Department of Justice for such use as it may deem necessary in the performance of its functions, unless the President determines that the withholding thereof is contrary to the interests of the national defense, and any person willfully violating this provision shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both." Former subsec. (d) redesignated (c).

Subsecs. (e), (f). Pub. L. 102–558, §142(2), (5), redesignated subsec. (f) as (e) and substituted "subpoenaed" for "subpenaed". Former subsec. (e) redesignated (d).

**1970**—Subsec. (b). Pub. L. 91–452 struck out subsec. (b) which related to immunity from prosecution of any natural person compelled to testify or produce evidence, documentary or otherwise, after claiming his privilege against self-incrimination, and that any such immunity granted would not be construed to vest in any individual any right to priorities assistance, to the allocation of materials, or to any other benefit within the power of the President to grant under sections 2061 to 2166 of this Appendix.

**1953**—Subsec. (e). Act June 30, 1953, added second par.

**1952**—Subsec. (f). Act June 30, 1952, added subsec. (f).

**1951**—Subsec. (a). Act July 31, 1951, made it clear that President has authority to administer oaths and affirmations.

### EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–558 deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as a note under section 2062 of this Appendix.

### EFFECTIVE DATE OF 1970 AMENDMENT

Amendment by Pub. L. 91–452 effective on sixtieth day following Oct. 15, 1970, and not to affect any immunity to which any individual is entitled under this section by reason of any testimony given before sixtieth day following Oct. 15, 1970, see section 260 of Pub. L. 91–452, set out as an Effective Date; Savings Provision note under section 6001 of Title 18, Crimes and Criminal Procedure.

### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

### DELEGATION OF FUNCTIONS

Functions of President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to production, conservation, use, control, distribution, and allocation of energy, delegated to Secretary of Energy, see section 4 of Ex. Ord. No. 11790, June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15, Commerce and Trade.

## §2156. Jurisdiction of courts; injunctions; venue; process; effect of termination of provisions

(a) Whenever in the judgment of the President any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix], he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the President that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order, with or without such injunction or restraining order, shall be granted without bond.

(b) The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction of violations of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] or any rule, regulation, order, or subpena thereunder, and of all civil actions under this Act to enforce any liability or duty created by, or to enjoin any violation of, this Act or any rule, regulation, order, or subpena thereunder. Any criminal proceeding on account of any such violation may be brought in any district in which any act, failure to act, or transaction constituting the violation occurred. Any such civil action may be brought in any such district or in the district in which the defendant resides or transacts business. Process in such cases, criminal or civil, may be served in any district wherein the defendant resides or transacts business or wherever the defendant may be found; the subpena for witnesses who are required to attend a court in any district in such case may run into any other district. The termination of the authority granted in any title or section of this Act, or of any rule, regulation, or order issued thereunder, shall not operate to defeat any suit, action, or prosecution, whether theretofore or thereafter commenced, with respect to any right, liability, or offense incurred or committed prior to the termination date of such title or of such rule, regulation, or order. No costs shall be assessed against the United States in any proceeding under this Act. All litigation arising under this Act or the regulations promulgated thereunder shall be under the supervision and control of the Attorney General.

(Sept. 8, 1950, ch. 932, title VII, §706, 64 Stat. 817; July 31, 1951, ch. 275, title I, §109(e), 65 Stat. 139.)

### AMENDMENTS

**1951**—Subsec. (a). Act July 31, 1951, broadened relief a court may grant when Government seeks to enjoin violations.

### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

### DELEGATION OF FUNCTIONS

Functions of President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to production, conservation, use, control, distribution, and allocation of energy, delegated to Secretary of Energy, see section 4 of Ex. Ord. No. 11790, June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15, Commerce and Trade.

## §2157. Liability for compliance with invalid regulations; discrimination against orders or contracts affected by priorities or allocations

No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix], notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid. No person shall discriminate against orders or contracts to which priority is assigned or for which materials or facilities are allocated under title I of this Act [sections 2071 to 2078 of this Appendix]

or under any rule, regulation, or order issued thereunder, by charging higher prices or by imposing different terms and conditions for such orders or contracts than for other generally comparable orders or contracts, or in any other manner.

(Sept. 8, 1950, ch. 932, title VII, §707, 64 Stat. 818; June 30, 1952, ch. 530, title I, §118, 66 Stat. 306.)

**AMENDMENTS**

1952—Act June 30, 1952, in first sentence struck out "his" before "compliance with".

## §2158. Voluntary agreements and plans of action for preparedness programs and expansion of production capacity and supply

**(a) Immunity from civil and criminal liability or defense to action under antitrust laws; exceptions**

Except as specifically provided in subsection (j) of this section, no provision of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] shall be deemed to convey to any person any immunity from civil or criminal liability, or to create defenses to actions, under the antitrust laws.

**(b) Definitions**

For purposes of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix]—

**(1) Antitrust laws**

The term "antitrust laws" has the meaning given to such term in subsection (a) of the first section of the Clayton Act [15 U.S.C. 12(a)], except that such term includes section 5 of the Federal Trade Commission Act [15 U.S.C. 45] to the extent that such section 5 applies to unfair methods of competition.

**(2) Plan of action**

The term "plan of action" means any of 1 or more documented methods adopted by participants in an existing voluntary agreement to implement that agreement.

**(c) Prerequisites for agreements and plans of action; delegation of authority to Presidential designees**

(1) Upon finding that conditions exist which may pose a direct threat to the national defense or its preparedness programs, the President may consult with representatives of industry, business, financing, agriculture, labor, and other interests in order to provide for the making by such persons, with the approval of the President, of voluntary agreements and plans of action to help provide for the national defense.

(2) The authority granted to the President in paragraph (1) and subsection (d) may be delegated by him (A) to individuals who are appointed by and with the advice and consent of the Senate, or are holding offices to which they have been appointed by and with the advice and consent of the Senate, (B) upon the condition that such individuals consult with the Attorney General and with the Federal Trade Commission not less than ten days before consulting with any persons under paragraph (1), and (C) upon the condition that such individuals obtain the prior approval of the Attorney General, after consultation by the Attorney General with the Federal Trade Commission, to consult under paragraph (1).

(3) Upon a determination by the President, on a nondelegable basis, that a specific voluntary agreement or plan of action is necessary to meet national defense requirements resulting from an event that degrades or destroys critical infrastructure—

(A) an individual that has been delegated authority under paragraph (1) with respect to such agreement or plan shall not be required to consult with the Attorney General or the Federal Trade Commission under paragraph (2)(B); and

(B) the President shall publish a rule in accordance with subsection (e)(2)(B) and publish notice in accordance with subsection (e)(3)(B) with respect to such agreement or plan as soon as is practicable under the circumstances.

**(d) Advisory committees; establishment; applicable provisions; membership; notice and participation in meetings; verbatim transcript; availability to public**

(1) To achieve the objectives of subsection (c)(1) of this section, the President or any individual designated pursuant to subsection (c)(2) may provide for the establishment of such advisory committees as he determines are necessary. In addition to the requirements specified in this section and except as provided in subsection (n), any such advisory committee shall be subject to the provisions of the Federal Advisory Committee Act, whether or not such Act or any of its provisions expire or terminate during the term of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] or of such committees, and in all cases such advisory committees shall be chaired by a Federal employee (other than an individual employed pursuant to section 3109 of title 5, United States Code) and shall include representatives of the public. The Attorney General and the Federal Trade Commission shall have adequate advance notice of any meeting and may have an official representative attend and participate in any such meeting.

(2) A full and complete verbatim transcript shall be kept of such advisory committee meetings, and shall be taken and deposited, together with any agreement resulting therefrom, with the Attorney General and the Federal Trade Commission. Such transcript and agreement shall be made available for public inspection and copying, subject to the provisions of paragraphs (1), (3), and (4) of section 552(b) of title 5, United States Code.

**(e) Rules; promulgation by Presidential designees; consultation by Attorney General with Chairman of Federal Trade Commission; approval of Attorney General; procedures; incorporation of standards and procedures for development of agreements and plans of action**

(1) The individual or individuals referred to in subsection (c)(2) shall, after approval of the Attorney General, after consultation by the Attorney General with the Chairman of the Federal Trade Commission, promulgate rules, in accordance with section 553 of title 5, United States Code, incorporating standards and procedures by which voluntary agreements and plans of action may be developed and carried out.

(2) In addition to the requirements of section 553 of title 5, United States Code—

(A) general notice of the proposed rulemaking referred to in paragraph (1) shall be published in the Federal Register, and such notice shall include—

(i) a statement of the time, place, and nature of the proposed rulemaking proceedings;

(ii) reference to the legal authority under which the rule is being proposed; and

(iii) either the terms of substance of the proposed rule or a description of the subjects and issues involved;

(B) the required publication of a rule shall be made not less than thirty days before its effective date; and

(C) the individual or individuals referred to in paragraph (1) shall give interested persons the right to petition for the issuance, amendment, or repeal of a rule.

(3) The rules promulgated pursuant to this subsection incorporating standards and procedures by which voluntary agreements may be developed shall provide, among other things, that—

(A) such agreements shall be developed at meetings which include—

(i) the Attorney General or his delegate,

(ii) the Chairman of the Federal Trade Commission or his delegate, and

(iii) an individual designated by the President in subsection (c)(2) or his delegate,

and which are chaired by the individual referred to in clause (iii);

(B) at least seven days prior to any such meeting, notice of the time, place, and nature of the meeting shall be published in the Federal Register;

(C) interested persons may submit written data and views concerning the proposed voluntary agreement, with or without opportunity for oral presentation;

(D) interested persons may attend any such meeting unless the individual designated by the President in subsection (c)(2) finds that the matter or matters to be discussed at such meeting falls within the purview of matters described in section 552b(c) of title 5, United States Code;

(E) a full and verbatim transcript shall be made of any such meeting and shall be transmitted by the chairman of the meeting to the Attorney General and to the Chairman of the Federal Trade Commission;

(F) any voluntary agreement resulting from the meetings shall be transmitted by the chairman of the meetings to the Attorney General, the Chairman of the Federal Trade Commission, and the Congress; and

(G) any transcript referred to in subparagraph (E) and any voluntary agreement referred to in subparagraph (F) shall be available for public inspection and copying, subject to paragraphs (1), (3), and (4) of section 552(b) of title 5, United States Code.

**(f) Commencement of agreements and plans of action; expiration date; extensions**

(1) A voluntary agreement or plan of action may not become effective unless and until—

(A) the individual referred to in subsection (c)(2) who is to administer the agreement or plan approves it and certifies, in writing, that the agreement or plan is necessary to carry out the purposes of subsection (c)(1) and submits a copy of such agreement or plan to the Congress; and

(B) the Attorney General (after consultation with the Chairman of the Federal Trade Commission) finds, in writing, that such purpose may not reasonably be achieved through a voluntary agreement or plan of action having less anticompetitive effects or without any voluntary agreement or plan of action and publishes such finding in the Federal Register.

(2) Each voluntary agreement or plan of action which becomes effective under paragraph (1) shall expire 5 years after the date it becomes effective (and at 5-year intervals thereafter, as the case may be), unless (immediately prior to such expiration date) the individual referred to in subsection (c)(2) who administers the agreement or plan and the Attorney General (after consultation with the Chairman of the Federal Trade Commission) make the certification or finding, as the case may be, described in paragraph (1) with respect to such voluntary agreement or plan of action and publish such certification or finding in the Federal Register, in which case, the voluntary agreement or plan of action may be extended for an additional period of 5 years.

**(g) Monitoring of agreements and plans of action by Attorney General and Chairman of Federal Trade Commission**

The Attorney General and the Chairman of the Federal Trade Commission shall monitor the carrying out of any voluntary agreement or plan of action to assure—

(1) that the agreement or plan is carrying out the purposes of subsection (c)(1);

(2) that the agreement or plan is being carried out under rules promulgated pursuant to subsection (e);

(3) that the participants are acting in accordance with the terms of the agreement or plan; and

(4) the protection and fostering of competition and the prevention of anticompetitive practices and effects.

**(h) Required provisions of rules for implementation of agreements and plans of action**

The rules promulgated under subsection (e) with respect to the carrying out of voluntary agreements and plans of action shall provide—

(1) for the maintenance, by participants in any voluntary agreement or plan of action, of documents, minutes of meetings, transcripts, records, and other data related to the carrying out of any voluntary agreement or plan of action;

(2) that participants in any voluntary agreement or plan of action agree, in writing, to make available to the individual designated by the President in subsection (c)(2) to administer the voluntary agreement or plan of action, the Attorney General and the Chairman of the Federal Trade Commission for inspection and copying at reasonable times and upon reasonable notice any item maintained pursuant to paragraph (1);

(3) that any item made available to the individual designated by the President in subsection (c)(2) to administer the voluntary agreement or plan of action, the Attorney General, or the Chairman of the Federal Trade Commission pursuant to paragraph (2) shall be available from such individual, the Attorney General, or the Chairman of the Federal Trade Commission, as the case may be, for public inspection and copying, subject to paragraph (1), (3), or (4) of section 552(b) of title 5, United States Code;

(4) that the individual designated by the President in subsection (c)(2) to administer the voluntary agreement or plan of action, the Attorney General, and the Chairman of the Federal Trade Commission, or their delegates, may attend meetings to carry out any voluntary agreement or plan of action;

(5) that a Federal employee (other than an individual employed pursuant to section 3109 of title 5 of the United States Code) shall attend meetings to carry out any voluntary agreement or plan of action;

(6) that participants in any voluntary agreement or plan of action provide the individual designated by the President in subsection (c)(2) to administer the voluntary agreement or plan of action, the Attorney General, and the Chairman of the Federal Trade Commission with adequate prior notice of the time, place, and nature of any meeting to be held to carry out the voluntary agreement or plan of action;

(7) for the attendance by interested persons of any meeting held to carry out any voluntary agreement or plan of action, unless the individual designated by the President in subsection (c)(2) to administer the voluntary agreement or plan of action finds that the matter or matters to be discussed at such meeting falls within the purview of matters described in section 552b(c) of title 5, United States Code;

(8) that the individual designated by the President in subsection (c)(2) to administer the voluntary agreement or plan of action has published in the Federal Register prior notification of the time, place, and nature of any meeting held to carry out any voluntary agreement or plan of action, unless he finds that the matter or matters to be discussed at such meeting falls within the purview of matters described in section 552b(c) of title 5, United States Code, in which case, notification of the time, place, and nature of such meeting shall be published in the Federal Register within ten days of the date of such meeting;

(9) that—

(A) the Attorney General (after consultation with the Chairman of the Federal Trade Commission and the individual designated by the President in subsection (c)(2) to administer a voluntary agreement or plan of action), or

(B) the individual designated by the President in subsection (c)(2), to administer a voluntary agreement or plan of action (after consultation with the Attorney General and the Chairman of the Federal Trade Commission),

may terminate or modify, in writing, the voluntary agreement or plan of action at any time, and that effective, immediately upon such termination or modification, any antitrust immunity conferred upon the participants in the voluntary agreement or plan of action by subsection (j) shall not apply to any act or omission occurring after the time of such termination or modification;

(10) that participants in any voluntary agreement or plan of action be reasonably representative of the appropriate industry or segment of such industry; and

(11) that the individual designated by the President in subsection (c)(2) to administer the voluntary agreement or plan of action shall provide prior written notification of the time, place, and nature of any meeting to carry out a voluntary agreement or plan of action to the Attorney General, the Chairman of the Federal Trade Commission and the Congress.

## (i) Rules; promulgation by Attorney General and Chairman of Federal Trade Commission

The Attorney General and the Chairman of the Federal Trade Commission shall each promulgate such rules as each deems necessary or appropriate to carry out his responsibility under this section.

## (j) Defenses

### (1) In general

Subject to paragraph (4), there shall be available as a defense for any person to any civil or criminal action brought under the antitrust laws (or any similar law of any State) with respect to any action taken to develop or carry out any voluntary agreement or plan of action under this section that—

  (A) such action was taken—

    (i) in the course of developing a voluntary agreement initiated by the President or a plan of action adopted under any such agreement; or

    (ii) to carry out a voluntary agreement initiated by the President and approved in accordance with this section or a plan of action adopted under any such agreement, and

  (B) such person—

    (i) complied with the requirements of this section and any regulation prescribed under this section; and

    (ii) acted in accordance with the terms of the voluntary agreement or plan of action.

**(2) Scope of defense**

Except in the case of actions taken to develop a voluntary agreement or plan of action, the defense established in paragraph (1) shall be available only if and to the extent that the person asserting the defense demonstrates that the action specified in, or was within the scope of, an approved voluntary agreement initiated by the President and approved in accordance with this section or a plan of action adopted under any such agreement and approved in accordance with this section. The defense established in paragraph (1) shall not be available unless the President or the President's designee has authorized and actively supervised the voluntary agreement or plan of action.

**(3) Burden of persuasion**

Any person raising the defense established in paragraph (1) shall have the burden of proof to establish the elements of the defense.

**(4) Exception for actions taken to violate the antitrust laws**

The defense established in paragraph (1) shall not be available if the person against whom the defense is asserted shows that the action was taken for the purpose of violating the antitrust laws.

**(k) Surveys and studies by Attorney General and Federal Trade Commission; content; annual report to Congress and President by Attorney General**

The Attorney General and the Federal Trade Commission shall each make surveys for the purpose of determining any factors which may tend to eliminate competition, create or strengthen monopolies, injure small business, or otherwise promote undue concentration of economic power in the course of the administration of this section. Such surveys shall include studies of the voluntary agreements and plans of action authorized by this section. The Attorney General shall (after consultation with the Federal Trade Commission) submit to the Congress and the President at least once every year reports setting forth the results of such studies of voluntary agreements and plans of action.

**(l) Annual report to Congress and President by Presidential designees; contents**

The individual or individuals designated by the President in subsection (c)(2) shall submit to the Congress and the President at least once every year reports describing each voluntary agreement or plan of action in effect and its contribution to achievement of the purpose of subsection (c)(1).

**(m) Jurisdiction to enjoin statutory exemption or suspension and order for production of transcripts, etc.; procedures**

On complaint, the United States District Court for the District of Columbia shall have jurisdiction to enjoin any exemption or suspension pursuant to subsections (d)(2), (e)(3)(D) and (G), and (h)(3), (7), and (8), and to order the production of transcripts, agreements, items, or other records maintained pursuant to this section by the Attorney General, the Federal Trade Commission or any individual designated under subsection (c)(2), where the court determines that such transcripts, agreements, items, or other records have been improperly withheld from the complainant. In such a

case the court shall determine the matter de novo, and may examine the contents of such transcripts, agreements, items, or other records in camera to determine whether such transcripts, agreements, items, or other records or any parts thereof shall be withheld under any of the exemption or suspension provisions referred to in this subsection, and the burden is on the Attorney General, the Federal Trade Commission, or such designated individual, as the case may be, to sustain its action.

**(n) Exemption from Advisory Committee Act provisions**

Notwithstanding any other provision of law, the Federal Advisory Committee Act (5 U.S.C. App.) and any other provision of Federal law relating to advisory committees shall not apply to—

    (1) the consultations referred to in subsection (c)(1); or

    (2) any activity conducted under a voluntary agreement or plan of action approved pursuant to this section that complies with the requirements of this section.

**(o) Preemption of contract law in emergencies**

In any action in any Federal or State court for breach of contract, there shall be available as a defense that the alleged breach of contract was caused predominantly by action taken during an emergency to carry out a voluntary agreement or plan of action authorized and approved in accordance with this section. Such defense shall not release the party asserting it from any obligation under applicable law to mitigate damages to the greatest extent possible.

(Sept. 8, 1950, ch. 932, title VII, §708, 64 Stat. 818; June 30, 1952, ch. 530, title I, §116(c), 66 Stat. 305; Aug. 9, 1955, ch. 655, §6, 69 Stat. 581; Pub. L. 87–305, §5(b), Sept. 26, 1961, 75 Stat. 667; Pub. L. 91–151, title I, §9, Dec. 23, 1969, 83 Stat. 376; Pub. L. 94–152, §3, Dec. 16, 1975, 89 Stat. 810; Pub. L. 102–99, §5, Aug. 17, 1991, 105 Stat. 487; Pub. L. 111–67, §9, Sept. 30, 2009, 123 Stat. 2018.)

REFERENCES IN TEXT

The Federal Advisory Committee Act, referred to in subsecs. (d)(1) and (n), is Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 770, which is set out in the Appendix to Title 5, Government Organization and Employees.

AMENDMENTS

**2009**—Subsec. (c)(1). Pub. L. 111–67, §9(1)(A), substituted "national defense." for "defense of the United States through the development of preparedness programs and the expansion of productive capacity and supply beyond levels needed to meet essential civilian demand in the United States."

Subsec. (c)(3). Pub. L. 111–67, §9(1)(B), added par. (3).

Subsec. (f)(2). Pub. L. 111–67, §9(2), substituted "5 years" for "two years" in two places and substituted "5-year" for "two-year."

Subsec. (n). Pub. L. 111–67, §9(3), added subsec. (n) and struck out former subsec. (n). Prior to amendment, text read as follows: "Notwithstanding any other provision of law, any activity conducted under a voluntary agreement or plan of action approved pursuant to this section, when conducted in compliance with the requirements of this section, any regulation prescribed under this subsection, and the provisions of the voluntary agreement or plan of action, shall be exempt from the Federal Advisory Committee Act and any other Federal law and any Federal regulation relating to advisory committees."

**1991**—Subsec. (a). Pub. L. 102–99, §5(1), struck out "and subsection (j) of section 708A" after "subsection (j) of this section".

Subsec. (b). Pub. L. 102–99, §5(2), added subsec. (b) and struck out former subsec. (b) which read as follows: "As used in this section and section 708A the term 'antitrust laws' means—

    "(1) the act entitled 'An Act to protect trade and commerce against unlawful restraints and monopolies', approved July 2, 1890 (15 U.S.C. 1 et seq.);

    "(2) the act entitled 'An act to supplement existing laws against unlawful restraints and monopolies and for other purposes', approved October 15, 1914 (15 U.S.C. 12 et seq.);

    "(3) the Federal Trade Commission Act (15 U.S.C. 41 et seq.);

    "(4) sections 73 and 74 of the Act entitled 'An Act to reduce taxation, to provide revenue for the Government, and for other purposes', approved August 27, 1894 (15 U.S.C. 8 and 9);

    "(5) the Act of June 19, 1936, chapter 592 (15 U.S.C. 13, 13a, 13b, and 21a); and

    "(6) the Act entitled 'An Act to promote export trade and for other purposes', approved April 10, 1918 (15 U.S.C. 61–65)."

Subsec. (c)(1). Pub. L. 102–99, §5(3), inserted "and plans of action" after "voluntary agreements" and substituted "Upon" for "Except as otherwise provided in section 708A(o), upon".

Subsec. (c)(2). Pub. L. 102–99, §5(4), struck out at end "For the purpose of carrying out the objectives of title I of this Act, the authority granted in paragraph (1) of this subsection shall not be delegated to more than one individual."

Subsec. (d)(1). Pub. L. 102–99, §5(5), inserted "and except as provided in subsection (n)" after "specified in this section" and struck out ", and the meetings of such committees shall be open to the public" after "representatives of the public".

Subsec. (d)(2). Pub. L. 102–99, §5(6), substituted "paragraphs (1), (3), and (4) of section 552(b)" for "section 552(b)(1) and (b)(3)".

Subsec. (e)(1). Pub. L. 102–99, §5(7), substituted "voluntary agreements and plans of action" for "voluntary agreements".

Subsec. (e)(3)(D). Pub. L. 102–99, §5(8), substituted "section 552b(c)" for "subsection (b)(1) or (b)(3) of section 552".

Subsec. (e)(3)(F). Pub. L. 102–99, §5(9), inserted reference to Congress.

Subsec. (e)(3)(G). Pub. L. 102–99, §5(10), substituted "paragraphs (1), (3), and (4) of section 552(b)" for "subsections (b)(1) and (b)(3) of section 552".

Subsec. (f)(1). Pub. L. 102–99, §5(11)(A), inserted "or plan of action" after "voluntary agreement".

Subsec. (f)(1)(A). Pub. L. 102–99, §5(12), inserted "and submits a copy of such agreement or plan to the Congress" after "subsection (c)(1)".

Pub. L. 102–99, §5(11)(B), inserted "or plan" after "the agreement" wherever appearing.

Subsec. (f)(1)(B). Pub. L. 102–99, §5(13), inserted before period "and publishes such finding in the Federal Register".

Pub. L. 102–99, §5(11)(A), inserted "or plan of action" after "voluntary agreement" wherever appearing.

Subsec. (f)(2). Pub. L. 102–99, §5(14), inserted "and publish such certification or finding in the Federal Register" before ", in which case".

Pub. L. 102–99, §5(11), inserted "or plan" after "the agreement", and "or plan of action" after "voluntary agreement" wherever appearing.

Subsec. (g). Pub. L. 102–99, §5(11)(A), inserted "or plan of action" after "voluntary agreement".

Subsec. (g)(1) to (3). Pub. L. 102–99, §5(11)(B), inserted "or plan" after "the agreement".

Subsec. (h). Pub. L. 102–99, §5(15)(A), inserted "and plans of action" after "voluntary agreements".

Subsec. (h)(1), (2). Pub. L. 102–99, §5(15)(B), inserted "or plan of action" after "voluntary agreement" wherever appearing.

Subsec. (h)(3). Pub. L. 102–99, §5(16), substituted "paragraph (1), (3), or (4) of section 552(b)" for "subsections (b)(1) and (b)(3) of section 552".

Pub. L. 102–99, §5(15)(B), inserted "or plan of action" after "voluntary agreement".

Subsec. (h)(4) to (6). Pub. L. 102–99, §5(15)(B), inserted "or plan of action" after "voluntary agreement" wherever appearing.

Subsec. (h)(7), (8). Pub. L. 102–99, §5(15)(B), (17), inserted "or plan of action" after "voluntary agreement" wherever appearing and substituted "section 552b(c)" for "subsection (b)(1) or (b)(3) of section 552".

Subsec. (h)(9), (10). Pub. L. 102–99, §5(15)(B), inserted "or plan of action" after "voluntary agreement" wherever appearing.

Subsec. (h)(11). Pub. L. 102–99, §5(15)(C)–(E), added par. (11).

Subsec. (j). Pub. L. 102–99, §5(18), added subsec. (j) and struck out former subsec. (j) which read as follows: "There shall be available as a defense for any person to any civil or criminal action brought for violation of the antitrust laws (or any similar law of any State) with respect to any act or omission to act to develop or carry out any voluntary agreement under this section that—

    "(1) such act or omission to act was taken in good faith by that person—

        "(A) in the course of developing a voluntary agreement under this section, or

        "(B) to carry out a voluntary agreement under this section; and

    "(2) such person fully complied with this section and the rules promulgated hereunder, and acted in accordance with the terms of the voluntary agreement."

Subsec. (k). Pub. L. 102–99, §5(19), inserted "and plans of action" after "voluntary agreements" wherever appearing.

Subsec. (l). Pub. L. 102–99, §5(20), inserted "or plan of action" after "voluntary agreement".

Subsecs. (n), (o). Pub. L. 102–99, §5(21), added subsecs. (n) and (o).

agreements under section 2061 et seq. of this Appendix.

Subsec. (b). Pub. L. 94–152 substituted definition of "antitrust laws" for provisions exempting under certain conditions acts or omissions to act pursuant to section 2061 et seq. of this Appendix from the antitrust laws or the Federal Trade Commission Act.

Subsec. (c). Pub. L. 94–152 restructured subsec. (c) into pars. (1) and (2), and, as so restructured, inserted provisions of par. (1) authorizing President to consult with leaders of industry, finance, agriculture and labor with a view to developing voluntary agreements to help provide for the defense of the United States whenever he finds conditions exist which pose a threat to the national defense or preparedness programs and transferred existing provisions to par. (2), and, as transferred, substituted provisions which authorized President to delegate authority granted to him in par. (1) of this subsection and under subsec. (d) of this section, for provisions authorizing delegation of authority of subsec. (b) of this section.

Subsec. (d). Pub. L. 94–152 substituted provisions relating to establishment, membership, meetings, transcripts, etc. of advisory committees, for provisions relating to application of this section to acts or omissions to act after withdrawal of any request or finding under this section or withdrawal of approval of Attorney General.

Subsec. (e). Pub. L. 94–152 substituted provisions relating to promulgation of rules for voluntary agreements, procedures for promulgation and required provisions, for provisions relating to monitoring by Attorney General of agreements in force and reports to President and Congress.

Subsecs. (f) to (m). Pub. L. 94–152 added subsecs. (f) to (m).

**1969**—Subsec. (b). Pub. L. 91–151, §9(a), struck out provision under which exemption from prohibitions of antitrust laws and application of Federal Trade Commission Act had been limited to only those voluntary agreements covering military equipment purchased by Defense Department.

Subsec. (f). Pub. L. 91–151, §9(b), struck out subsec. (f) which prohibited approval of voluntary credit control agreements under this section after June 30, 1952.

**1961**—Subsec. (e). Pub. L. 87–305 struck out ", and the reports hereafter required," after "Such surveys" and "within ninety days after the approval of this Act [Sept. 8, 1950], and" after "President" and substituted "studies of voluntary agreements and programs authorized by this section" for "such surveys and including such recommendations as he may deem desirable".

**1955**—Subsec. (b). Act Aug. 9, 1955, §6(1), inserted proviso.

Subsec. (d). Act Aug. 9, 1955, §6(2), exempted subsequent acts or omissions to act upon withdrawal by Attorney General of his approval of voluntary agreement or program.

Subsec. (e). Act Aug. 9, 1955, §6(3), (4), included studies of voluntary agreements and programs in surveys and reports, and required Attorney General to report to Congress at least once every three months.

**1952**—Subsec. (f). Act June 30, 1952, added subsec. (f).

### EFFECTIVE DATE OF 1991 AMENDMENT

Amendment by Pub. L. 102–99 effective Oct. 20, 1990, see section 7 of Pub. L. 102–99, set out as a note under section 2071 of this Appendix.

### EFFECTIVE DATE OF 1975 AMENDMENT

Pub. L. 94–152, §9, Dec. 16, 1975, 89 Stat. 821, as amended by Pub. L. 94–153, Dec. 16, 1975, 89 Stat. 822; Pub. L. 94–220, Feb. 27, 1976, 90 Stat. 195, provided that: "This Act and the amendments made by it [enacting section 2158a of this Appendix, amending sections 2160, 2162, 2166, 2168, and 2169 of this Appendix, and enacting provisions set out as notes under this section and section 2061 of this Appendix] shall take effect at the close of November 30, 1975, except that the amendment made by section 3 [amending this section] shall take effect upon the one hundred and twentieth day beginning after the date of its enactment [Dec. 16, 1975]."

### EFFECTIVE DATE OF 1955 AMENDMENT

Amendment by act Aug. 9, 1955, effective as of the close of July 31, 1955, see section 11 of act Aug. 9, 1955, set out as a note under section 2062 of this Appendix.

### DELEGATION OF FUNCTIONS

Functions conferred upon President under this section necessary to effect changes in composition of, or to take other action respecting voluntary agreements and programs relating to, small business production pools

approved prior to July 91, 1953, delegated to Administrator of Small Business Administration by Ex. Ord. No. 10493, Oct. 14, 1953, 18 F.R. 6583, set out as a note under section 640 of Title 15, Commerce and Trade.

Functions of President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to production, conservation, use, control, distribution, and allocation of energy, delegated to Secretary of Energy, see section 4 of Ex. Ord. No. 11790, June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15.

For delegation of authority of President under subsecs. (c) and (d) of this section, see sections 401 and 402 of Ex. Ord. No. 13603, Mar. 16, 2012, 77 F.R. 16656, set out as a note under section 2153 of this Appendix.

### CONTINUATION IN EFFECT OF EXISTING VOLUNTARY AGREEMENTS

Pub. L. 94–152, §4, Dec. 16, 1975, 89 Stat. 820, provided that:

"(a) Any voluntary agreement—

"(1) entered into under section 708 of the Defense Production Act of 1950 [this section] prior to the effective date of this Act [see Effective Date of 1975 Amendment note below], and

"(2) in effect immediately prior to such date may continue in effect (except as otherwise provided in section 708A(o) of the Defense Production Act of 1950, as amended by this Act) [former section 2158a(o) of this Appendix] and shall be carried out in accordance with such section 708, as amended by this Act, and such section 708A.

"(b) No provision of the Defense Production Act of 1950, as amended by this Act [see Short Title of 1975 Amendment note set out under section 2061 of this Appendix] shall be construed as granting immunity for, nor as limiting or in any way affecting any remedy or penalty which may result from any legal action or proceeding arising from, any acts or practices which occurred (1) prior to the date of enactment of this Act [Dec. 16, 1975], (2) outside the scope and purpose or not in compliance with the terms and conditions of the Defense Production Act of 1950 [see section 2061 of this Appendix], or (3) subsequent to the expiration or repeal of the Defense Production Act of 1950.

"(c) Effective on the date of enactment of this Act [Dec. 16, 1975], the immunity conferred by section 708 or 708A of the Defense Production Act of 1950, as amended by this Act [this section and section 2158a of this Appendix], shall not apply to any action taken or authorized to be taken by or under the Emergency Petroleum Allocation Act of 1973 [section 751 et seq. of Title 15, Commerce and Trade]."

### TERMINATION OF ADVISORY COMMITTEES

Advisory committees in existence on Jan. 5, 1973, to terminate not later than the expiration of the 2-year period following Jan. 5, 1973, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided by law. Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

## §2158a. Repealed. Pub. L. 102–99, §4, Aug. 17, 1991, 105 Stat. 487

Section, act Sept. 8, 1950, ch. 932, title VII, §708A, as added Dec. 16, 1975, Pub. L. 94–152, §3, 89 Stat. 815, related to voluntary agreements and plans of action for international agreements for international allocation of petroleum products and related information systems.

### EFFECTIVE DATE OF REPEAL

Repeal effective Oct. 20, 1990, see section 7 of Pub. L. 102–99, set out as an Effective Date of 1991 Amendment note under section 2071 of this Appendix.

## §2159. Public participation in rulemaking

## (a) Exemption from Administrative Procedure Act

Any regulation issued under this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] shall not be subject to sections 551 through 559 of title 5, United States Code.

**(b) Opportunity for notice and comment**

**(1) In general**

Except as provided in subsection (c), any regulation issued under this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] shall be published in the Federal Register and opportunity for public comment shall be provided for not less than 30 days, consistent with the requirements of section 553(b) of title 5, United States Code.

**(2) Waiver for temporary provisions**

The requirements of paragraph (1) may be waived, if—

(A) the officer authorized to issue the regulation finds that urgent and compelling circumstances make compliance with such requirements impracticable;

(B) the regulation is issued on a temporary basis; and

(C) the publication of such temporary regulation is accompanied by the finding made under subparagraph (A) (and a brief statement of the reasons for such finding) and an opportunity for public comment is provided for not less than 30 days before any regulation becomes final.

**(3) Consideration of public comments**

All comments received during the public comment period specified pursuant to paragraph (1) or (2) shall be considered and the publication of the final regulation shall contain written responses to such comments.

**(c) Public comment on procurement regulations**

Any procurement policy, regulation, procedure, or form (including any amendment or modification of any such policy, regulation, procedure, or form) issued under this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] shall be subject to section 22 of the Office of Federal Procurement Policy Act [now 41 U.S.C. 1707].

(Sept. 8, 1950, ch. 932, title VII, §709, 64 Stat. 819; Pub. L. 102–558, title I, §136(a), Oct. 28, 1992, 106 Stat. 4216.)

REFERENCES IN TEXT

The Administrative Procedure Act, referred to in subsec. (a), was repealed by Pub. L. 89–554, §8(a), Sept. 6, 1966, 80 Stat. 632, and reenacted by the first section thereof principally in subchapter II (§551 et seq.) of chapter 5, and chapter 7 (§701 et seq.), of Title 5, Government Organization and Employees.

Section 22 of the Office of Federal Procurement Policy Act, referred to in subsec. (c), was section 22 of Pub. L. 93–400, which was classified to section 418b of former Title 41, Public Contracts, and was repealed and restated as section 1707 of Title 41, Public Contracts, by Pub. L. 111–350, §§3, 7(b), Jan. 4, 2011, 124 Stat. 3677, 3855.

AMENDMENTS

**1992**—Pub. L. 102–558 amended section generally. Prior to amendment, section read as follows: "The functions exercised under this Act shall be excluded from the operation of the Administrative Procedure Act (60 Stat. 237) except as to the requirements of section 3 thereof. Any rule, regulation, or order, or amendment thereto, issued under authority of this Act shall be accompanied by a statement that in the formulation thereof there has been consultation with industry representatives, including trade association representatives, and that consideration has been given to their recommendations, or that special circumstances have rendered such consultation impracticable or contrary to the interest of the national defense, but no such rule, regulation, or order shall be invalid by reason of any subsequent finding by judicial or other authority that such a statement is inaccurate."

EFFECTIVE DATE OF 1992 AMENDMENT

Pub. L. 102–558, title I, §136(b), Oct. 28, 1992, 106 Stat. 4217, provided that: "Section 709 of the Defense Production Act of 1950 (50 U.S.C. App. 2159), as amended by subsection (a) of this section, shall not apply to any regulation issued in proposed or final form on or before the date of enactment of this Act [Oct. 28, 1992]."

TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

## §2160. Employment of personnel; appointment policies; nucleus executive reserve; use of confidential information by employees; printing and distribution of reports

(a) Repealed. June 28, 1955, ch. 189, §12(c)(1), 69 Stat. 180.

(b)(1) The President is further authorized, to the extent he deems it necessary and appropriate in order to carry out the provisions of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] and subject to such regulations as he may issue, to employ persons of outstanding experience and ability without compensation;

(2) The President shall be guided in the exercise of the authority provided in this subsection by the following policies:

(i) So far as possible, operations under the Act shall be carried on by full-time, salaried employees of the Government, and appointments under this authority shall be to advisory or consultative positions only.

(ii) Appointments to positions other than advisory or consultative may be made under this authority only when the requirements of the position are such that the incumbent must personally possess outstanding experience and ability not obtainable on a full-time, salaried basis.

(3) Appointees under this subsection shall, when policy matters are involved, be limited to advising appropriate full-time salaried Government officials who are responsible for making policy decisions.

(4) Appointments under this subsection shall be supported by written certification by the head of the employing department or agency—

(i) that the appointment is necessary and appropriate in order to carry out the provisions of the Act [sections 2061 to 2170, 2171, and 2172 of this Appendix];

(ii) that the duties of the position to which the appointment is being made require outstanding experience and ability;

(iii) that the appointee has the outstanding experience and ability required by the position; and

(iv) that the department or agency head has been unable to obtain a person with the qualifications necessary for the position on a full-time, salaried basis.

(5) NOTICE AND FINANCIAL DISCLOSURE REQUIREMENTS.—

(A) PUBLIC NOTICE OF APPOINTMENT.—The head of any department or agency who appoints any individual under this subsection shall publish a notice of such appointment in the Federal Register, including the name of the appointee, the employing department or agency, the title of the appointee's position, and the name of the appointee's private employer.

(B) FINANCIAL DISCLOSURE.—Any individual appointed under this subsection who is not required to file a financial disclosure report pursuant to section 101 of the Ethics in Government Act of 1978, shall file a confidential financial disclosure report pursuant to section 107 of that Act with the appointing department or agency.

(6) The Director of the Office of Personnel Management shall carry out a biennial survey of appointments made under this subsection and shall report his or her findings to the President and make such recommendations as he or she may deem proper.

(7) Persons appointed under the authority of this subsection may be allowed reimbursement for travel, subsistence, and other necessary expenses incurred by them in carrying out the functions for which they were appointed in the same manner as persons employed intermittently in the Federal Government are allowed expenses under section 5703 of title 5, United States Code.

(c) The President is authorized, to the extent he deems it necessary and appropriate in order to carry out the provisions of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] to employ experts and consultants or organizations thereof as authorized by section 55a [1] of title 5 of

excess of $50 per diem and while away from their homes or regular places of business they may be allowed transportation and not to exceed $15 per diem in lieu of subsistence and other expenses while so employed.

(d) The President may utilize the services of Federal, State, and local agencies and may utilize and establish such regional, local, or other agencies, and utilize such voluntary and uncompensated services, as may from time to time be needed.

(e) The President is further authorized to provide for the establishment and training of a nucleus executive reserve for employment in executive positions in Government during periods of national defense emergency, as determined by the President. Members of this executive reserve who are not full-time Government employees may be allowed transportation and per diem in lieu of subsistence, in accordance with title 5 of the United States Code (with respect to individuals serving without pay, while away from their homes or regular places of business), for the purpose of participating in the executive reserve training program.

(f) Whoever, being an officer or employee of the United States or any department or agency thereof (including any Member of the Senate or House of Representatives), receives, by virtue of his office or employment, confidential information, and (1) uses such information in speculating directly or indirectly on any commodity exchange, or (2) discloses such information for the purpose of aiding any other person so to speculate, shall be fined not more than $10,000 or imprisoned not more than one year, or both. As used in this section, the term "speculate" shall not include a legitimate hedging transaction, or a purchase or sale which is accompanied by actual delivery of the commodity.

(g) The President, when he deems such action necessary, may make provision for the printing and distribution of reports, in such number and in such manner as he deems appropriate, concerning the actions taken to carry out the objectives of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix].

(Sept. 8, 1950, ch. 932, title VII, §710, 64 Stat. 819; July 31, 1951, ch. 275, title I, §109(f), 65 Stat. 139; June 28, 1955, ch. 189, §12(c)(1), 69 Stat. 180; Aug. 9, 1955, ch. 655, §§7, 8, 69 Stat. 582, 583; Pub. L. 94–152, §5, Dec. 16, 1975, 89 Stat. 820; Pub. L. 102–558, title I, §143, Oct. 28, 1992, 106 Stat. 4217; Pub. L. 111–67, §10, Sept. 30, 2009, 123 Stat. 2019.)

### REFERENCES IN TEXT

Sections 101 and 107 of the Ethics in Governments Act of 1978, referred to in subsec. (b)(5)(B), are sections 101 and 107 of Pub. L. 95–521, which are set out in the Appendix to Title 5, Government Organization and Employees.

Section 55a of title 5, referred to in subsec. (c), which was based on section 15 of act Aug. 2, 1946, ch. 744, 60 Stat. 810, was repealed by Pub. L. 89–554, §8(a), Sept. 6, 1966, 80 Stat. 632, and reenacted by the first section thereof as section 3109 of Title 5.

### AMENDMENTS

**2009**—Subsec. (b)(2)(iii). Pub. L. 111–67, §10(1)(A), struck out cl. (iii), which read as follows: "In the appointment of personnel and in assignment of their duties, the head of the department or agency involved shall take steps to avoid, to as great an extent as possible, any conflict between the governmental duties and the private interests of such personnel."

Subsec. (b)(4), (5). Pub. L. 111–67, §10(1)(B), (C), redesignated pars. (5) and (6) as (4) and (5), respectively, and struck out former par. (4), which exempted persons employed under subsec. (b) from certain provisions restricting activities of and payments to retired military officers and public officials, with specific exceptions.

Subsec. (b)(6). Pub. L. 111–67, §10(1)(D), substituted "The Director of the Office of Personnel Management shall carry out a biennial survey of" for "At least once every three months the Director of the Office of Personnel Management shall survey".

Pub. L. 111–67, §10(1)(C), redesignated par. (7) as (6). Former par. (6) redesignated (5).

Subsec. (b)(7), (8). Pub. L. 111–67, §10(1)(C), redesignated par. (8) as (7). Former par. (7) redesignated (6).

Subsec. (c). Pub. L. 111–67, §10(2), struck out at end "The President is authorized to provide by regulation for the exemption of such persons from the operation of sections 281, 283, 284, 434, and 1914 of title 18 of the United States Code and section 190 of the Revised Statutes (5 U.S.C. 99)."

Subsec. (d). Pub. L. 111–67, §10(3), substituted "needed, and he is authorized to provide by regulation for the exemption of persons whose services are utilized under this subsection from the operation of sections 281, 283, 284, 434, and 1914 of title 18 of the United States Code and section 190 of the Revised Statutes (5 U.S.C. 99)."

Subsec. (e). Pub. L. 111–67, §10(4), substituted "national defense emergency, as determined by the President" for "emergency" and struck out at end "The President is authorized to provide by regulation for the exemption of such persons who are not full-time Government employees from the operation of sections 281, 283, 284, 434, and 1914 of title 18 of the United States Code and section 190 of the Revised Statutes (5 U.S.C. 99)."

**1992**—Subsec. (b)(6). Pub. L. 102–558, §143(a), amended par. (6) generally. Prior to amendment, par. (6) read as follows: "The heads of the departments or agencies making appointments under this subsection shall file with the Division of the Federal Register for publication in the Federal Register a statement including the name of the appointee, the employing department or agency, the title of his position, and the name of his private employer, and the appointee shall file with such Division for publication in the Federal Register a statement listing the names of any corporations of which he is an officer or director or within sixty days preceding his appointment has been an officer or director, or in which he owns, or within sixty days preceding his appointment has owned, any stocks, bonds, or other financial interests, and the names of any partnerships in which he is, or was within sixty days preceding his appointment, a partner, and the names of any other businesses in which he owns, or within such sixty-day period has owned, any similar interest. At the end of each succeeding six-month period, the appointee shall file with such Division for publication in the Federal Register a statement showing any changes in such interests during such period."

Subsec. (b)(7). Pub. L. 102–558, §143(b)(1), substituted "Director of the Office of Personnel Management" for "Chairman of the United States Civil Service Commission" and "his or her findings" for "his findings", struck out "and the Joint Committee on Defense Production" after "to the President", and substituted "he or she may" for "he may".

Subsec. (b)(8). Pub. L. 102–558, §143(b)(2), substituted "reimbursement for travel, subsistence, and other necessary expenses incurred by them in carrying out the functions for which they were appointed in the same manner as persons employed intermittently in the Federal Government are allowed expenses under section 5703 of title 5, United States Code" for "transportation and not to exceed $15 per diem in lieu of subsistence while away from their homes or regular places of business pursuant to such appointment".

**1975**—Subsec. (e). Pub. L. 94–152 substituted provisions authorizing per diem in lieu of subsistence in accordance with provisions of title 5 of the United States Code with respect to individuals serving without pay while away from their homes or regular places of business, for provisions authorizing $15 per diem in lieu of subsistence.

**1955**—Subsec. (a). Act June 28, 1955, repealed subsec. (a) which authorized President to place positions and employ persons temporarily in grades 16, 17, and 18 of the General Schedule established by Classification Act of 1949.

Subsec. (b). Act Aug. 9, 1955, §7, imposed additional restrictions on employment of persons without compensation by establishing guides to be used by President, requiring written certification, publication of statements, and a survey of appointments.

Subsecs. (e) to (g). Act Aug. 9, 1955, §8, added subsec. (e) and redesignated former subsecs. (e) and (f) as (f) and (g), respectively.

**1951**—Subsec. (f). Act July 31, 1951, added subsec. (f).

### EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–558 deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as a note under section 2062 of this Appendix.

### EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 94–152 effective at close of Nov. 30, 1975, see section 9 of Pub. L. 94–152, as amended, set out as a note under section 2158 of this Appendix.

### EFFECTIVE DATE OF 1955 AMENDMENTS

Amendment by act Aug. 9, 1955, effective as of close of July 31, 1955, see section 11 of act Aug. 9, 1955, set out as a note under section 2062 of this Appendix.

Amendment by act June 28, 1955, effective June 28, 1955, see section 13(b) of act June 28, 1955.

### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

## DELEGATION OF FUNCTIONS

Functions of President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to production, conservation, use, control, distribution, and allocation of energy, delegated to Secretary of Energy, see section 4 of Ex. Ord. No. 11790, June 25, 1974, 39 F.R. 23185, set out under section 761 of Title 15, Commerce and Trade.

For delegation of authority of President under subsecs. (b), (c), and (e) of this section, see sections 501(b) and 502 of Ex. Ord. No. 13603, Mar. 16, 2012, 77 F.R. 16656, set out as a note under section 2153 of this Appendix.

## ANNUAL SUBMISSION OF REPORT

Pub. L. 89–348, §2(11), Nov. 8, 1965, 79 Stat. 1313, which modified former subsec. (b)(7) (now (b)(6)) of this section to require annual instead of quarterly submission of the report to the Congress, was rendered obsolete by the amendment by section 10(1)(D) of Pub. L. 111–67. See 2009 Amendment note above.

## EXECUTIVE ORDER NO. 10182

Ex. Ord. No. 10182, Nov. 21, 1950, 15 F.R. 8013, as amended by Ex. Ord. No. 10205, Jan. 16, 1951, 16 F.R. 419, which provided for appointments and exemptions, was revoked by Ex. Ord. No. 10647, Nov. 28, 1955, 20 F.R. 8769, formerly set out below.

## EXECUTIVE ORDER NO. 10647

Ex. Ord. No. 10647, Nov. 28, 1955, 20 F.R. 8769, as amended by Ex. Ord. No. 11355, May 26, 1967, 32 F.R. 7803; Ex. Ord. No. 12107, Dec. 28, 1978, 44 F.R. 1055, which delegated authority to make appointments, was revoked by section 904(a)(4) of Ex. Ord. No. 12919, June 3, 1994, 59 F.R. 29533, set out as a note under section 2153 of this Appendix.

[1] *See References in Text note below.*

# §2161. Authorization of appropriations

There is authorized to be appropriated $133,000,000 for fiscal year 2015 and each fiscal year thereafter for the carrying out of the provisions and purposes of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] by the President and such agencies as he may designate or create.

(Sept. 8, 1950, ch. 932, title VII, §711, 64 Stat. 820; Pub. L. 93–426, §3, Sept. 30, 1974, 88 Stat. 1167; Pub. L. 96–294, title I, §105(a), June 30, 1980, 94 Stat. 632; Pub. L. 98–265, §5, Apr. 17, 1984, 98 Stat. 151; Pub. L. 99–441, §3, Oct. 3, 1986, 100 Stat. 1117; Pub. L. 101–137, §9(b), Nov. 3, 1989, 103 Stat. 826; Pub. L. 102–99, §3, Aug. 17, 1991, 105 Stat. 487; Pub. L. 102–558, title I, §§144, 152, 161, Oct. 28, 1992, 106 Stat. 4218, 4219; Pub. L. 104–64, §3, Dec. 18, 1995, 109 Stat. 689; Pub. L. 105–261, div. A, title X, §1072(b), Oct. 17, 1998, 112 Stat. 2137; Pub. L. 106–65, div. A, title X, §1063(b), Oct. 5, 1999, 113 Stat. 769; Pub. L. 106–363, §2, Oct. 27, 2000, 114 Stat. 1407; Pub. L. 107–47, §3, Oct. 5, 2001, 115 Stat. 260; Pub. L. 108–195, §2(b), Dec. 19, 2003, 117 Stat. 2892; Pub. L. 110–367, §3, Oct. 8, 2008, 122 Stat. 4026; Pub. L. 111–67, §2(b), Sept. 30, 2009, 123 Stat. 2007; Pub. L. 113–172, §5, Sept. 26, 2014, 128 Stat. 1898.)

## AMENDMENTS

**2014**—Pub. L. 113–172 substituted "is authorized to be appropriated $133,000,000 for fiscal year 2015 and each fiscal year thereafter" for "are hereby authorized to be appropriated such sums as may be necessary and appropriate" and struck out at end "Funds made available pursuant to this paragraph for the purposes of this Act may be allocated or transferred for any of the purposes of this Act, with the approval of the Office of Management and Budget, to any agency designated to assist in carrying out this Act. Funds so allocated or transferred shall remain available for such period as may be specified in the Acts making such funds available."

**2009**—Pub. L. 111–67 struck out subsec. (a) designation and heading at beginning of section, substituted "There" for "Except as provided in subsection (b), there" and "by" for "(including sections 302 and 303, but excluding sections 305 and 306) by", and struck out subsec. (b). Text of subsec. (b) read as follows: "There are

authorized to be appropriated for each of fiscal years 1999 through 2009, such sums as may be necessary to carry out title III."

**2008**—Subsec. (b). Pub. L. 110–367 substituted "2009" for "2008".

**2003**—Subsec. (b). Pub. L. 108–195 substituted "2008" for "2003".

**2001**—Subsec. (b). Pub. L. 107–47 substituted "2003" for "2001".

**2000**—Subsec. (b). Pub. L. 106–363 substituted "2001" for "2000".

**1999**—Subsec. (b). Pub. L. 106–65 substituted "fiscal years 1996 through 2000" for "the fiscal years 1996, 1997, 1998, and 1999".

**1998**—Subsec. (b). Pub. L. 105–261 substituted "1998, and 1999" for "and 1998".

**1995**—Subsec. (a). Pub. L. 104–64, §3(1), struck out paragraph designation "(1)" and former par. (1) heading "In general" and in text substituted "Except as provided in subsection (b)," for "Except as provided in subsection (c),".

Subsecs. (b) to (d). Pub. L. 104–64, §3(2), added subsec. (b) and struck out former subsec. (b) which authorized appropriations to carry out provisions of section 2095(k)(2) of this Appendix, former subsec. (c) which authorized appropriations for fiscal year 1991 to carry out provisions of sections 2091 to 2093 of this Appendix, and former subsec. (d) which authorized appropriations for fiscal years 1993, 1994, and 1995 to carry out sections 2091 to 2099a of this Appendix.

**1992**—Subsec. (a). Pub. L. 102–558, §152(2)(A), inserted heading.

Subsec. (a)(1). Pub. L. 102–558, §152(2)(A), (B), inserted par. heading, substituted "Except as provided in subsection (c)," for "Except as provided in paragraph (2) and paragraph (4)", and struck out "and for payment of interest under subsection (b) of this section" after "sections 302 and 303".

Pub. L. 102–558, §144, substituted "Office of Management and Budget" for "Bureau of the Budget".

Subsec. (a)(2). Pub. L. 102–558, §152(2)(C), struck out par. (2) which read as follows:

"(A) There are hereby authorized to be appropriated without fiscal year limitation not to exceed $3,000,000,000 to carry out the provisions of section 305 until the date on which the authority of the President under such section ceases to be effective in accordance with section 305(k)(1). Subject to subparagraphs (B) and (C), all such funds shall remain available until expended.

"(B) Such funds may be expended to carry out section 305 after such date only if such funds were obligated by the President before such date, or are required to be retained as a reserve against a contingent obligation incurred before such date.

"(C) Any sums appropriated pursuant to this paragraph which have not been expended or obligated pursuant to subparagraph (B) as of the date determined under section 305(k)(1) or are not required to be retained as a reserve against a contingent obligation as specified in subparagraph (B), shall be transferred to the Energy Security Reserve and made available to the Secretary of the Treasury for the United States Synthetic Fuels Corporation pursuant to section 195 of the United States Synthetic Fuels Corporation Act of 1980."

Subsec. (a)(3). Pub. L. 102–558, §152(2)(D), redesignated par. (3) as subsec. (b). See below.

Subsec. (a)(4). Pub. L. 102–558, §152(2)(E), redesignated subpar. (A) as subsec. (c) (see below) and struck out subpar. (B) which read as follows: "The aggregate amount of loans, guarantees, purchase agreements, and other actions under sections 301, 302, and 303 during fiscal years 1987, 1988, and 1989 may not exceed $150,000,000."

Subsec. (b). Pub. L. 102–558, §152(1), (2)(D), redesignated par. (3) of subsec. (a) as subsec. (b), inserted heading, struck out "There are" before "hereby", and struck out former subsec. (b) which read as follows: "Interest shall accrue on (1) the cumulative amount of disbursements to carry out the purposes of sections 302 and 303 (except for storage maintenance, and other operating and administrative expenses), plus any unpaid accrued interest, less the cumulative amount of any funds received on transactions entered into pursuant to sections 302 and 303 and any net losses incurred by an agency in carrying out its functions under sections 302 and 303 when the head of the agency determines that such net losses have occurred; and (2) the current market value of the inventory of materials procured under section 303 as of the first day of each fiscal year commencing with the fiscal year beginning July 1, 1975. At the close of each fiscal year there shall be deposited into the Treasury as miscellaneous receipts, from any amounts appropriated under this section, an amount which the Secretary of the Treasury determines necessary to provide for the payment of any interest accrued and unpaid under this subsection. The rate of interest shall be determined by the Secretary of the Treasury, taking into consideration the average market yield during the month preceding each fiscal year on outstanding marketable obligations of the United States with one year remaining to maturity."

Subsec. (c). Pub. L. 102–558, §152(2)(E), redesignated subpar. (A) of par. (4) of subsec. (a) as subsec. (c) and inserted heading.

Subsec. (d). Pub. L. 102–558, §161, added subsec. (d).

**1991**—Subsec. (a)(4). Pub. L. 102–99 amended par. (4) generally. Prior to amendment, par. (4) read as follows:

"(4)(A) There are authorized to be appropriated for fiscal year 1990, not to exceed $50,000,000 to carry out the provisions of section 303.

"(B) The aggregate amount of loans, guarantees, purchase agreements, and other actions under sections 301, 302, and 303 during fiscal year 1990 may not exceed $50,000,000."

**1989**—Subsec. (a)(4). Pub. L. 101–137 amended par. (4) generally. Prior to amendment, par. (4) read as follows:

"(A) There are authorized to be appropriated for fiscal years 1987, 1988, and 1989 not to exceed $150,000,000 to carry out the provisions of section 303, except that not more than $30,000,000 is authorized to be appropriated for fiscal year 1987.

"(B) The aggregate amount of loans, guarantees, purchase agreements, and other actions under sections 301, 302, and 303 during fiscal years 1987, 1988, and 1989 may not exceed $150,000,000."

**1986**—Subsec. (a)(4). Pub. L. 99–441 amended par. (4) generally. Prior to amendment, par. (4) read as follows:

"(A) There are authorized to be appropriated to carry out the provisions of section 303 not to exceed $100,000,000 for fiscal years 1985 and 1986, except that not more than $25,000,000 is authorized to be appropriated for fiscal year 1985.

"(B) The aggregate amount of loans, guarantees, purchase agreements, and other actions under sections 301, 302, and 303 during fiscal years 1985 and 1986 may not exceed $100,000,000."

**1984**—Subsec. (a)(1), (4). Pub. L. 98–265 inserted "and paragraph (4)" after "paragraph (2)" in par. (1) and added par. (4).

**1980**—Subsec. (a). Pub. L. 96–294, §105(a), designated existing provisions as par. (1), inserted exclusions of sections 305 and 306, reference to funds made available pursuant to this paragraph, and exception for par. (2), and added pars. (2) and (3).

**1974**—Pub. L. 93–426 designated existing provisions as subsec. (a), inserted reference to sections 302 and 303 of this Appendix, and added subsec. (b).

### EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–558 deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as a note under section 2062 of this Appendix.

### EFFECTIVE DATE OF 1991 AMENDMENT

Amendment by Pub. L. 102–99 effective Oct. 20, 1990, see section 7 of Pub. L. 102–99, set out as a note under section 2071 of this Appendix.

### EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–294 effective June 30, 1980, see section 107 of Pub. L. 96–294, set out as a note under section 2062 of this Appendix.

### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

### DELEGATION OF FUNCTIONS

Functions of President under act Sept. 8, 1950 [section 2061 et seq. of this Appendix], relating to production, conservation, use, control, distribution, and allocation of energy, delegated to Secretary of Energy, see section 4 of Ex. Ord. No. 11790, June 25, 1974, 39 F.R. 23185, set out as a note under section 761 of Title 15, Commerce and Trade.

## §2162. Repealed. Pub. L. 102–558, title I, §153, Oct. 28, 1992, 106 Stat. 4219

Section, acts Sept. 8, 1950, ch. 932, title VII, §712, 64 Stat. 820; June 30, 1952, ch. 530, title I, §119, 66 Stat. 306; Aug. 9, 1955, ch. 655, §9, 69 Stat. 583; June 29, 1956, ch. 474, §§3, 5, 70 Stat. 408, 409; June 30, 1966, Pub. L. 89–482, §2, 80 Stat. 235; July 1, 1968, Pub. L. 90–370, §2, 82 Stat. 279; Dec. 16, 1975, Pub. L. 94–152, §6, 89 Stat. 820, established a Joint Committee on Defense Production.

### EFFECTIVE DATE OF REPEAL

Repeal deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as an Effective Date of 1992 Amendment note under section 2062 of this Appendix.

## §2163. Territorial application of Act

The provisions of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] shall be applicable to the United States, its Territories and possessions, and the District of Columbia.

(Sept. 8, 1950, ch. 932, title VII, §713, 64 Stat. 821.)

### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

## §2163a. Repealed. Pub. L. 89–554, §8(a), Sept. 6, 1966, 80 Stat. 656

Section, act Sept. 8, 1950, ch. 932, title VII, §714, as added July 31, 1951, ch. 275, title I, §110(a) 65 Stat. 139; amended June 30, 1952, ch. 530, title I, §121(a) 66 Stat. 306; June 30, 1953, ch. 171, §10, 67 Stat. 131, created Small Defense Plants Administration, and related generally to encouragement and aid to small-business concerns with respect to defense production. It terminated at close of July 31, 1953, by terms of section 2166(a) of this Appendix. For provisions relating to aid to small business, see section 631 et seq. of Title 15, Commerce and Trade.

### REVOLVING FUND CONTINUATION

Act July 16, 1953, ch. 204, §1, 67 Stat. 176, provided in part that the revolving fund established under the Small Defense Plants Administration was to remain available through July 31, 1953, for payment of obligations and direct costs under contracts entered into during fiscal year 1953.

## §2164. Separability

If any provision of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] or the application of such provision to any person or circumstances shall be held invalid, the remainder of the Act, and the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

(Sept. 8, 1950, ch. 932, title VII, §715, formerly §714, 64 Stat. 821; renumbered §715, July 31, 1951, ch. 275, title I, §110(b), 65 Stat. 144.)

### TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

## §2165. Repealed. Pub. L. 102–558, title I, §154, Oct. 28, 1992, 106 Stat. 4219

Section, acts Sept. 8, 1950, ch. 932, title VII, §716, formerly §715, 64 Stat. 821; renumbered §716, July 31, 1951, ch. 275, title I, §110(b), 65 Stat. 144, related to persons disqualified from employment and penalties.

### EFFECTIVE DATE OF REPEAL

Repeal deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as an Effective Date of 1992 Amendment note under section 2062 of this Appendix.

## §2166. Termination of Act

(a) Title I [sections 2071 to 2078 of this Appendix] (except section 104 [section 2074 of this Appendix]), title III [sections 2091 to 2094 of this Appendix], and title VII [sections 2151 to 2170, 2171, and 2172 of this Appendix] (except sections 707, 708, and 721 [sections 2157, 2158, and 2170 of this Appendix]) shall terminate on September 30, 2019, except that all authority extended under

title III shall be effective for any fiscal year only to such extent or in such amounts as are provided in advance in appropriations Acts.

(b) Notwithstanding subsection (a), any agency created under a provision of law that is terminated under subsection (a) may continue in existence, for purposes of liquidation, for a period not to exceed 6 months, beginning on the date of termination of the provision authorizing the creation of such agency under subsection (a).

(c) The termination of any section of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix], or of any agency or corporation utilized under this Act, shall not affect the disbursement of funds under, or the carrying out of, any contract, guarantee, commitment or other obligation entered into pursuant to this Act prior to the date of such termination, or the taking of any action necessary to preserve or protect the interests of the United States in any amounts advanced or paid out in carrying on operations under this Act, or the taking of any action (including the making of new guarantees) deemed by a guaranteeing agency to be necessary to accomplish the orderly liquidation, adjustment or settlement of any loans guaranteed under this Act, including actions deemed necessary to avoid undue hardship to borrowers in reconverting to normal civilian production; and all of the authority granted to the President, guaranteeing agencies, and fiscal agents, under section 301 of this Act [section 2091 of this Appendix] shall be applicable to actions taken pursuant to the authority contained in this subsection.

(d) No action for the recovery of any cooperative payment made to a cooperative association by a Market Administrator under an invalid provision of a milk marketing order issued by the Secretary of Agriculture pursuant to the Agricultural Marketing Agreement Act of 1937 [7 U.S.C. 671 et seq.] shall be maintained unless such action is brought by producers specifically named as party plaintiffs to recover their respective share of such payments within ninety days after the date of enactment of the Defense Production Act Amendments of 1952 [June 30, 1952] with respect to any cause of action heretofore accrued and not otherwise barred, or within ninety days after accrual with respect to future payments, and unless each claimant shall allege and prove (1) that he objected at the hearing to the provisions of the order under which such payments were made and (2) that he either refused to accept payments computed with such deduction or accepted them under protest to either the Secretary or the Administrator. The district courts of the United States shall have exclusive original jurisdiction of all such actions regardless of the amount involved. This subsection shall not apply to funds held in escrow pursuant to court order. Notwithstanding any other provision of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix], no termination date shall be applicable to this subsection.

(Sept. 8, 1950, ch. 932, title VII, §717, formerly §716, 64 Stat. 822; June 30, 1951, ch. 198, §1, 65 Stat. 110; renumbered §717, July 31, 1951, ch. 275, title I, §§110(b), 111, 65 Stat. 144; June 30, 1952, ch. 530, title I, §§120, 121(b), 66 Stat. 306; June 30, 1953, ch. 170, §20, 67 Stat. 126; June 30, 1953, ch. 171, §§11, 12, 67 Stat. 131; June 30, 1955, ch. 251, §5, 69 Stat. 225; Aug. 9, 1955, ch. 655, §10, 69 Stat. 583; June 29, 1956, ch. 474, §1, 70 Stat. 408; Pub. L. 85–471, June 28, 1958, 72 Stat. 241; Pub. L. 86–560, §1, June 30, 1960, 74 Stat. 282; Pub. L. 87–505, June 28, 1962, 76 Stat. 112; Pub. L. 88–343, §1, June 30, 1964, 78 Stat. 235; Pub. L. 89–482, §1, June 30, 1966, 80 Stat. 235; Pub. L. 90–370, §1, July 1, 1968, 82 Stat. 279; Pub. L. 91–300, June 30, 1970, 84 Stat. 367; Pub. L. 91–371, Aug. 1, 1970, 84 Stat. 694; Pub. L. 91–379, title I, §101, Aug. 15, 1970, 84 Stat. 796; Pub. L. 92–15, §2, May 18, 1971, 85 Stat. 38; Pub. L. 92–325, §2, June 30, 1972, 86 Stat. 390; Pub. L. 93–323, June 30, 1974, 88 Stat. 280; Pub. L. 93–367, Aug. 7, 1974, 88 Stat. 419; Pub. L. 93–426, §4, Sept. 30, 1974, 88 Stat. 1167; Pub. L. 94–42, §1, June 28, 1975, 89 Stat. 232; Pub. L. 94–100, §1, Oct. 1, 1975, 89 Stat. 483; Pub. L. 94–152, §2, Dec. 16, 1975, 89 Stat. 810; Pub. L. 95–37, §2, June 1, 1977, 91 Stat. 178; Pub. L. 96–77, Sept. 29, 1979, 93 Stat. 588; Pub. L. 96–188, Jan. 28, 1980, 94 Stat. 3; Pub. L. 96–225, Apr. 3, 1980, 94 Stat. 310; Pub. L. 96–250, May 26, 1980, 94 Stat. 371; Pub. L. 96–294, title I, §105(b), June 30, 1980, 94 Stat. 633; Pub. L. 97–47, §1, Sept. 30, 1981, 95 Stat. 954; Pub. L. 97–336, Oct. 15, 1982, 96 Stat. 1630; Pub. L. 98–12, Mar. 29, 1983, 97 Stat. 53; Pub. L. 98–181, title I [title VII, §703], Nov. 30, 1983, 97 Stat. 1267; Pub. L. 98–265, §2, Apr. 17, 1984, 98 Stat. 149; Pub. L. 99–441, §2, Oct. 3, 1986, 100 Stat. 1117; Pub. L. 101–137, §9(a), Nov. 3, 1989, 103 Stat. 826; Pub. L. 101–351, §1, Aug. 9, 1990, 104 Stat. 404; Pub. L. 101–407, §1, Oct. 4, 1990, 104 Stat. 882; Pub. L. 101–411, §1, Oct. 6, 1990, 104 Stat. 893; Pub. L. 102–99, §§2, 8, Aug. 17,

1991, 105 Stat. 487, 490; Pub. L. 102–193, §1, Dec. 6, 1991, 105 Stat. 1593; Pub. L. 102–558, title I, §162, Oct. 28, 1992, 106 Stat. 4219; Pub. L. 104–64, §2, Dec. 18, 1995, 109 Stat. 689; Pub. L. 105–261, div. A, title X, §1072(a), Oct. 17, 1998, 112 Stat. 2137; Pub. L. 106–65, div. A, title X, §1063(a), Oct. 5, 1999, 113 Stat. 769; Pub. L. 106–363, §1, Oct. 27, 2000, 114 Stat. 1407; Pub. L. 107–47, §2, Oct. 5, 2001, 115 Stat. 260; Pub. L. 108–195, §2(a), Dec. 19, 2003, 117 Stat. 2892; Pub. L. 110–367, §2, Oct. 8, 2008, 122 Stat. 4026; Pub. L. 111–67, §2(a)(1), Sept. 30, 2009, 123 Stat. 2006; Pub. L. 113–172, §1, Sept. 26, 2014, 128 Stat. 1896.)

### REFERENCES IN TEXT

The Agricultural Marketing Agreement Act of 1937, referred to in subsec. (d), is act June 3, 1937, ch. 296, 50 Stat. 246, which is classified principally to chapter 26A (§671 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 674 of Title 7 and Tables.

### AMENDMENTS

**2014**—Subsec. (a). Pub. L. 113–172 substituted "2019" for "2014" and struck out"on or after the date of enactment of the Defense Production Act Reauthorization of 2009" before "shall be effective".

**2009**—Subsec. (a). Pub. L. 111–67, §2(a)(1)(A), added subsec. (a) and struck out former subsec. (a) which read as follows: "Title I (except section 104), title III, and title VII (except sections 707, 708, and 721), and all authority conferred thereunder, shall terminate at the close of September 30, 2009: *Provided,* That all authority hereby or hereafter extended under title III of this Act shall be effective for any fiscal year only to such extent or in such amounts as are provided in advance in appropriation Acts. Section 714 of this Act, and all authority conferred thereunder, shall terminate at the close of July 31, 1953. Section 104, and title II, and title VI of this Act, and all authority conferred thereunder, shall terminate at the close of June 30, 1953. Title IV and V of this Act, and all authority conferred thereunder, shall terminate at the close of April 30, 1953."

Subsec. (b). Pub. L. 111–67, §2(a)(1)(A), added subsec. (b) and struck out former subsec. (b) which read as follows: "Notwithstanding the foregoing—

"(1) The Congress by concurrent resolution or the President by proclamation may terminate this Act prior to the termination otherwise provided therefor.

"(2) The Congress may also provide by concurrent resolution that any section of this Act and all authority conferred thereunder shall terminate prior to the termination otherwise provided therefor.

"(3) Any agency created under this Act may be continued in existence for purposes of liquidation for not to exceed six months after the termination of the provision authorizing the creation of such agency."

Subsec. (c). Pub. L. 111–67, §2(a)(1)(B), struck out the second undesignated paragraph in subsec. (c), which read as follows: "Notwithstanding any other provision of this Act, the termination of title VI or any section thereof shall not be construed as affecting any obligation, condition, liability, or restriction arising out of any agreement heretofore entered into pursuant to, or under the authority of, section 602 or section 605 of this Act, or any issuance thereunder, by any person or corporation and the Federal Government or any agency thereof relating to the provision of housing for defense workers or military personnel in an area designated as a critical defense housing area pursuant to law."

**2008**—Subsec. (a). Pub. L. 110–367 substituted "September 30, 2009" for "September 30, 2008".

**2003**—Subsec. (a). Pub. L. 108–195, in first sentence, substituted "sections 707, 708, and 721" for "sections 708 and 721" and "September 30, 2008" for "September 30, 2003".

**2001**—Subsec. (a). Pub. L. 107–47 substituted "September 30, 2003" for "September 30, 2001".

**2000**—Subsec. (a). Pub. L. 106–363 substituted "September 30, 2001" for "September 30, 2000".

**1999**—Subsec. (a). Pub. L. 106–65 substituted "September 30, 2000" for "September 30, 1999".

**1998**—Subsec. (a). Pub. L. 105–261 substituted "September 30, 1999" for "September 30, 1998".

**1995**—Subsec. (a). Pub. L. 104–64, which directed substitution in first sentence of "Title I (except section 104), title III, and title VII (except sections 708 and 721), and all authority conferred thereunder, shall terminate at the close of September 30, 1998" for "Title I (except section 104), title III, and title VII (except sections 708, 714, 719, and 721) of this Act, and all authority conferred thereunder shall terminate at the close of September 30, 1995" was executed by making the substitution for text which included comma after "thereunder", to reflect the probable intent of Congress.

**1992**—Subsec. (a). Pub. L. 102–558 substituted "September 30, 1995" for "March 1, 1992".

**1991**—Subsec. (a). Pub. L. 102–193 substituted "March 1, 1992" for "September 30, 1991".

Pub. L. 102–99 substituted "September 30, 1991" for "October 20, 1990" and "sections 708, 714, 719, and 721" for "sections 708, 714, and 719".

**1990**—Subsec. (a). Pub. L. 101–411 extended termination date from Oct. 5, 1990, to Oct. 20, 1990.

Pub. L. 101–407 extended termination date from Sept. 30, 1990, to Oct. 9, 1990.

Pub. L. 101–351 extended termination date from Aug. 10, 1990, to Sept. 30, 1990.

**1989**—Subsec. (a). Pub. L. 101–137 extended termination date from Sept. 30, 1989, to Aug. 10, 1990.

**1986**—Subsec. (a). Pub. L. 99–441 extended termination date from Sept. 30, 1986, to Sept. 30, 1989.

**1984**—Subsec. (a). Pub. L. 98–265 extended termination date from Mar. 30, 1984, to Sept. 30, 1986.

**1983**—Subsec. (a). Pub. L. 98–181 extended termination date from Sept. 30, 1983, to Mar. 30, 1984.

Pub. L. 98–12 extended termination date from Mar. 31, 1983, to Sept. 30, 1983.

**1982**—Pub. L. 97–336 extended termination date from Sept. 30, 1982, to Mar. 31, 1983.

**1981**—Subsec. (a). Pub. L. 97–47 extended termination date from Sept. 30, 1981, to Sept. 30, 1982.

**1980**—Subsec. (a). Pub. L. 96–294 extended termination date from Aug. 27, 1981, to Sept. 30, 1981.

Pub. L. 96–250 extended termination date from May 27, 1980, to Aug. 27, 1980.

Pub. L. 96–225 extended termination date from Mar. 28, 1980, to May 27, 1980.

Pub. L. 96–188 extended termination date from Jan. 28, 1980, to Mar. 28, 1980.

**1979**—Subsec. (a). Pub. L. 96–77 extended termination date from Sept. 30, 1979, to Jan. 28, 1980.

**1977**—Subsec. (a). Pub. L. 95–37 extended termination date from Sept. 30, 1977, to Sept. 30, 1979.

**1975**—Subsec. (a). Pub. L. 94–152 extended termination date from Nov. 30, 1975, to Sept. 30, 1977, and inserted proviso that all authority now or subsequently extended under Title III of this Act [sections 2091 to 2094 of this Appendix] shall be effective for any fiscal year only to such extent and amounts as are provided for in advance in appropriation Acts.

Pub. L. 94–100 extended termination date from Sept. 30, 1975, to Nov. 30, 1975.

Pub. L. 94–42 extended termination date from June 30, 1975, to Sept. 30, 1975.

**1974**—Subsec. (a). Pub. L. 93–426 extended termination date from June 30, 1974, to June 30, 1975.

Pub. L. 93–367 extended termination date from July 30, 1974, to Sept. 30, 1974.

Pub. L. 93–323 extended termination date from June 30, 1974, to July 30, 1974.

**1972**—Subsec. (a). Pub. L. 92–325 substituted "June 30, 1974" for "June 30, 1972".

**1971**—Subsec. (a). Pub. L. 92–15 inserted parenthetical reference to section "708".

**1970**—Subsec. (a). Pub. L. 91–379 substituted "June 30, 1972" for "August 15, 1970" and "sections 714 and 719" for "section 714".

Pub. L. 91–371 extended termination date from July 30, 1970, to Aug. 15, 1970.

Pub. L. 91–300 extended termination date from June 30, 1970, to July 30, 1970.

**1968**—Subsec. (a). Pub. L. 90–370 extended termination date from June 30, 1968, to June 30, 1970.

**1966**—Subsec. (a). Pub. L. 89–482 extended termination date from June 30, 1966, to June 30, 1968.

**1964**—Subsec. (a). Pub. L. 88–343 extended termination date from June 30, 1964, to June 30, 1966.

**1962**—Subsec. (a). Pub. L. 87–505 extended termination date from June 30, 1962, to June 30, 1964.

**1960**—Subsec. (a). Pub. L. 86–560 extended termination date from June 30, 1960, to June 30, 1962.

**1958**—Subsec. (a). Pub. L. 85–471 extended termination date from June 30, 1958, to June 30, 1960.

**1956**—Subsec. (a). Act June 29, 1956, extended termination date from June 30, 1956, to June 30, 1958.

**1955**—Subsec. (a). Act Aug. 9, 1955, extended termination date from July 31, 1955, to June 30, 1956.

Act June 30, 1955, extended termination date from June 30, 1955, to July 31, 1955.

**1953**—Subsec. (a). Act June 30, 1953, ch. 171, §11, changed termination dates as follows: (1) Title I except section 2074 of this Appendix, from June 30, 1953, to June 30, 1955; (2) Title III, from June 30, 1953, to June 30, 1955; Title VII (except section 2163a of this Appendix), from June 30, 1953 to June 30, 1955.

Subsec. (c). Act June 30, 1953, ch. 171, §12, inserted "or the taking of any action (including the making of new guarantees) deemed by a guaranteeing agency to be necessary to accomplish the orderly liquidation, adjustment or settlement of any loans guaranteed under this Act, including actions deemed necessary to avoid undue hardship to borrowers in reconverting to normal civilian production; and all of the authority granted to the President, guaranteeing agencies, and fiscal agents, under section 301 of this Act shall be applicable to actions taken pursuant to the authority contained in this subsection".

Act June 30, 1953, ch. 170, added second par.

**1952**—Subsec. (a). Act June 30, 1952, §121(b), extended termination dates from Apr. 30, 1952, to Apr. 30, 1953, and from June 30, 1952, to June 30, 1953.

Subsec. (d). Act June 30, 1952, §120, added subsec. (d).

**1951**—Subsec. (a). Acts July 31, 1951, §111, and June 30, 1951. Act July 31, 1951, struck out subsec. (a) relating to termination of certain titles of act Sept. 8, 1950, and substituted present subsec. (a). Act June 30, 1951, extended termination date from June 30, 1951, to July 31, 1951.

Subsec. (b). Act July 31, 1951, redesignated subsec. (c) as (b) and struck out former subsec. (b) which related to termination date of certain titles of act Sept. 8, 1950. Former subsec. (b) was amended by act June

30, 1951, to extend termination date from June 30, 1951, to July 31, 1951.

Case 4:23-cv-01687-KES-SKO   Document 1   Filed 12/05/23   Page 74 of 101

Subsecs. (c), (d). Act July 31, 1951, §111, redesignated subsec. (d) as (c). Former subsec. (c) redesignated (b).

### EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–558 deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as a note under section 2062 of this Appendix.

### EFFECTIVE DATE OF 1991 AMENDMENTS

Pub. L. 102–193, §2, Dec. 6, 1991, 105 Stat. 1593, provided that: "This Act [amending this section] shall take effect on September 30, 1991."

Amendment by Pub. L. 102–99 effective Oct. 20, 1990, see section 7 of Pub. L. 102–99, set out as a note under section 2071 of this Appendix.

### EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–294 effective June 30, 1980, see section 107 of Pub. L. 96–294, set out as a note under section 2062 of this Appendix.

### EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 94–152 effective at close of Nov. 30, 1975, see section 9 of Pub. L. 94–152, as amended, set out as a note under section 2158 of this Appendix.

### EFFECTIVE DATE OF 1955 AMENDMENT

Amendment by act Aug. 9, 1955, effective as of close of July 31, 1955, see section 11 of act Aug. 9, 1955, set out as a note under section 2062 of this Appendix.

## §2167. Repealed. Pub. L. 102–558, title I, §155, Oct. 28, 1992, 106 Stat. 4219

Section, act Sept. 8, 1950, ch. 932, title VII, §718, as added July 1, 1968, Pub. L. 90–370, §3, 82 Stat. 279, authorized a feasibility study of application of uniform cost accounting standards to defense procurement contracts.

### EFFECTIVE DATE OF REPEAL

Repeal deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as an Effective Date of 1992 Amendment note under section 2062 of this Appendix.

## §2168. Repealed. Pub. L. 100–679, §5(b), Nov. 17, 1988, 102 Stat. 4063

Section, act Sept. 8, 1950, ch. 932, title VII, §719, as added Aug. 15, 1970, Pub. L. 91–379, title I, §103, 84 Stat. 796; amended Dec. 16, 1975, Pub. L. 94–152, §7, 89 Stat. 820; Nov. 8, 1985, Pub. L. 99–145, title IX, §934(b), 99 Stat. 700; Nov. 14, 1986, Pub. L. 99–661, div. A, title XIII, §1342(f), 100 Stat. 3991, related to formation, functions, appointment and compensation of staff, etc., of Cost Accounting Standards Board.

## §2169. Repealed. Pub. L. 102–558, title I, §156, Oct. 28, 1992, 106 Stat. 4219

Section, act Sept. 8, 1950, ch. 932, title VII, §720, as added Sept. 30, 1974, Pub. L. 93–426, §5, 88 Stat. 1167; amended Mar. 21, 1975, Pub. L. 94–9, 89 Stat. 15; Aug. 5, 1975, Pub. L. 94–72, 89 Stat. 399; Dec. 16, 1975, Pub. L. 94–152, §8, 89 Stat. 820; established a National Commission on Supplies and Shortages.

### EFFECTIVE DATE OF REPEAL

Repeal deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as an Effective Date of 1992 Amendment note under section 2062 of this Appendix.

## §2170. Authority to review certain mergers, acquisitions, and takeovers

### (a) Definitions

**(1) Committee; chairperson**

The terms "Committee" and "chairperson" mean the Committee on Foreign Investment in the United States and the chairperson thereof, respectively.

**(2) Control**

The term "control" has the meaning given to such term in regulations which the Committee shall prescribe.

**(3) Covered transaction**

The term "covered transaction" means any merger, acquisition, or takeover that is proposed or pending after August 23, 1988, by or with any foreign person which could result in foreign control of any person engaged in interstate commerce in the United States.

**(4) Foreign government-controlled transaction**

The term "foreign government-controlled transaction" means any covered transaction that could result in the control of any person engaged in interstate commerce in the United States by a foreign government or an entity controlled by or acting on behalf of a foreign government.

**(5) Clarification**

The term "national security" shall be construed so as to include those issues relating to "homeland security", including its application to critical infrastructure.

**(6) Critical infrastructure**

The term "critical infrastructure" means, subject to rules issued under this section, systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems or assets would have a debilitating impact on national security.

**(7) Critical technologies**

The term "critical technologies" means critical technology, critical components, or critical technology items essential to national defense, identified pursuant to this section, subject to regulations issued at the direction of the President, in accordance with subsection (h).

**(8) Lead agency**

The term "lead agency" means the agency, or agencies, designated as the lead agency or agencies pursuant to subsection (k)(5) for the review of a transaction.

**(b) National security reviews and investigations**

**(1) National security reviews**

**(A) In general**

Upon receiving written notification under subparagraph (C) of any covered transaction, or pursuant to a unilateral notification initiated under subparagraph (D) with respect to any covered transaction, the President, acting through the Committee—

(i) shall review the covered transaction to determine the effects of the transaction on the national security of the United States; and

(ii) shall consider the factors specified in subsection (f) for such purpose, as appropriate.

**(B) Control by foreign government**

If the Committee determines that the covered transaction is a foreign government-controlled transaction, the Committee shall conduct an investigation of the transaction under paragraph (2).

**(C) Written notice**

**(i) In general**

Any party or parties to any covered transaction may initiate a review of the transaction under this paragraph by submitting a written notice of the transaction to the Chairperson of the Committee.

**(ii) Withdrawal of notice**

No covered transaction for which a notice was submitted under clause (i) may be withdrawn from review, unless a written request for such withdrawal is submitted to the Committee by any party to the transaction and approved by the Committee.

**(iii) Continuing discussions**

A request for withdrawal under clause (ii) shall not be construed to preclude any party to the covered transaction from continuing informal discussions with the Committee or any member thereof regarding possible resubmission for review pursuant to this paragraph.

**(D) Unilateral initiation of review**

Subject to subparagraph (F), the President or the Committee may initiate a review under subparagraph (A) of—

(i) any covered transaction;

(ii) any covered transaction that has previously been reviewed or investigated under this section, if any party to the transaction submitted false or misleading material information to the Committee in connection with the review or investigation or omitted material information, including material documents, from information submitted to the Committee; or

(iii) any covered transaction that has previously been reviewed or investigated under this section, if—

(I) any party to the transaction or the entity resulting from consummation of the transaction intentionally materially breaches a mitigation agreement or condition described in subsection (l)(1)(A);

(II) such breach is certified to the Committee by the lead department or agency monitoring and enforcing such agreement or condition as an intentional material breach; and

(III) the Committee determines that there are no other remedies or enforcement tools available to address such breach.

**(E) Timing**

Any review under this paragraph shall be completed before the end of the 30-day period beginning on the date of the acceptance of written notice under subparagraph (C) by the chairperson, or beginning on the date of the initiation of the review in accordance with subparagraph (D), as applicable.

**(F) Limit on delegation of certain authority**

The authority of the Committee to initiate a review under subparagraph (D) may not be delegated to any person, other than the Deputy Secretary or an appropriate Under Secretary of the department or agency represented on the Committee.

**(2) National security investigations**

**(A) In general**

In each case described in subparagraph (B), the Committee shall immediately conduct an investigation of the effects of a covered transaction on the national security of the United States, and take any necessary actions in connection with the transaction to protect the national security of the United States.

**(B) Applicability**

Subparagraph (A) shall apply in each case in which—

(i) a review of a covered transaction under paragraph (1) results in a determination that—

(I) the transaction threatens to impair the national security of the United States and that threat has not been mitigated during or prior to the review of a covered transaction under paragraph (1);

(II) the transaction is a foreign government-controlled transaction; or

(III) the transaction would result in control of any critical infrastructure of or within the United States by or on behalf of any foreign person, if the Committee determines that the

transaction could impair national security, and that such impairment to national security has not been mitigated by assurances provided or renewed with the approval of the Committee, as described in subsection (l), during the review period under paragraph (1); or

(ii) the lead agency recommends, and the Committee concurs, that an investigation be undertaken.

**(C) Timing**

Any investigation under subparagraph (A) shall be completed before the end of the 45-day period beginning on the date on which the investigation commenced.

**(D) Exception**

**(i) In general**

Notwithstanding subparagraph (B)(i), an investigation of a foreign government-controlled transaction described in subclause (II) of subparagraph (B)(i) or a transaction involving critical infrastructure described in subclause (III) of subparagraph (B)(i) shall not be required under this paragraph, if the Secretary of the Treasury and the head of the lead agency jointly determine, on the basis of the review of the transaction under paragraph (1), that the transaction will not impair the national security of the United States.

**(ii) Nondelegation**

The authority of the Secretary or the head of an agency referred to in clause (i) may not be delegated to any person, other than the Deputy Secretary of the Treasury or the deputy head (or the equivalent thereof) of the lead agency, respectively.

**(E) Guidance on certain transactions with national security implications**

The Chairperson shall, not later than 180 days after the effective date of the Foreign Investment and National Security Act of 2007, publish in the Federal Register guidance on the types of transactions that the Committee has reviewed and that have presented national security considerations, including transactions that may constitute covered transactions that would result in control of critical infrastructure relating to United States national security by a foreign government or an entity controlled by or acting on behalf of a foreign government.

**(3) Certifications to Congress**

**(A) Certified notice at completion of review**

Upon completion of a review under subsection (b) that concludes action under this section, the chairperson and the head of the lead agency shall transmit a certified notice to the members of Congress specified in subparagraph (C)(iii).

**(B) Certified report at completion of investigation**

As soon as is practicable after completion of an investigation under subsection (b) that concludes action under this section, the chairperson and the head of the lead agency shall transmit to the members of Congress specified in subparagraph (C)(iii) a certified written report (consistent with the requirements of subsection (c)) on the results of the investigation, unless the matter under investigation has been sent to the President for decision.

**(C) Certification procedures**

**(i) In general**

Each certified notice and report required under subparagraphs (A) and (B), respectively, shall be submitted to the members of Congress specified in clause (iii), and shall include—

(I) a description of the actions taken by the Committee with respect to the transaction; and

(II) identification of the determinative factors considered under subsection (f).

**(ii) Content of certification**

Each certified notice and report required under subparagraphs (A) and (B), respectively, shall be signed by the chairperson and the head of the lead agency, and shall state that, in the determination of the Committee, there are no unresolved national security concerns with the transaction that is the subject of the notice or report.

### (iii) Members of Congress

Each certified notice and report required under subparagraphs (A) and (B), respectively, shall be transmitted—

(I) to the Majority Leader and the Minority Leader of the Senate;

(II) to the chair and ranking member of the Committee on Banking, Housing, and Urban Affairs of the Senate and of any committee of the Senate having oversight over the lead agency;

(III) to the Speaker and the Minority Leader of the House of Representatives;

(IV) to the chair and ranking member of the Committee on Financial Services of the House of Representatives and of any committee of the House of Representatives having oversight over the lead agency; and

(V) with respect to covered transactions involving critical infrastructure, to the members of the Senate from the State in which the principal place of business of the acquired United States person is located, and the member from the Congressional District in which such principal place of business is located.

### (iv) Signatures; limit on delegation

#### (I) In general

Each certified notice and report required under subparagraphs (A) and (B), respectively, shall be signed by the chairperson and the head of the lead agency, which signature requirement may only be delegated in accordance with subclause (II).

#### (II) Limitation on delegation of certifications

The chairperson and the head of the lead agency may delegate the signature requirement under subclause (I)—

(aa) only to an appropriate employee of the Department of the Treasury (in the case of the Secretary of the Treasury) or to an appropriate employee of the lead agency (in the case of the lead agency) who was appointed by the President, by and with the advice and consent of the Senate, with respect to any notice provided under paragraph (1) following the completion of a review under this section; or

(bb) only to a Deputy Secretary of the Treasury (in the case of the Secretary of the Treasury) or a person serving in the Deputy position or the equivalent thereof at the lead agency (in the case of the lead agency), with respect to any report provided under subparagraph (B) following an investigation under this section.

## (4) Analysis by Director of National Intelligence

### (A) In general

The Director of National Intelligence shall expeditiously carry out a thorough analysis of any threat to the national security of the United States posed by any covered transaction. The Director of National Intelligence shall also seek and incorporate the views of all affected or appropriate intelligence agencies with respect to the transaction.

### (B) Timing

The analysis required under subparagraph (A) shall be provided by the Director of National Intelligence to the Committee not later than 20 days after the date on which notice of the transaction is accepted by the Committee under paragraph (1)(C), but such analysis may be supplemented or amended, as the Director considers necessary or appropriate, or upon a request for additional information by the Committee. The Director may begin the analysis at any time prior to acceptance of the notice, in accordance with otherwise applicable law.

### (C) Interaction with intelligence community

The Director of National Intelligence shall ensure that the intelligence community remains engaged in the collection, analysis, and dissemination to the Committee of any additional relevant information that may become available during the course of any investigation conducted under subsection (b) with respect to a transaction.

### (D) Independent role of Director

The Director of National Intelligence shall be a nonvoting, ex officio member of the Committee, and shall be provided with all notices received by the Committee under paragraph (1)(C) regarding covered transactions, but shall serve no policy role on the Committee, other than to provide analysis under subparagraphs (A) and (C) in connection with a covered transaction.

### (5) Submission of additional information

No provision of this subsection shall be construed as prohibiting any party to a covered transaction from submitting additional information concerning the transaction, including any proposed restructuring of the transaction or any modifications to any agreements in connection with the transaction, while any review or investigation of the transaction is ongoing.

### (6) Notice of results to parties

The Committee shall notify the parties to a covered transaction of the results of a review or investigation under this section, promptly upon completion of all action under this section.

### (7) Regulations

Regulations prescribed under this section shall include standard procedures for—

(A) submitting any notice of a covered transaction to the Committee;

(B) submitting a request to withdraw a covered transaction from review;

(C) resubmitting a notice of a covered transaction that was previously withdrawn from review; and

(D) providing notice of the results of a review or investigation to the parties to the covered transaction, upon completion of all action under this section.

## (c) Confidentiality of information

Any information or documentary material filed with the President or the President's designee pursuant to this section shall be exempt from disclosure under section 552 of title 5, United States Code, and no such information or documentary material may be made public, except as may be relevant to any administrative or judicial action or proceeding. Nothing in this subsection shall be construed to prevent disclosure to either House of Congress or to any duly authorized committee or subcommittee of the Congress.

## (d) Action by the President

### (1) In general

Subject to paragraph (4), the President may take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States.

### (2) Announcement by the President

The President shall announce the decision on whether or not to take action pursuant to paragraph (1) not later than 15 days after the date on which an investigation described in subsection (b) is completed.

### (3) Enforcement

The President may direct the Attorney General of the United States to seek appropriate relief, including divestment relief, in the district courts of the United States, in order to implement and enforce this subsection.

### (4) Findings of the President

The President may exercise the authority conferred by paragraph (1), only if the President finds that—

(A) there is credible evidence that leads the President to believe that the foreign interest exercising control might take action that threatens to impair the national security; and

(B) provisions of law, other than this section and the International Emergency Economic Powers Act [50 U.S.C. 1701 et seq.], do not, in the judgment of the President, provide adequate and appropriate authority for the President to protect the national security in the matter before the President.

**(5) Factors to be considered**

For purposes of determining whether to take action under paragraph (1), the President shall consider, among other factors each of the factors described in subsection (f), as appropriate.

**(e) Actions and findings nonreviewable**

The actions of the President under paragraph (1) of subsection (d) and the findings of the President under paragraph (4) of subsection (d) shall not be subject to judicial review.

**(f) Factors to be considered**

For purposes of this section, the President or the President's designee may, taking into account the requirements of national security, consider—

(1) domestic production needed for projected national defense requirements,

(2) the capability and capacity of domestic industries to meet national defense requirements, including the availability of human resources, products, technology, materials, and other supplies and services,

(3) the control of domestic industries and commercial activity by foreign citizens as it affects the capability and capacity of the United States to meet the requirements of national security,

(4) the potential effects of the proposed or pending transaction on sales of military goods, equipment, or technology to any country—

(A) identified by the Secretary of State—

(i) under section 6(j) of the Export Administration Act of 1979 [section 2405(j) of this Appendix], as a country that supports terrorism;

(ii) under section 6(l) of the Export Administration Act of 1979 [section 2405(l) of this Appendix], as a country of concern regarding missile proliferation; or

(iii) under section 6(m) of the Export Administration Act of 1979 [section 2405(m) of this Appendix], as a country of concern regarding the proliferation of chemical and biological weapons;

(B) identified by the Secretary of Defense as posing a potential regional military threat to the interests of the United States; or

(C) listed under section 309(c) of the Nuclear Non-Proliferation Act of 1978 [42 U.S.C. 2139a(c)] on the "Nuclear Non-Proliferation-Special Country List" (15 C.F.R. Part 778, Supplement No. 4) or any successor list;

(5) the potential effects of the proposed or pending transaction on United States international technological leadership in areas affecting United States national security;

(6) the potential national security-related effects on United States critical infrastructure, including major energy assets;

(7) the potential national security-related effects on United States critical technologies;

(8) whether the covered transaction is a foreign government-controlled transaction, as determined under subsection (b)(1)(B);

(9) as appropriate, and particularly with respect to transactions requiring an investigation under subsection (b)(1)(B), a review of the current assessment of—

(A) the adherence of the subject country to nonproliferation control regimes, including treaties and multilateral supply guidelines, which shall draw on, but not be limited to, the annual report on "Adherence to and Compliance with Arms Control, Nonproliferation and Disarmament Agreements and Commitments" required by section 403 of the Arms Control and Disarmament Act [22 U.S.C. 2593a];

(B) the relationship of such country with the United States, specifically on its record on cooperating in counter-terrorism efforts, which shall draw on, but not be limited to, the report of the President to Congress under section 7120 of the Intelligence Reform and Terrorism Prevention Act of 2004; and

(C) the potential for transshipment or diversion of technologies with military applications, including an analysis of national export control laws and regulations;

(10) the long-term projection of United States requirements for sources of energy and other critical resources and material; and

(11) such other factors as the President or the Committee may determine to be appropriate, generally or in connection with a specific review or investigation.

## (g) Additional information to Congress; confidentiality

### (1) Briefing requirement on request

The Committee shall, upon request from any Member of Congress specified in subsection (b)(3)(C)(iii), promptly provide briefings on a covered transaction for which all action has concluded under this section, or on compliance with a mitigation agreement or condition imposed with respect to such transaction, on a classified basis, if deemed necessary by the sensitivity of the information. Briefings under this paragraph may be provided to the congressional staff of such a Member of Congress having appropriate security clearance.

### (2) Application of confidentiality provisions

#### (A) In general

The disclosure of information under this subsection shall be consistent with the requirements of subsection (c). Members of Congress and staff of either House of Congress or any committee of Congress, shall be subject to the same limitations on disclosure of information as are applicable under subsection (c).

#### (B) Proprietary information

Proprietary information which can be associated with a particular party to a covered transaction shall be furnished in accordance with subparagraph (A) only to a committee of Congress, and only when the committee provides assurances of confidentiality, unless such party otherwise consents in writing to such disclosure.

## (h) Regulations

### (1) In general

The President shall direct, subject to notice and comment, the issuance of regulations to carry out this section.

### (2) Effective date

Regulations issued under this section shall become effective not later than 180 days after the effective date of the Foreign Investment and National Security Act of 2007.

### (3) Content

Regulations issued under this subsection shall—

(A) provide for the imposition of civil penalties for any violation of this section, including any mitigation agreement entered into or conditions imposed pursuant to subsection (l);

(B) to the extent possible—

(i) minimize paperwork burdens; and

(ii) coordinate reporting requirements under this section with reporting requirements under any other provision of Federal law; and

(C) provide for an appropriate role for the Secretary of Labor with respect to mitigation agreements.

## (i) Effect on other law

No provision of this section shall be construed as altering or affecting any other authority, process, regulation, investigation, enforcement measure, or review provided by or established under any other provision of Federal law, including the International Emergency Economic Powers Act [50 U.S.C. 1701 et seq.], or any other authority of the President or the Congress under the Constitution of the United States.

**(j) Technology risk assessments**

In any case in which an assessment of the risk of diversion of defense critical technology is performed by a designee of the President, a copy of such assessment shall be provided to any other designee of the President responsible for reviewing or investigating a merger, acquisition, or takeover under this section.

**(k) Committee on Foreign Investment in the United States**

**(1) Establishment**

The Committee on Foreign Investment in the United States, established pursuant to Executive Order No. 11858, shall be a multi agency committee to carry out this section and such other assignments as the President may designate.

**(2) Membership**

The Committee shall be comprised of the following members or the designee of any such member:

(A) The Secretary of the Treasury.
(B) The Secretary of Homeland Security.
(C) The Secretary of Commerce.
(D) The Secretary of Defense.
(E) The Secretary of State.
(F) The Attorney General of the United States.
(G) The Secretary of Energy.
(H) The Secretary of Labor (nonvoting, ex officio).
(I) The Director of National Intelligence (nonvoting, ex officio).
(J) The heads of any other executive department, agency, or office, as the President determines appropriate, generally or on a case-by-case basis.

**(3) Chairperson**

The Secretary of the Treasury shall serve as the chairperson of the Committee.

**(4) Assistant Secretary for the Department of the Treasury**

There shall be established an additional position of Assistant Secretary of the Treasury, who shall be appointed by the President, by and with the advice and consent of the Senate. The Assistant Secretary appointed under this paragraph shall report directly to the Undersecretary of the Treasury for International Affairs. The duties of the Assistant Secretary shall include duties related to the Committee on Foreign Investment in the United States, as delegated by the Secretary of the Treasury under this section.

**(5) Designation of lead agency**

The Secretary of the Treasury shall designate, as appropriate, a member or members of the Committee to be the lead agency or agencies on behalf of the Committee—

(A) for each covered transaction, and for negotiating any mitigation agreements or other conditions necessary to protect national security; and

(B) for all matters related to the monitoring of the completed transaction, to ensure compliance with such agreements or conditions and with this section.

**(6) Other members**

The chairperson shall consult with the heads of such other Federal departments, agencies, and independent establishments in any review or investigation under subsection (a), as the chairperson determines to be appropriate, on the basis of the facts and circumstances of the covered transaction under review or investigation (or the designee of any such department or agency head).

**(7) Meetings**

The Committee shall meet upon the direction of the President or upon the call of the chairperson, without regard to section 552b of title 5, United States Code (if otherwise applicable).

## (l) Mitigation, tracking, and postconsummation monitoring and enforcement

### (1) Mitigation

#### (A) In general

The Committee or a lead agency may, on behalf of the Committee, negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any threat to the national security of the United States that arises as a result of the covered transaction.

#### (B) Risk-based analysis required

Any agreement entered into or condition imposed under subparagraph (A) shall be based on a risk-based analysis, conducted by the Committee, of the threat to national security of the covered transaction.

### (2) Tracking authority for withdrawn notices

#### (A) In general

If any written notice of a covered transaction that was submitted to the Committee under this section is withdrawn before any review or investigation by the Committee under subsection (b) is completed, the Committee shall establish, as appropriate—

(i) interim protections to address specific concerns with such transaction that have been raised in connection with any such review or investigation pending any resubmission of any written notice under this section with respect to such transaction and further action by the President under this section;

(ii) specific time frames for resubmitting any such written notice; and

(iii) a process for tracking any actions that may be taken by any party to the transaction, in connection with the transaction, before the notice referred to in clause (ii) is resubmitted.

#### (B) Designation of agency

The lead agency, other than any entity of the intelligence community (as defined in the National Security Act of 1947 [50 U.S.C. 3001 et seq.]), shall, on behalf of the Committee, ensure that the requirements of subparagraph (A) with respect to any covered transaction that is subject to such subparagraph are met.

### (3) Negotiation, modification, monitoring, and enforcement

#### (A) Designation of lead agency

The lead agency shall negotiate, modify, monitor, and enforce, on behalf of the Committee, any agreement entered into or condition imposed under paragraph (1) with respect to a covered transaction, based on the expertise with and knowledge of the issues related to such transaction on the part of the designated department or agency. Nothing in this paragraph shall prohibit other departments or agencies in assisting the lead agency in carrying out the purposes of this paragraph.

#### (B) Reporting by designated agency

##### (i) Modification reports

The lead agency in connection with any agreement entered into or condition imposed with respect to a covered transaction shall—

(I) provide periodic reports to the Committee on any material modification to any such agreement or condition imposed with respect to the transaction; and

(II) ensure that any material modification to any such agreement or condition is reported to the Director of National Intelligence, the Attorney General of the United States, and any other Federal department or agency that may have a material interest in such modification.

(ii) Compliance

The Committee shall develop and agree upon methods for evaluating compliance with any agreement entered into or condition imposed with respect to a covered transaction that will allow the Committee to adequately assure compliance, without—

(I) unnecessarily diverting Committee resources from assessing any new covered transaction for which a written notice has been filed pursuant to subsection (b)(1)(C), and if necessary, reaching a mitigation agreement with or imposing a condition on a party to such covered transaction or any covered transaction for which a review has been reopened for any reason; or

(II) placing unnecessary burdens on a party to a covered transaction.

## (m) Annual report to Congress

### (1) In general

The chairperson shall transmit a report to the chairman and ranking member of the committee of jurisdiction in the Senate and the House of Representatives, before July 31 of each year on all of the reviews and investigations of covered transactions completed under subsection (b) during the 12-month period covered by the report.

### (2) Contents of report relating to covered transactions

The annual report under paragraph (1) shall contain the following information, with respect to each covered transaction, for the reporting period:

(A) A list of all notices filed and all reviews or investigations completed during the period, with basic information on each party to the transaction, the nature of the business activities or products of all pertinent persons, along with information about any withdrawal from the process, and any decision or action by the President under this section.

(B) Specific, cumulative, and, as appropriate, trend information on the numbers of filings, investigations, withdrawals, and decisions or actions by the President under this section.

(C) Cumulative and, as appropriate, trend information on the business sectors involved in the filings which have been made, and the countries from which the investments have originated.

(D) Information on whether companies that withdrew notices to the Committee in accordance with subsection (b)(1)(C)(ii) have later refiled such notices, or, alternatively, abandoned the transaction.

(E) The types of security arrangements and conditions the Committee has used to mitigate national security concerns about a transaction, including a discussion of the methods that the Committee and any lead agency are using to determine compliance with such arrangements or conditions.

(F) A detailed discussion of all perceived adverse effects of covered transactions on the national security or critical infrastructure of the United States that the Committee will take into account in its deliberations during the period before delivery of the next report, to the extent possible.

### (3) Contents of report relating to critical technologies

#### (A) In general

In order to assist Congress in its oversight responsibilities with respect to this section, the President and such agencies as the President shall designate shall include in the annual report submitted under paragraph (1)—

(i) an evaluation of whether there is credible evidence of a coordinated strategy by 1 or more countries or companies to acquire United States companies involved in research, development, or production of critical technologies for which the United States is a leading producer; and

(ii) an evaluation of whether there are industrial espionage activities directed or directly assisted by foreign governments against private United States companies aimed at obtaining commercial secrets related to critical technologies.

#### (B) Release of unclassified study

All appropriate portions of the annual report under paragraph (1) may be classified. An unclassified version of the report, as appropriate, consistent with safeguarding national security and privacy, shall be made available to the public.

**(n) Certification of notices and assurances**

Each notice, and any followup information, submitted under this section and regulations prescribed under this section to the President or the Committee by a party to a covered transaction, and any information submitted by any such party in connection with any action for which a report is required pursuant to paragraph (3)(B) of subsection (l), with respect to the implementation of any mitigation agreement or condition described in paragraph (1)(A) of subsection (l), or any material change in circumstances, shall be accompanied by a written statement by the chief executive officer or the designee of the person required to submit such notice or information certifying that, to the best of the knowledge and belief of that person—

    (1) the notice or information submitted fully complies with the requirements of this section or such regulation, agreement, or condition; and

    (2) the notice or information is accurate and complete in all material respects.

(Sept. 8, 1950, ch. 932, title VII, §721, as added Pub. L. 100–418, title V, §5021, Aug. 23, 1988, 102 Stat. 1425; amended Pub. L. 102–484, div. A, title VIII, §837(a)–(c), (e), Oct. 23, 1992, 106 Stat. 2463–2465; Pub. L. 102–558, title I, §163, Oct. 28, 1992, 106 Stat. 4219; Pub. L. 103–359, title VIII, §809(d), Oct. 14, 1994, 108 Stat. 3454; Pub. L. 110–49, §§2–7(b), 8–10, July 26, 2007, 121 Stat. 246, 252–257, 259.)

REFERENCES IN TEXT

For the effective date of the Foreign Investment and National Security Act of 2007, referred to in subsecs. (b)(2)(E) and (h)(2), see section 12 of Pub. L. 110–49, set out as an Effective Date of 2007 Amendment note under section 5315 of Title 5, Government Organization and Employees.

The International Emergency Economic Powers Act, referred to in subsecs. (d)(4)(B) and (i), is title II of Pub. L. 95–223, Dec. 28, 1977, 91 Stat. 1626, which is classified generally to chapter 35 (§1701 et seq.) of Title 50, War and National Defense. For complete classification of this Act to the Code, see Short Title note set out under section 1701 of Title 50 and Tables.

Section 7120 of the Intelligence Reform and Terrorism Prevention Act of 2004, referred to in subsec. (f)(9)(B), is section 7120 of Pub. L. 108–458, title VII, Dec. 17, 2004, 118 Stat. 3803, which is not classified to the Code.

Executive Order 11858, referred to in subsec. (k)(1), is set out as a note under this section.

The National Security Act of 1947, referred to in (l)(2)(B), is act July 26, 1947, ch. 343, 61 Stat. 495, which is classified principally to chapter 44 (§3001 et seq.) of Title 50, War and National Defense. For complete classification of this Act to the Code, see Tables.

AMENDMENTS

**2007**—Subsec. (a). Pub. L. 110–49, §2, added subsec. (a) and struck out former subsec. (a). Prior to amendment, text of subsec. (a) read as follows: "The President or the President's designee may make an investigation to determine the effects on national security of mergers, acquisitions, and takeovers proposed or pending on or after the date of enactment of this section by or with foreign persons which could result in foreign control of persons engaged in interstate commerce in the United States. If it is determined that an investigation should be undertaken, it shall commence no later than 30 days after receipt by the President or the President's designee of written notification of the proposed or pending merger, acquisition, or takeover as prescribed by regulations promulgated pursuant to this section. Such investigation shall be completed no later than 45 days after such determination."

Subsec. (b). Pub. L. 110–49, §2, added subsec. (b) and struck out former subsec. (b). Prior to amendment, text of subsec. (b) read as follows: "The President or the President's designee shall make an investigation, as described in subsection (a), in any instance in which an entity controlled by or acting on behalf of a foreign government seeks to engage in any merger, acquisition, or takeover which could result in control of a person engaged in interstate commerce in the United States that could affect the national security of the United States. Such investigation shall—

    "(1) commence not later than 30 days after receipt by the President or the President's designee of written notification of the proposed or pending merger, acquisition, or takeover, as prescribed by regulations promulgated pursuant to this section; and

"(2) shall be completed not later than 45 days after its commencement."

Subsec. (d). Pub. L. 110–49, §6, added subsec. (d) and struck out former subsec. (d). Prior to amendment, text of subsec. (d) read as follows: "Subject to subsection (d), the President may take such action for such time as the President considers appropriate to suspend or prohibit any acquisition, merger, or takeover, of a person engaged in interstate commerce in the United States proposed or pending on or after the date of enactment of this section by or with foreign persons so that such control will not threaten to impair the national security. The President shall announce the decision to take action pursuant to this subsection not later than 15 days after the investigation described in subsection (a) is completed. The President may direct the Attorney General to seek appropriate relief, including divestment relief, in the district courts of the United States in order to implement and enforce this section."

Subsec. (e). Pub. L. 110–49, §6, added subsec. (e) and struck out former subsec. (e). Prior to amendment, text of subsec. (e) read as follows: "The President may exercise the authority conferred by subsection (c) only if the President finds that—

"(1) there is credible evidence that leads the President to believe that the foreign interest exercising control might take action that threatens to impair the national security, and

"(2) provisions of law, other than this section and the International Emergency Economic Powers Act (50 U.S.C. 1701–1706), do not in the President's judgment provide adequate and appropriate authority for the President to protect the national security in the matter before the President.

"The provisions of subsection (d) of this section shall not be subject to judicial review."

Subsec. (f). Pub. L. 110–49, §4(1), struck out "among other factors" after "consider" in introductory provisions.

Subsec. (f)(4)(B), (C). Pub. L. 110–49, §4(2)(A)–(C), added subpar. (B) and redesignated former subpar. (B) as (C).

Subsec. (f)(6) to (11). Pub. L. 110–49, §4(2)(D)–(4), added pars. (6) to (11).

Subsec. (g). Pub. L. 110–49, §7(a), amended subsec. (g) generally. Prior to amendment, text of subsec. (g) read as follows: "The President shall immediately transmit to the Secretary of the Senate and the Clerk of the House of Representatives a written report of the President's determination of whether or not to take action under subsection (d), including a detailed explanation of the findings made under subsection (e) and the factors considered under subsection (f). Such report shall be consistent with the requirements of subsection (c) of this Act."

Subsec. (h). Pub. L. 110–49, §9, amended subsec. (h) generally. Prior to amendment, text of subsec. (h) read as follows: "The President shall direct the issuance of regulations to carry out this section. Such regulations shall, to the extent possible, minimize paperwork burdens and shall to the extent possible coordinate reporting requirements under this section with reporting requirements under any other provision of Federal law."

Subsec. (i). Pub. L. 110–49, §10, amended subsec. (i) generally. Prior to amendment, text of subsec. (i) read as follows: "Nothing in this section shall be construed to alter or affect any existing power, process, regulation, investigation, enforcement measure, or review provided by any other provision of law."

Subsec. (k). Pub. L. 110–49, §3, added subsec. (k) and struck out former subsec. (k) which defined "critical technologies" and required the President and such agencies as the President shall designate to submit quadrennial reports, which could be classified, to Congress concerning credible evidence of a coordinated strategy by 1 or more countries or companies to acquire U.S. companies involved in critical technologies or foreign industrial espionage activities directed at obtaining commercial secrets related to critical technologies.

Subsec. (l). Pub. L. 110–49, §5, added subsec. (l).

Subsec. (m). Pub. L. 110–49, §7(b), added subsec. (m).

Subsec. (n). Pub. L. 110–49, §8, added subsec. (n).

**1994**—Subsec. (k)(1)(B). Pub. L. 103–359 inserted "or directly assisted" after "directed".

**1992**—Subsecs. (b) to (e). Pub. L. 102–484, §837(a), added subsec. (b) and redesignated former subsecs. (b) to (d) as (c) to (e), respectively. Former subsec. (e) redesignated (f).

Subsec. (f). Pub. L. 102–484, §837(a)(1), (b), redesignated subsec. (e) as (f) and added pars. (4) and (5). Former subsec. (f) redesignated (g).

Subsec. (g). Pub. L. 102–484, §837(c), amended subsec. (g) generally. Prior to amendment, subsec. (g) read as follows: "If the President determines to take action under subsection (c), the President shall immediately transmit to the Secretary of the Senate and the Clerk of the House of Representatives a written report of the action which the President intends to take, including a detailed explanation of the findings made under subsection (d)."

Pub. L. 102–484, §837(a)(1), redesignated subsec. (f) as (g). Former subsec. (g) redesignated (h).

Subsecs. (h), (i). Pub. L. 102–484, §837(a)(1), redesignated subsecs. (g) and (h) as (h) and (i), respectively.

Subsec. (j). Pub. L. 102–484, §837(e), added subsec. (j).
Subsec. (k). Pub. L. 102–558 added subsec. (k).

### EFFECTIVE DATE OF 2007 AMENDMENT

Amendment by Pub. L. 110–49 applicable after the end of the 90-day period beginning on July 26, 2007, see section 12 of Pub. L. 110–49, set out as a note under section 5315 of Title 5, Government Organization and Employees.

### EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–558 deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as a note under section 2062 of this Appendix.

### DELEGATION OF FUNCTIONS

For delegation of functions of President under subsecs. (b)(1)(A), (D), (h), and (m)(3)(A) of this section, see section 4(a), (b) of Ex. Ord. No. 11858, May 7, 1975, 40 F.R. 20263, set out below.

### STUDY AND REPORT ON FOREIGN DIRECT INVESTMENTS IN UNITED STATES

Pub. L. 110–49, §7(c), July 26, 2007, 121 Stat. 258, provided that:

"(1) STUDY REQUIRED.—Before the end of the 120-day period beginning on the date of enactment of this Act [July 26, 2007] and annually thereafter, the Secretary of the Treasury, in consultation with the Secretary of State and the Secretary of Commerce, shall conduct a study on foreign direct investments in the United States, especially investments in critical infrastructure and industries affecting national security, by—

"(A) foreign governments, entities controlled by or acting on behalf of a foreign government, or persons of foreign countries which comply with any boycott of Israel; or

"(B) foreign governments, entities controlled by or acting on behalf of a foreign government, or persons of foreign countries which do not ban organizations designated by the Secretary of State as foreign terrorist organizations.

"(2) REPORT.—Before the end of the 30-day period beginning upon the date of completion of each study under paragraph (1), and thereafter in each annual report under section 721(m) of the Defense Production Act of 1950 [50 U.S.C. App. 2170(m)] (as added by this section), the Secretary of the Treasury shall submit a report to Congress, for transmittal to all appropriate committees of the Senate and the House of Representatives, containing the findings and conclusions of the Secretary with respect to the study described in paragraph (1), together with an analysis of the effects of such investment on the national security of the United States and on any efforts to address those effects."

### EX. ORD. NO. 11858. FOREIGN INVESTMENT IN THE UNITED STATES

Ex. Ord. No. 11858, May 7, 1975, 40 F.R. 20263, as amended by Ex. Ord. No. 12188, Jan. 2, 1980, 45 F.R. 989; Ex. Ord. No. 12661, Dec. 27, 1988, 54 F.R. 779; Ex. Ord. No. 12860, Sept. 3, 1993, 58 F.R. 47201; Ex. Ord. No. 13286, §57, Feb. 28, 2003, 68 F.R. 10629; Ex. Ord. No. 13456, §1, Jan. 23, 2008, 73 F.R. 4677, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 721 of the Defense Production Act of 1950, as amended (50 U.S.C. App. 2170), and section 301 of title 3, United States Code, it is hereby ordered as follows:

SECTION 1. *Policy.* International investment in the United States promotes economic growth, productivity, competitiveness, and job creation. It is the policy of the United States to support unequivocally such investment, consistent with the protection of the national security.

SEC. 2. *Definitions.* (a) The "Act" as used in this order means section 721 of the Defense Production Act of 1950, as amended.

(b) Terms used in this order that are defined in subsection 721(a) of the Act shall have the same meaning in this order as they have in such subsection.

(c) "Risk mitigation measure" as used in this order means any provision of a risk mitigation agreement or a condition to which section 7 of this order refers.

SEC. 3. *Establishment.* (a) There is hereby established the Committee on Foreign Investment in the United States (the "Committee") as provided in the Act.

(b) In addition to the members specified in the Act, the following heads of departments, agencies, or offices shall be members of the Committee:

(i) The United States Trade Representative;

(ii) The Director of the Office of Science and Technology Policy; and

(iii) The heads of any other executive department, agency, or office, as the President or the Secretary of the Treasury determines appropriate, on a case-by-case basis.

(c) The following officials (or their designees) shall observe and, as appropriate, participate in and report to the President on the Committee's activities:

(i) The Director of the Office of Management and Budget;

(ii) The Chairman of the Council of Economic Advisers;

(iii) The Assistant to the President for National Security Affairs;

(iv) The Assistant to the President for Economic Policy; and

(v) The Assistant to the President for Homeland Security and Counterterrorism.

SEC. 4. *Duties of the Secretary of the Treasury.*

(a) The functions of the President under subsections (b)(1)(A) (relating to review and consideration after notification), (b)(1)(D) (relating to unilateral initiation of review and consideration), and (m)(3)(A) (relating to inclusion in annual report and designation) of the Act are assigned to the Secretary of the Treasury.

(b) The Secretary of the Treasury shall perform the function of issuance of regulations under section 721(h) of the Act. The Secretary shall consult the Committee with respect to such regulations prior to any notice and comment and prior to their issuance.

(c) Except as otherwise provided in the Act or this order, the chairperson shall have the authority, exclusive of the heads of departments or agencies, after consultation with the Committee

(i) to act, or authorize others to act, on behalf of the Committee; and

(ii) to communicate on behalf of the Committee with the Congress and the public.

(d) The chairperson shall coordinate the preparation of and transmit the annual report to the Congress provided for in the Act and may assign to any member of the Committee, as the chairperson determines appropriate and consistent with the Act, responsibility for conducting studies and providing analyses necessary for the preparation of the report.

(e) After consultation with the Committee, the chairperson may request that the Director of National Intelligence begin preparing the analysis required by the Act at any time, including prior to acceptance of the notice of a transaction, in accordance with otherwise applicable law. The Director of National Intelligence shall provide the Director's analysis as soon as possible and consistent with section 721(b)(4) of the Act.

SEC. 5. *Lead Agency.* (a) The lead agency or agencies ("lead agency") shall have primary responsibility, on behalf of the Committee, for the specific activity for which the Secretary of the Treasury designates it a lead agency.

(b) In acting on behalf of the Committee, the lead agency shall keep the Committee fully informed of its activities. In addition, the lead agency shall notify the chairperson of any material action that the lead agency proposes to take on behalf of the Committee, sufficiently in advance to allow adequate time for the chairperson to consult the Committee and provide the Committee's direction to the lead agency not to take, or to amend, such action.

SEC. 6. *Reviews and Investigations.*

(a) Any member of the Committee may conduct its own inquiry with respect to the potential national security risk posed by a transaction, but communication with the parties to a transaction shall occur through or in the presence of the lead agency, or the chairperson if no lead agency has been designated.

(b) The Committee shall undertake an investigation of a transaction in any case, in addition to the circumstances described in the Act, in which following a review a member of the Committee advises the chairperson that the member believes that the transaction threatens to impair the national security of the United States and that the threat has not been mitigated.

(c) The Committee shall send a report to the President requesting the President's decision with respect to a review or investigation of a transaction in the following circumstances:

(i) the Committee recommends that the President suspend or prohibit the transaction;

(ii) the Committee is unable to reach a decision on whether to recommend that the President suspend or prohibit the transaction; or

(iii) the Committee requests that the President make a determination with regard to the transaction.

(d) Upon completion of a review or investigation of a transaction, the lead agency shall prepare for the approval of the chairperson the appropriate certified notice or report to the Congress called for under the Act. The chairperson shall transmit such notice or report to the Congress, as appropriate.

SEC. 7. *Risk Mitigation.* (a) The Committee, or any lead agency acting on behalf of the Committee, may seek to mitigate any national security risk posed by a transaction that is not adequately addressed by other provisions of law by entering into a mitigation agreement with the parties to a transaction or by imposing conditions on such parties.

(b) Prior to the Committee or a department or agency proposing risk mitigation measures to the parties to a transaction, the department or agency seeking to propose any such measure shall prepare and provide to the Committee a written statement that: (1) identifies the national security risk posed by the transaction based on factors including the threat (taking into account the Director of National Intelligence's threat analysis), vulnerabilities, and potential consequences; and (2) sets forth the risk mitigation measures the department or agency believes are reasonably necessary to address the risk. If the Committee agrees that mitigation is appropriate and approves the risk mitigation measures, the lead agency shall seek to negotiate such measures with the parties to the transaction.

(c) A risk mitigation measure shall not, except in extraordinary circumstances, require that a party to a transaction recognize, state its intent to comply with, or consent to the exercise of any authorities under existing provisions of law.

(d) The lead agency designated for the purpose of monitoring a risk mitigation measure shall seek to ensure that adequate resources are available for such monitoring. When designating a lead agency for those purposes, the Secretary of the Treasury shall consider the agency's views on the adequacy of its resources for such purposes.

(e)(i) Nothing in this order shall be construed to limit the ability of a department or agency, in the exercise of authorities other than those provided under the Act, to:

(A) conduct inquiries with respect to a transaction;

(B) communicate with the parties to a transaction; or

(C) negotiate, enter into, impose, or enforce contractual provisions with the parties to a transaction.

(ii) A department or agency shall not condition actions or the exercise of authorities to which paragraph (i) of this subsection refers upon the exercise, or forbearance in the exercise, of its authority under the Act or this order, and no authority under the Act shall be available for the enforcement of such actions or authorities.

(f) The Committee may initiate a review of a transaction that has previously been reviewed by the Committee only in the extraordinary circumstances provided in the Act.

SEC. 8. *Additional Assignments to the Committee.* In addition to the functions assigned to the Committee by the Act, the Committee shall review the implementation of the Act and this order and report thereon from time to time to the President, together with such recommendations for policy, administrative, or legislative proposals as the Committee determines appropriate.

SEC. 9. *Duties of the Secretary of Commerce.* The Secretary of Commerce shall:

(a) obtain, consolidate, and analyze information on foreign investment in the United States;

(b) monitor and, where necessary, improve procedures for the collection and dissemination of information on foreign investment in the United States;

(c) prepare for the public, the President or heads of departments or agencies, as appropriate, reports, analyses of trends, and analyses of significant developments in appropriate categories of foreign investment in the United States; and

(d) compile and evaluate data on significant transactions involving foreign investment in the United States.

SEC. 10. *General Provisions.* (a) The heads of departments and agencies shall provide, as appropriate and to the extent permitted by law, such information and assistance as the Committee may request to implement the Act and this order.

(b) Nothing in this order shall be construed to impair or otherwise affect:

(i) authority granted by law to a department or agency or the head thereof;

(ii) functions of the Director of the Office of Management and Budget relating to budget, administrative, or legislative proposals; or

(iii) existing mitigation agreements.

(c) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(d) Officers of the United States with authority or duties under the Act or this order shall ensure that, in carrying out the Act and this order, the actions of departments, agencies, and the Committee are consistent with the President's constitutional authority to: (i) conduct the foreign affairs of the United States; (ii) withhold information the disclosure of which could impair the foreign relations, the national security, the deliberative processes of the Executive, or the performance of the Executive's constitutional duties; (iii) recommend for congressional consideration such measures as the President may judge necessary and expedient; and (iv) supervise the unitary executive branch.

SEC. 11. *Revocation.* Section 801 of Executive Order 12919 of June 3, 1994, is revoked.

INTERIM DIRECTIVE REGARDING DISPOSITION OF CERTAIN MERGERS, ACQUISITIONS, AND TAKEOVERS

Memorandum of the President of the United States, Oct. 26, 1988, 53 F.R. 43999, provided:

Memorandum for the Secretary of the Treasury

By virtue of the authority vested in me by the Constitution and statutes of the United States, including without limitation Section 301 of Title 3 of the United States Code, the Defense Production Act of 1950, as amended (50 U.S.C. App. 2061 *et seq.*), and the Omnibus Trade and Competitiveness Act of 1988 (Pub. L. 100–418, August 23, 1988) (the "Act") [see Tables for classification], it is ordered as follows:

Pending the issuance of an Executive order to implement the Act, the Secretary of the Treasury is hereby designated and empowered to perform the following-described functions of the President: The authority vested in the President by Section 721 of the Defense Production Act of 1950, as amended [this section], relative to mergers, acquisitions, and takeovers proposed or pending on or after the date of enactment of the Act [Aug. 23, 1988] by or with foreign persons which could result in foreign control of persons engaged in interstate commerce in the United States.

The Secretary of the Treasury shall consult with the Committee on Foreign investment in the United States, established pursuant to Executive Order No. 11858 [set out above] and chaired by the representative of the Secretary of the Treasury, to take such actions or make such recommendations as requested by the Secretary of the Treasury.

The delegation provided herein shall terminate, and this interim directive shall be without any further effect, except as may be provided in the Executive order implementing the Act, upon the effective date of such order.

This interim directive shall be published in the Federal Register.

RONALD REAGAN.

# §2170a. Prohibition on purchase of United States defense contractors by entities controlled by foreign governments

## (a) In general

No entity controlled by a foreign government may merge with, acquire, or take over a company engaged in interstate commerce in the United States that—

(1) is performing a Department of Defense contract, or a Department of Energy contract under a national security program, that cannot be performed satisfactorily unless that company is given access to information in a proscribed category of information; or

(2) during the previous fiscal year, was awarded—

(A) Department of Defense prime contracts in an aggregate amount in excess of $500,000,000; or

(B) Department of Energy prime contracts under national security programs in an aggregate amount in excess of $500,000,000.

## (b) Inapplicability to certain cases

The limitation in subsection (a) shall not apply if a merger, acquisition, or takeover is not suspended or prohibited pursuant to section 721 of the Defense Production Act of 1950 (50 U.S.C. App. 2170).

## (c) Definitions

In this section:

(1) The term "entity controlled by a foreign government" includes—

(A) any domestic or foreign organization or corporation that is effectively owned or controlled by a foreign government; and

(B) any individual acting on behalf of a foreign government,

as determined by the President.

(2) The term "proscribed category of information" means a category of information that—

(A) with respect to Department of Defense contracts—

(i) includes special access information;

(ii) is determined by the Secretary of Defense to include information the disclosure of which to an entity controlled by a foreign government is not in the national security interests

of the United States; and

    (iii) is defined in regulations prescribed by the Secretary of Defense for the purposes of this section; and

   (B) with respect to Department of Energy contracts—

    (i) is determined by the Secretary of Energy to include information described in subparagraph (A)(ii); and

    (ii) is defined in regulations prescribed by the Secretary of Energy for the purposes of this section.

(Pub. L. 102–484, div. A, title VIII, §835, Oct. 23, 1992, 106 Stat. 2461.)

CODIFICATION

Section was enacted as part of the National Defense Authorization Act for Fiscal Year 1993, and not as part of the Defense Production Act of 1950 which comprises sections 2061 to 2170, 2171, and 2172 of this Appendix.

## §2170b. Reports on foreign industrial espionage

### (a) In general

#### (1) Submission and contents

In order to assist Congress in its oversight functions with respect to this Act and to improve the awareness of United States industry of foreign industrial espionage and the ability of such industry to protect against such espionage, the President shall submit to Congress a report that describes, as of the time of the report, the following:

   (A) The respective policy functions and operational roles of the agencies of the executive branch of the Federal Government in identifying and countering threats to United States industry of foreign industrial espionage, including the manner in which such functions and roles are coordinated.

   (B) The means by which the Federal Government communicates information on such threats, and on methods to protect against such threats, to United States industry in general and to United States companies known to be targets of foreign industrial espionage.

   (C) The specific measures that are being or could be undertaken in order to improve the activities referred to in subparagraphs (A) and (B), including proposals for any modifications of law necessary to facilitate the undertaking of such activities.

   (D) The threat to United States industry of foreign industrial espionage and any trends in that threat, including—

    (i) the number and identity of the foreign governments conducting foreign industrial espionage;

    (ii) the industrial sectors and types of information and technology targeted by such espionage; and

    (iii) the methods used to conduct such espionage.

#### (2) Date of submission

The President shall submit the report required under this subsection not later than six months after the date of the enactment of this Act [Oct. 14, 1994].

### (b) Repealed. Pub. L. 112–87, title III, §311(c)(1), Jan. 3, 2012, 125 Stat. 1886

### (c) Form of reports

To the maximum extent practicable, the report referred to in subsection (a) shall be submitted in an unclassified form, but may be accompanied by a classified appendix.

### (d) Omitted

### (e) Definition

For the purposes of this section, "foreign industrial espionage" means industrial espionage conducted by a foreign government or by a foreign company with direct assistance of a foreign government against a private United States company and aimed at obtaining commercial secrets.

(Pub. L. 103–359, title VIII, §809, Oct. 14, 1994, 108 Stat. 3454; Pub. L. 107–306, title VIII, §811(b)(5)(A), Nov. 27, 2002, 116 Stat. 2423; Pub. L. 111–259, title III, §347(h), Oct. 7, 2010, 124 Stat. 2699; Pub. L. 112–87, title III, §311(c), Jan. 3, 2012, 125 Stat. 1886.)

### REFERENCES IN TEXT

This Act, referred to in subsec. (a)(1), is Pub. L. 103–359, Oct. 14, 1994, 108 Stat. 3423, known as the Intelligence Authorization Act for Fiscal Year 1995. For complete classification of this Act to the Code, see Tables.

### CODIFICATION

Section is comprised of section 809 of Pub. L. 103–359. Subsec. (d) of section 809 of Pub. L. 103–359 amended section 2170 of this Appendix.

Section was enacted as part of the Counterintelligence and Security Enhancements Act of 1994 and also as part of the Intelligence Authorization Act for Fiscal Year 1995, and not as part of the Defense Production Act of 1950 which comprises sections 2061 to 2170, 2171, and 2172 of this Appendix.

### AMENDMENTS

**2012**—Subsec. (b). Pub. L. 112–87, §311(c)(1), struck out subsec. (b) which related to biennial reports on the threat to United States industry of foreign industrial espionage.

Subsec. (c). Pub. L. 112–87, §311(c)(2), substituted "report referred to in subsection (a)" for "reports referred to in subsections (a) and (b)".

**2010**—Subsec. (b). Pub. L. 111–259 substituted "Biennial report" for "Annual update" in heading, added par. (1), redesignated par. (3) as (2), and struck out former par. (2). Prior to amendment, text of par. (2) read as follows: "Not later than April 14 each year, the President shall submit to the congressional leadership a report updating the information referred to in subsection (a)(1)(D)."

**2002**—Subsec. (b). Pub. L. 107–306 added subsec. (b) and struck out heading and text of former subsec. (b). Text read as follows: "Not later than one year after the date referred to in paragraph (2) of subsection (a), and on the expiration of each year thereafter, the President shall submit to Congress a report updating the information referred to in paragraph (1)(D) of that subsection."

# §2171. Defense Production Act Committee

## (a) Committee established

There is established the Defense Production Act Committee (in this section referred to as the "Committee"), which shall coordinate and plan for on [1] the effective use of the priorities and allocations authorities under this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] by the departments, agencies, and independent establishments of the Federal Government to which the President has delegated authority under this Act.

## (b) Membership

(1) IN GENERAL.—The members of the Committee shall be—

(A) the head of each Federal agency to which the President has delegated authority under this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix]; and

(B) the Chairperson of the Council of Economic Advisors.

(2) The Chairperson of the Committee shall be the head of the agency to which the President has delegated primary responsibility for government-wide coordination of the authorities in this Act.

## (c) Coordination of Committee activities

The Chairperson shall appoint one person to coordinate all of the activities of the Committee, and such person shall—

(1) be a full-time employee of the Federal Government;

(2) report to the Chairperson; and

(3) carry out such activities relating to the Committee as the Chairperson may determine as appropriate.

## (d) Report

The Committee shall issue a report each year by March 31 to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives a report signed by the Chairperson that contains—

(1) a description of the contingency planning by each department, agency, or independent establishment of the Federal Government to which the President has delegated authority under this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix] for events that might require the use of the priorities and allocations authorities;

(2) recommendations for the effective use of the priorities and allocations authorities in this Act in a manner consistent with the statement of policy under section 2(b) [section 2062(b) of this Appendix];

(3) recommendations for legislation actions, as appropriate, to support the effective use of the priorities and allocations authorities in this Act;

(4) recommendations for improving information sharing between departments, agencies, and independent establishments of the Federal Government relating to the use of the priorities and allocations authorities in this Act;

(5) up-to-date copies of the rules described under section 101(d)(1) [section 2071(d)(1) of this Appendix]; and

(6) short attestations signed by each member of the Committee stating their concurrence in the report.

## (e) Federal Advisory Committee Act

The provisions of the Federal Advisory Committee Act (5 U.S.C. App.) shall not apply to the Committee.

(Sept. 8, 1950, ch. 932, title VII, §722, as added Pub. L. 102–558, title I, §135, Oct. 28, 1992, 106 Stat. 4212; amended Pub. L. 109–295, title VI, §612(c), Oct. 4, 2006, 120 Stat. 1410; Pub. L. 111–67, §11, Sept. 30, 2009, 123 Stat. 2019; Pub. L. 113–172, §2, Sept. 26, 2014, 128 Stat. 1896.)

### REFERENCES IN TEXT

The Federal Advisory Committee Act, referred to in subsec. (e), is Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 770, which is set out in the Appendix to Title 5, Government Organization and Employees.

### AMENDMENTS

**2014**—Subsec. (a). Pub. L. 113–172, §2(1), substituted "coordinate and plan for" for "advise the President" and "the priorities and allocations authorities" for "the authority".

Subsec. (b)(2). Pub. L. 113–172, §2(2), amended par. (2) generally. Prior to amendment, text read as follows: "The President shall designate 1 member of the Committee as the Chairperson of the Committee."

Subsec. (c). Pub. L. 113–172, §2(3), amended subsec. (c) generally. Prior to amendment, text read as follows:

"(1) IN GENERAL.—The President shall appoint an Executive Director of the Defense Production Act Committee (in this section referred to as the 'Executive Director'), who shall—

"(A) be responsible to the Chairperson of the Committee; and

"(B) carry out such activities relating to the Committee as the Chairperson may determine.

"(2) APPOINTMENT.—The appointment by the President shall not be subject to the advice and consent of the Senate.

"(3) COMPENSATION.—For pay periods beginning on or after the date on which each Chairperson is appointed, funds for the pay of the Executive Director shall be paid from appropriations to the salaries and expenses account of the department or agency of the Chairperson of the Committee. The Executive Director shall be compensated at a rate of pay equivalent to that of a Deputy Assistant Secretary (or a comparable position) of the Federal agency of the Chairperson of the Committee."

Subsec. (d). Pub. L. 113–172, §2(4)(A), (B), in introductory provisions, substituted "The Committee shall issue a report each year by March 31" for "Not later than the end of the first quarter of each calendar year, the Committee shall submit" and "the Chairperson" for "each member of the Committee".

Subsec. (d)(1). Pub. L. 113–172, §2(4)(C), substituted "a description of the contingency planning by" for "a review of the authority under this Act of" and inserted before semicolon at end "for events that might require the use of the priorities and allocations authorities".

Subsec. (d)(2). Pub. L. 113–172, §2(4)(D), substituted "priorities and allocations authorities in this Act" for "authority described in paragraph (1)".

Subsec. (d)(3). Pub. L. 113–172, §2(4)(E), amended par. (3) generally. Prior to amendment, par. (3) read as follows: "recommendations for legislation, regulations, executive orders, or other action by the Federal Government necessary to improve the use of the authority described in paragraph (1); and".

Subsec. (d)(4). Pub. L. 113–172, §2(4)(F), substituted "the use of the priorities and allocations authorities in this Act;" for "all aspects of the authority described in paragraph (1)."

Subsec. (d)(5), (6). Pub. L. 113–172, §2(4)(G), added pars. (5) and (6).

**2009**—Pub. L. 111–67 amended section generally. Prior to amendment, section related to defense industrial base information system with regard to its establishment, sources of information, strategic plan for developing comprehensive system, capabilities, and required report on subcontractor and supplier base.

#### Effective Date

Section deemed to have become effective Mar. 1, 1992, see section 304 of Pub. L. 102–558, set out as an Effective Date of 1992 Amendment note under section 2062 of this Appendix.

#### Termination Date

Termination of section, see section 2166(a) of this Appendix.

#### Designating the Chairperson of the Defense Production Act Committee

Memorandum of President of the United States, May 19, 2010, 75 F.R. 32087, provided:

Memorandum for the Secretary of Defense [and] the Secretary of Homeland Security

Pursuant to the authority vested in me by section 722(b)(2) of the Defense Production Act of 1950, as amended (section 11 of Public Law 111–67; 50 App. U.S.C. 2171) (the "Act"), I hereby designate the Secretary of Homeland Security and the Secretary of Defense as rotating Chairpersons of the Defense Production Act Committee (the "Committee"). The Chair shall rotate annually on April 1 of each year, with the Secretary of Homeland Security hereby designated to serve as Chairperson of the Committee for the remainder of this first term. The Secretary of Homeland Security and the Secretary of Defense are directed to formalize responsibilities for funding and administratively supporting the Committee through interagency agreement.

Furthermore, the Chairperson shall invite to each meeting of the Committee all Members of the Committee as defined in section 722(b) of the Act, and shall ensure that the reporting requirements of section 722(d) of the Act are fulfilled.

The Secretary of Homeland Security is hereby authorized and directed to publish this memorandum in the Federal Register.

Barack Obama.

---

*[1] So in original. The word "on" probably should not appear.*

# §2172. Annual report on impact of offsets

## (a) Report required

### (1) In general

The President shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives, a detailed annual report on the impact of offsets on the defense preparedness, industrial competitiveness, employment, and trade of the United States.

## (2) Duties of the Secretary of Commerce

The Secretary of Commerce (hereafter in this subsection referred to as the "Secretary") shall—

    (A) prepare the report required by paragraph (1);

(B) consult with the Secretary of Defense, the Secretary of the Treasury, the Secretary of State, and the United States Trade Representative in connection with the preparation of such report; and

(C) function as the President's Executive Agent for carrying out this section.

**(b) Interagency studies and related data**

**(1) Purpose of report**

Each report required under subsection (a) shall identify the cumulative effects of offset agreements on—

(A) the full range of domestic defense productive capability (with special attention paid to the firms serving as lower-tier subcontractors or suppliers); and

(B) the domestic defense technology base as a consequence of the technology transfers associated with such offset agreements.

**(2) Use of data**

Data developed or compiled by any agency while conducting any interagency study or other independent study or analysis shall be made available to the Secretary to facilitate the execution of the Secretary's responsibilities with respect to trade offset and countertrade policy development.

**(c) Notice of offset agreements**

**(1) In general**

If a United States firm enters into a contract for the sale of a weapon system or defense-related item to a foreign country or foreign firm and such contract is subject to an offset agreement exceeding $5,000,000 in value, such firm shall furnish to the official designated in the regulations promulgated pursuant to paragraph (2) information concerning such sale.

**(2) Regulations**

The information to be furnished under paragraph (1) shall be prescribed in regulations promulgated by the Secretary. Such regulations shall provide protection from public disclosure for such information, unless public disclosure is subsequently specifically authorized by the firm furnishing the information.

**(d) Contents of report**

**(1) In general**

Each report under subsection (a) shall include—

(A) a net assessment of the elements of the industrial base and technology base covered by the report;

(B) recommendations for appropriate remedial action under the authority of this Act [sections 2061 to 2170, 2171, and 2172 of this Appendix], or other law or regulations;

(C) a summary of the findings and recommendations of any interagency studies conducted during the reporting period under subsection (b);

(D) a summary of offset arrangements concluded during the reporting period for which information has been furnished pursuant to subsection (c); and

(E) a summary and analysis of any bilateral and multilateral negotiations relating to the use of offsets completed during the reporting period.

**(2) Alternative findings or recommendations**

Each report required under this section shall include any alternative findings or recommendations offered by any departmental Secretary, agency head, or the United States Trade Representative to the Secretary.

**(e) Utilization of annual report in negotiations**

The findings and recommendations of the reports required by subsection (a), and any interagency reports and analyses shall be considered by representatives of the United States during bilateral and multilateral negotiations to minimize the adverse effects of offsets.

## TERMINATION DATE

Termination of section, see section 2166(a) of this Appendix.

## DELEGATION OF FUNCTIONS

For directive to Secretary of Commerce to prepare and submit annual report required by this section, see section 702 of Ex. Ord. No. 13603, Mar. 16, 2012, 77 F.R. 16658, set out as a note under section 2153 of this Appendix.

## REPORT ON IMPACT OF OFFSETS ON DOMESTIC CONTRACTORS AND LOWER TIER SUBCONTRACTORS

Pub. L. 108–195, §7(a), Dec. 19, 2003, 117 Stat. 2894, as amended by Pub. L. 111–67, §12(b)(3), Sept. 30, 2009, 123 Stat. 2022, provided that:

"(1) IN GENERAL.—As part of the annual report required under section 723(a) of the Defense Production Act of 1950 [50 U.S.C. App. 2172(a)], the Secretary of Commerce (in this section referred to as the 'Secretary') shall—

"(A) detail the number of foreign contracts involving domestic contractors that use offsets, industrial participation agreements, or similar arrangements during the preceding 5-year period;

"(B) calculate the aggregate, median, and mean values of the contracts and the offsets, industrial participation agreements, and similar arrangements during the preceding 5-year period; and

"(C) describe the impact of international or foreign sales of United States defense products and related offsets, industrial participation agreements, and similar arrangements on domestic prime contractors and, to the extent practicable, the first 3 tiers of domestic contractors and subcontractors during the preceding 5-year period in terms of domestic employment, including any job losses, on an annual basis.

"(2) USE OF INTERNAL DOCUMENTS.—To the extent that the Department of Commerce is already in possession of relevant data, the Department shall use internal documents or existing departmental records to carry out paragraph (1).

"(3) INFORMATION FROM NON-FEDERAL ENTITIES.—

"(A) EXISTING INFORMATION.—In carrying out paragraph (1), the Secretary shall only require a non-Federal entity to provide information that is available through the existing data collection and reporting systems of that non-Federal entity.

"(B) FORMAT.—The Secretary may require a non-Federal entity to provide information to the Secretary in the same form that is already provided to a foreign government in fulfilling an offset arrangement, industrial participation agreement, or similar arrangement."

[Pub. L. 111–67, §12(b)(3), which directed amendment of section 7(a) of the Defense Production Act Amendments of 2003 (50 U.S.C. App. 2099 note), by striking "section 309(a) of the Defense Production Act of 1950 (50 U.S.C. App. 2099(a))" and inserting "section 723(a) of the Defense Production Act of 1950", was executed to section 7(a) of Pub. L. 108–195, the Defense Production Act Reauthorization of 2003, set out above, to reflect the probable intent of Congress.]

## DEFENSE OFFSETS DISCLOSURE

Pub. L. 106–113, div. B, §1000(a)(7) [div. B, title XII, subtitle D], Nov. 29, 1999, 113 Stat. 1536, 1501A–500, provided that:

"SEC. 1241. SHORT TITLE.

"This subtitle may be cited as the 'Defense Offsets Disclosure Act of 1999'.

"SEC. 1242. FINDINGS AND DECLARATION OF POLICY.

"(a) FINDINGS.—Congress makes the following findings:

"(1) A fair business environment is necessary to advance international trade, economic stability, and development worldwide, is beneficial for American workers and businesses, and is in the United States national interest.

"(2) In some cases, mandated offset requirements can cause economic distortions in international defense trade and undermine fairness and competitiveness, and may cause particular harm to small- and medium-sized businesses.

"(3) The use of offsets may lead to increasing dependence on foreign suppliers for the production of United States weapons systems.

"(4) The offset demands required by some purchasing countries, including some close allies of the United States, equal or exceed the value of the base contract they are intended to offset, mitigating much of the potential economic benefit of the exports.

"(5) Offset demands often unduly distort the prices of defense contracts.

"(6) In some cases, United States contractors are required to provide indirect offsets which can negatively impact nondefense industrial sectors.

"(7) Unilateral efforts by the United States to prohibit offsets may be impractical in the current era of globalization and would severely hinder the competitiveness of the United States defense industry in the global market.

"(8) The development of global standards to manage and restrict demands for offsets would enhance United States efforts to mitigate the negative impact of offsets.

"(b) DECLARATION OF POLICY.—It is the policy of the United States to monitor the use of offsets in international defense trade, to promote fairness in such trade, and to ensure that foreign participation in the production of United States weapons systems does not harm the economy of the United States.

"SEC. 1243. DEFINITIONS.

"In this subtitle:

"(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term 'appropriate congressional committees' means—

"(A) the Committee on Foreign Relations of the Senate; and

"(B) the Committee on International Relations [now Committee on Foreign Affairs] of the House of Representatives.

"(2) G–8.—The term 'G–8' means the group consisting of France, Germany, Japan, the United Kingdom, the United States, Canada, Italy, and Russia established to facilitate economic cooperation among the eight major economic powers.

"(3) OFFSET.—The term 'offset' means the entire range of industrial and commercial benefits provided to foreign governments as an inducement or condition to purchase military goods or services, including benefits such as coproduction, licensed production, subcontracting, technology transfer, in-country procurement, marketing and financial assistance, and joint ventures.

"(4) TRANSATLANTIC ECONOMIC PARTNERSHIP.—The term 'Transatlantic Economic Partnership' means the joint commitment made by the United States and the European Union to reinforce their close relationship through an initiative involving the intensification and extension of multilateral and bilateral cooperation and common actions in the areas of trade and investment.

"(5) WASSENAAR ARRANGEMENT.—The term 'Wassenaar Arrangement' means the multilateral export control regime in which the United States participates that seeks to promote transparency and responsibility with regard to transfers of conventional armaments and sensitive dual-use items.

"(6) WORLD TRADE ORGANIZATION.—The term 'World Trade Organization' means the organization established pursuant to the WTO Agreement.

"(7) WTO AGREEMENT.—The term 'WTO Agreement' means the Agreement Establishing the World Trade Organization entered into on April 15, 1994.

"SEC. 1244. SENSE OF CONGRESS.

"It is the sense of Congress that—

"(1) the executive branch should pursue efforts to address trade fairness by establishing reasonable, business-friendly standards for the use of offsets in international business transactions between the United States and its trading partners and competitors;

"(2) the Secretary of Defense, the Secretary of State, the Secretary of Commerce, and the United States Trade Representative, or their designees, should raise with other industrialized nations at every suitable venue the need for transparency and reasonable standards to govern the role of offsets in international defense trade;

"(3) the United States Government should enter into discussions regarding the establishment of multilateral standards for the use of offsets in international defense trade through the appropriate multilateral fora, including such organizations as the Transatlantic Economic Partnership, the Wassenaar Arrangement, the G–8, and the World Trade Organization; and

"(4) the United States Government, in entering into the discussions described in paragraph (3), should take into account the distortions produced by the provision of other benefits and subsidies, such as export financing, by various countries to support defense trade.

"SEC. 1245. REPORTING OF OFFSET AGREEMENTS.

"SEC. 1246. EXPANDED PROHIBITION ON INCENTIVE PAYMENTS.

"[Amended section 2779a of title 22.]

"SEC. 1247. ESTABLISHMENT OF REVIEW COMMISSION.

"(a) IN GENERAL.—There is established a National Commission on the Use of Offsets in Defense Trade (in this section referred to as the 'Commission') to address all aspects of the use of offsets in international defense trade.

"(b) COMMISSION MEMBERSHIP.—Not later than 120 days after the date of enactment of this Act [Nov. 29, 1999], the President, with the concurrence of the Majority and Minority Leaders of the Senate and the Speaker and Minority Leader of the House of Representatives, shall appoint 11 individuals to serve as members of the Commission. Commission membership shall include—

"(1) representatives from the private sector, including—

"(A) one each from—

"(i) a labor organization,

"(ii) a United States defense manufacturing company dependent on foreign sales,

"(iii) a United States company dependent on foreign sales that is not a defense manufacturer, and

"(iv) a United States company that specializes in international investment, and

"(B) two members from academia with widely recognized expertise in international economics; and

"(2) five members from the executive branch, including a member from—

"(A) the Office of Management and Budget,

"(B) the Department of Commerce,

"(C) the Department of Defense,

"(D) the Department of State, and

"(E) the Department of Labor.

The member designated from the Office of Management and Budget shall serve as Chairperson of the Commission. The President shall ensure that the Commission is nonpartisan and that the full range of perspectives on the subject of offsets in the defense industry is adequately represented.

"(c) DUTIES.—The Commission shall be responsible for reviewing and reporting on—

"(1) the full range of current practices by foreign governments in requiring offsets in purchasing agreements and the extent and nature of offsets offered by United States and foreign defense industry contractors;

"(2) the impact of the use of offsets on defense subcontractors and nondefense industrial sectors affected by indirect offsets; and

"(3) the role of offsets, both direct and indirect, on domestic industry stability, United States trade competitiveness and national security.

"(d) COMMISSION REPORT.—Not later than 12 months after the Commission is established, the Commission shall submit a report to the appropriate congressional committees. In addition to the items described under subsection (c), the report shall include—

"(1) an analysis of—

"(A) the collateral impact of offsets on industry sectors that may be different than those of the contractor providing the offsets, including estimates of contracts and jobs lost as well as an assessment of damage to industrial sectors;

"(B) the role of offsets with respect to competitiveness of the United States defense industry in international trade and the potential damage to the ability of United States contractors to compete if offsets were prohibited or limited; and

"(C) the impact on United States national security, and upon United States nonproliferation objectives, of the use of coproduction, subcontracting, and technology transfer with foreign governments or companies that results from fulfilling offset requirements, with particular emphasis on the question of dependency upon foreign nations for the supply of critical components or technology;

"(2) proposals for unilateral, bilateral, or multilateral measures aimed at reducing any detrimental effects of offsets; and

"(3) an identification of the appropriate executive branch agencies to be responsible for monitoring the use of offsets in international defense trade.

Case 1:23-cv-01687-KES-SKO   Document   Filed 12/05/23   Page 99 of 101

"(e) PERIOD OF APPOINTMENT; VACANCIES.—Members shall be appointed for the life of the Commission. Any vacancy in the Commission shall not affect its powers, but shall be filled in the same manner as the original appointment.

"(f) INITIAL MEETING.—Not later than 30 days after the date on which all members of the Commission have been appointed, the Commission shall hold its first meeting.

"(g) MEETINGS.—The Commission shall meet at the call of the Chairman.

"(h) COMMISSION PERSONNEL MATTERS.—

"(1) COMPENSATION OF MEMBERS.—Each member of the Commission who is not an officer or employee of the Federal Government shall be compensated at a rate equal to the daily equivalent of the annual rate of basic pay prescribed for level IV of the Executive Schedule under section 5315 of title 5, United States Code, for each day (including travel time) during which such member is engaged in the performance of the duties of the Commission. All members of the Commission who are officers or employees of the United States shall serve without compensation in addition to that received for their services as officers or employees of the United States.

"(2) TRAVEL EXPENSES.—The members of the Commission shall be allowed travel expenses, including per diem in lieu of subsistence, at rates authorized for employees of agencies under subchapter I of chapter 57 of title 5, United States Code, while away from their homes or regular places of business in the performance of services for the Commission.

"(3) STAFF.—

"(A) IN GENERAL.—The Chairman of the Commission may, without regard to the civil service laws and regulations, appoint and terminate an executive director and such other additional personnel as may be necessary to enable the Commission to perform its duties. The employment of an executive director shall be subject to confirmation by the Commission.

"(B) COMPENSATION.—The Chairman of the Commission may fix the compensation of the executive director and other personnel without regard to the provisions of chapter 51 and subchapter III of chapter 53 of title 5, United States Code, relating to classification of positions and General Schedule pay rates, except that the rate of pay for the executive director and other personnel may not exceed the rate payable for level V of the Executive Schedule under section 5316 of such title.

"(4) DETAIL OF GOVERNMENT EMPLOYEES.—Any Federal Government employee may be detailed to the Commission without reimbursement, and such detail shall be without interruption or loss of civil service status or privilege.

"(5) PROCUREMENT OF TEMPORARY AND INTERMITTENT SERVICES.—The Chairman of the Commission may procure temporary and intermittent services under section 3109(b) of title 5, United States Code, at rates for individuals which do not exceed the daily equivalent of the annual rate of basic pay prescribed for level V of the Executive Schedule under section 5316 of such title.

"(i) TERMINATION.—The Commission shall terminate 30 days after the transmission of the report from the President as mandated in section 1248(b).

"SEC. 1248. MULTILATERAL STRATEGY TO ADDRESS OFFSETS.

"(a) IN GENERAL.—The President shall initiate a review to determine the feasibility of establishing, and the most effective means of negotiating, a multilateral treaty on standards for the use of offsets in international defense trade, with a goal of limiting all offset transactions that are considered injurious to the economy of the United States.

"(b) REPORT REQUIRED.—Not later than 90 days after the date on which the Commission submits the report required under section 1247(d), the President shall submit to the appropriate congressional committees a report containing the President's determination pursuant to subsection (a), and, if the President determines a multilateral treaty is feasible or desirable, a strategy for United States negotiation of such a treaty. One year after the date the report is submitted under the preceding sentence, and annually thereafter for 5 years, the President shall submit to the appropriate congressional committees a report detailing the progress toward reaching such a treaty.

"(c) REQUIRED INFORMATION.—The report required by subsection (b) shall include—

"(1) a description of the United States efforts to pursue multilateral negotiations on standards for the use of offsets in international defense trade;

"(2) an evaluation of existing multilateral fora as appropriate venues for establishing such negotiations;

"(3) a description on a country-by-country basis of any United States efforts to engage in negotiations to establish bilateral treaties or agreements with respect to the use of offsets in international defense trade; and

(f) an evaluation on a country-by-country basis of any foreign government efforts to address the use of offsets in international defense trade.

"(d) COMPTROLLER GENERAL REVIEW.—The Comptroller General of the United States shall monitor and periodically report to Congress on the progress in reaching a multilateral treaty."

### DECLARATION OF OFFSET POLICY

Pub. L. 102–558, title I, §123, Oct. 28, 1992, 106 Stat. 4206, as amended by Pub. L. 108–195, §7(c), Dec. 19, 2003, 117 Stat. 2895; Pub. L. 111–67, §12(b)(1), Sept. 30, 2009, 123 Stat. 2022, provided that:

"(a) IN GENERAL.—Recognizing that certain offsets for military exports are economically inefficient and market distorting, and mindful of the need to minimize the adverse effects of offsets in military exports while ensuring that the ability of United States firms to compete for military export sales is not undermined, it is the policy of the Congress that—

"(1) no agency of the United States Government shall encourage, enter directly into, or commit United States firms to any offset arrangement in connection with the sale of defense goods or services to foreign governments;

"(2) United States Government funds shall not be used to finance offsets in security assistance transactions, except in accordance with policies and procedures that were in existence on March 1, 1992;

"(3) nothing in this section shall prevent agencies of the United States Government from fulfilling obligations incurred through international agreements entered into before March 1, 1992; and

"(4) the decision whether to engage in offsets, and the responsibility for negotiating and implementing offset arrangements, reside with the companies involved.

"(b) PRESIDENTIAL APPROVAL OF EXCEPTIONS.—It is the policy of the Congress that the President may approve an exception to the policy stated in subsection (a) after receiving the recommendation of the National Security Council.

"(c) NEGOTIATIONS.—

"(1) INTERAGENCY TEAM.—

"(A) IN GENERAL.—It is the policy of Congress that the President shall designate a chairman of an interagency team comprised of the Secretary of Commerce, Secretary of Defense, United States Trade Representative, Secretary of Labor, and Secretary of State to consult with foreign nations on limiting the adverse effects of offsets in defense procurement without damaging the economy or the defense industrial base of the United States or United States defense production or defense preparedness.

"(B) MEETINGS.—The President shall direct the interagency team to meet on a quarterly basis.

"(C) REPORTS.—The President shall direct the interagency team to submit to Congress an annual report, to be included as part of the report required under section 723(a) of the Defense Production Act of 1950 [50 U.S.C. App. 2172(a)], that describes the results of the consultations of the interagency team under subparagraph (A) and the meetings of the interagency team under subparagraph (B).

"(2) RECOMMENDATIONS FOR MODIFICATIONS.—The interagency team shall submit to the President any recommendations for modifications of any existing or proposed memorandum of understanding between officials acting on behalf of the United States and one or more foreign countries (or any instrumentality of a foreign country) relating to—

"(A) research, development, or production of defense equipment; or

"(B) the reciprocal procurement of defense items."

Ex. Ord. No. 13177, Dec. 4, 2000, 65 F.R. 76558, as amended by Ex. Ord. No. 13316, §3(f), Sept. 17, 2003, 68 F.R. 55256, provided:

By the authority vested in the President by the Constitution and the laws of the United States of America, including Public Law 106–113 [see Tables for classification] and the Federal Advisory Committee Act, as amended (5 U.S.C. App.), and in order to implement section 1247 of Public Law 106–113 (113 Stat. 1501A–502) [set out in a note above] and to create a parallel "President's Council on the Use of Offsets in Commercial Trade," it is hereby ordered as follows:

SECTION 1. *Membership.* Pursuant to Public Law 106–113, the "National Commission on the Use of Offsets in Defense Trade" (Commission) comprises 11 members appointed by the President with the concurrence of the Majority and Minority Leaders of the Senate and the Speaker and the Minority Leader of the House of Representatives. The Commission membership includes: (a) representatives from the private sector, including one each from (i) a labor organization, (ii) a United States defense manufacturing company dependent on foreign sales, (iii) a United States company dependent on foreign sales that is not a defense manufacturer, and (iv) a United States company that specializes in international investment; (b) two members from academia with widely recognized expertise in international economics; and (c) five members from the executive branch,

including a member from the: (i) Office of Management and Budget; (ii) Department of Commerce, (iii) Department of Defense, (iv) Department of State, and (v) Department of Labor. The member from the Office of Management and Budget will serve as Chairperson of the Commission and will appoint, and fix the compensation of, the Executive Director of the Commission.

Sec. 2. *Duties*. The Commission will be responsible for reviewing and reporting on: (a) current practices by foreign governments in requiring offsets in purchasing agreements and the extent and nature of offsets offered by United States and foreign defense industry contractors; (b) the impact of the use of offsets on defense subcontractors and nondefense industrial sectors affected by indirect offsets; and (c) the role of offsets, both direct and indirect, on domestic industry stability, United States trade competitiveness, and national security.

Sec. 3. *Commission Report*. Not later than 12 months after the Commission is established, it will report to the appropriate congressional committees. In addition to the items described in section 2 of this order, the report will include: (a) an analysis of (i) the collateral impact of offsets on industry sectors that may be different than those of the contractor paying offsets, including estimates of contracts and jobs lost as well as an assessment of damage to industrial sectors; (ii) the role of offsets with respect to competitiveness of the United States defense industry in international trade and the potential damage to the ability of United States contractors to compete if offsets were prohibited or limited; and (iii) the impact on United States national security, and upon United States nonproliferation objectives, of the use of co-production, subcontracting, and technology transfer with foreign governments or companies, that results from fulfilling offset requirements, with particular emphasis on the question of dependency upon foreign nations for the supply of critical components or technology; (b) proposals for unilateral, bilateral, or multilateral measures aimed at reducing any detrimental effects of offsets; and (c) an identification of the appropriate executive branch agencies to be responsible for monitoring the use of offsets in international defense trade.

Sec. 4. *Administration, Compensation, and Termination*. (a) The Department of Defense will provide administrative support and funding for the Commission and Federal Government employees may be detailed to the Commission without reimbursement.

(b) Members of the Commission who are not officers or employees of the Federal Government will be compensated at a rate of basic pay prescribed for level IV of the Executive Schedule under section 5315 of title 5, United States Code, for each day (including travel time) during which such member is engaged in performance of the duties of the Commission. Members of the Commission who are officers or employees of the Federal Government will serve without compensation in addition to that received for their services as officers or employees of the Federal Government.

(c) Members of the Commission will be allowed travel expenses, including per diem in lieu of subsistence, under subchapter 1 of chapter 57 of title 5, United States Code, while on business in the performance of services for the Commission.

(d) The Commission will terminate 30 days after transmitting the report required in section 1248(b) of Public Law 106–113 (113 Stat. 1501A–505) [set out in a note above].

[Secs. 5 to 8. Revoked effective Sept. 30, 2003, by Ex. Ord. No. 13316, §3(f), Sept. 17, 2003, 68 F.R. 55256.]